# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| MLN US HOLDCO LLC, *et al.*,[1] | § | Case No. 25-90090 (CML) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY
## MOTION FOR ENTRY OF INTERIM
## AND FINAL ORDERS (I) AUTHORIZING
## THE DEBTORS TO (A) CONTINUE TO
## OPERATE THEIR CASH MANAGEMENT SYSTEM,
## (B) HONOR CERTAIN PREPETITION OBLIGATIONS
## RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS
## FORMS AND BOOKS AND RECORDS, AND (D) CONTINUE TO PERFORM
## INTERCOMPANY TRANSACTIONS; AND (II) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 11:00 A.M. (PREVAILING CENTRAL TIME) ON MARCH 11, 2025.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON MARCH 11, 2025 AT 11:00 A.M. (PREVAILING CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JudgeLopez." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Mitel. The Debtors' service address for purposes of these chapter 11 cases is: 2160 W Broadway Road, Suite 103, Mesa, Arizona 85202.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

### Relief Requested

1.      The Debtors seek entry of interim (the "Interim Order") and final orders (the "Final Order" and, together with the Interim Order, the "Proposed Orders"), substantially in the forms attached hereto:  (a) authorizing the Debtors to (i) continue to operate their cash management system, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Business Forms (as defined herein) and books and records in the ordinary course of business, and (iv) continue to perform Intercompany Transactions (as defined herein) consistent with past practices; and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 30 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue of these chapter 11 cases and this motion is proper pursuant to 28 U.S.C. § 1408.

4.      The bases for the relief requested herein are sections 105, 345, 363, 503(b), and 1107(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, Rules 1075-1 and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas.

### Background

5.      On March 9 and March 10, 2025 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

6.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no statutory committees have been appointed or designated.

7.      The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith.

8.      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Janine Yetter in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.[2]

### The Cash Management System

9.      In the ordinary course of business, the Debtors and their non-Debtor affiliates (collectively, the "Company") operate a sophisticated cash management system

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

(the "Cash Management System") that facilitates the timely and efficient collection, management, and disbursement of funds to support operations.  All collections, transfers, and disbursements of the Company are carefully managed and maintained by the Company's treasury and accounting personnel and tracked and reported as they are made.  Additionally, the Company's accounting department regularly reconciles the Company's books and records to ensure that all transfers are properly recorded.

10.     The Cash Management System enables the Company to efficiently (a) fund its operations and pay its financial obligations, (b) monitor and forecast its cash needs, (c) track the collection and disbursement of funds, and (d) maintain control over the administration of the Company's bank accounts.  Maintaining the Cash Management System will facilitate the Debtors' reorganization efforts by avoiding costly delays and distractions that would accompany any disruption in the Cash Management System.  Any such disruption could, among other things, delay or prevent the Debtors from making ordinary course payments, delay delivery of supplies necessary to operate the business, and interfere with the Debtors' ability to implement a successful reorganization.

11.     The Cash Management System is similar to the cash management systems employed by comparable complex business enterprises.  The Cash Management System is comprised of several main components:  (a) collections accounts, utilized for the collection of customer receipts; (b) a main concentration account, into which receipts from the Company's operations are concentrated and out of which funds are transferred to other accounts or disbursed directly; (c) disbursement accounts, through which the Company makes cash disbursements to fund its operations, including payroll, capital expenditures, trade payables, insurance, taxes, legal fees, and rent; and (d) cash transfers among the Debtors and non-Debtor affiliates.

12.     The Cash Management System is vital to the Debtors' ability to conduct their operations around the globe.  Any disruption of the Cash Management System would be extremely detrimental to the Debtors' operations, as their business requires prompt access to cash and accurate cash tracking.   Accordingly, the Debtors request authority to continue using the Cash Management System to facilitate a smooth transition into these chapter 11 cases and to maximize value for the Debtors' stakeholders.

## I.     The Bank Accounts and Flow of Funds

### A.     Flow of Funds

13.     The Cash Management System is tailored to meet the Company's operating needs, enabling it to control and monitor company funds, ensure cash availability and liquidity, reduce administrative expenses incurred in connection with the movement of funds among multiple entities, and facilitate the reporting of accurate account balances.  To provide an overview of the movement of cash through the Cash Management System, a schematic diagram illustrating the customary flow of funds through the Cash Management System is attached as **Exhibit A** to each of the Proposed Orders.[3]  Cash generally moves through the Cash Management System as follows:

14.     *Collection Accounts*.  The Debtors' primary source of income consists of receipts from the sale of the Debtors' products, software, and services.  The Debtors' receipts from both their North American Mitel and Unify lines of business enter the Cash Management System predominately through automated clearing house ("ACH") transfers, as well as by paper checks, credit card payments, and wire transfers, and are deposited into various collection accounts

---

[3]     The flow of funds described in this motion and in the schematic diagram attached to the Proposed Orders is representative of the customary movement of cash through the Cash Management System.  In the ordinary course of the Debtors' operations, funds may be transferred from one Bank Account to another within the Cash Management System, other than as described herein.  For the avoidance of doubt, the Debtors request authority pursuant to this motion to continue making such transfers in the ordinary course of business.

corresponding to the applicable lines of business (the "Collection Accounts").  Amounts held in the Collection Accounts maintained by each of Mitel Cloud Services, Inc., Mitel Business Systems Inc., and Mitel Technologies, Inc. are generally swept automatically from various Collection Accounts into the Main Concentration Account (as defined below) on a daily basis.  Funds aggregated into the Collection Accounts maintained by each of Mitel Networks Corporation ("MNC") and Mitel Networks, Inc. ("MNI") are either:  (a) transferred to the Main Concentration Account; (b) transferred to Disbursement Accounts held by MNC and other Debtor entities; or (c) used to make disbursements directly for MNC and MNI's respective operating costs, each on a daily basis.  Receipts collected from the Debtors' North American Unify business are aggregated into the Collection Account held by Debtor Unify Inc. and are either manually transferred to (x) the Main Concentration Account, (y) a General Disbursement Account (as defined below) held by Debtor Unify Inc. for the purpose of making operational disbursements without passing through the Main Concentration Account, or (z) certain non-Debtor Unify affiliates outside of the United States and Canada.

15.    ***Main Concentration Account***.  The Cash Management System has one primary concentration account (the "Main Concentration Account") held by Debtor Mitel (Delaware), Inc. ("MDI").  As described above, funds from the Mitel and Unify Collection Accounts are either swept daily or manually transferred into the Main Concentration Account.  Funds in the Main Concentration Account are then transferred to various Disbursement Accounts (as defined below) in the Cash Management System to fund the Mitel Debtors' operations and make necessary disbursements.  The Main Concentration Account also makes periodic disbursements for the Mitel Debtors' operations.  As discussed in more detail below, receipts collected from the Company's Mitel non-Debtor affiliate operations outside of the United States and Canada are aggregated in

the Foreign Operating Accounts (as defined below) and are generally either subsequently (a) transferred to one of the Foreign Exchange Conversion Accounts (as defined below) held by Debtor MNC before being transferred to either the Main Concentration Account or one of the Disbursement Accounts, or (b) disbursed directly from one of the Foreign Operating Accounts.

16.    ***Disbursement Accounts***.  With respect to the Mitel North American Debtors' operations, funds are generally transferred from the Main Concentration Account to disbursement accounts (the "Disbursement Accounts") maintained by various Debtors.  In addition to receiving funds from the Main Concentration Account, the Disbursement Accounts maintained by Debtors Mitel US Holdings, Inc., MLN TopCo Ltd., MLN US TopCo Inc., and MLN US HoldCo LLC receive certain transfers from the Collection Account maintained by MNI, and the Disbursement Accounts maintained by MNC receive certain transfers from the Collection Account and Foreign Exchange Accounts maintained by MNC.  Additionally, the Disbursement Accounts maintained by Mitel Networks (International) Limited receive certain transfers from the Foreign Exchange Conversion Accounts and certain non-Debtor Mitel affiliates outside of the United States and Canada.  From the Mitel Disbursement Accounts, funds are transferred out of the Cash Management System to fund, among other things, payroll, capital expenditures, trade payables, insurance, taxes, legal fees, and rent corresponding to the Company's Mitel business.  In contrast, operational disbursements in connection with the Unify North American Debtors' business are made from the Disbursement Account held by Debtor Unify Inc., and disbursements in connection with the Company's Unify business outside of North America are made by certain foreign non-Debtor Unify affiliates.  Customer receipts related to the Unify North American Debtors' operations are aggregated into a Collection Account held by Debtor Unify Inc. and are either manually transferred to (a) the Main Concentration Account, (b) the Disbursement Account held

by Debtor Unify Inc., or (c) certain non-Debtor Unify affiliates outside of the United States and Canada to make international disbursements. Funds transferred to the Disbursement Account held by Debtor Unify Inc. do not pass through the Main Concentration Account.

17.    **Miscellaneous Accounts**.  As set forth above, receipts collected by non-Debtor affiliates outside of the United States and Canada with respect to the Company's Mitel line of business are generally transferred to operating accounts (the "Foreign Operating Accounts") held by either Debtor Mitel Europe Limited ("MEL"), non-Debtor Mitel Deutschland GmbH, or non-Debtor Mitel Schweiz AG.  Funds are also transferred from non-Debtor Unify Funding GmbH to the Foreign Operating Accounts held by MEL.  From the Foreign Operating Accounts, amounts may be used to make disbursements in connection with Mitel operations without passing through the Main Concentration Account.  To the extent funds aggregated in the Foreign Operating Accounts need to be converted to USD, Euros, CAD, GBP, CHF or other foreign currency, such amounts are transferred manually on an ad hoc basis from the Foreign Operating Accounts to one of two accounts maintained by MNC for effectuating such conversion (the "Foreign Exchange Conversion Accounts" and, together with the Foreign Operating Accounts, the "Miscellaneous Accounts").[4]  From the Foreign Exchange Conversion Accounts, funds are either transferred manually on an ad hoc basis to the Main Concentration Account or the Disbursement Accounts maintained by MNC and Mitel Networks (International) Limited.[5]  Funds are also transferred manually from the Foreign Exchange Conversion Accounts to certain non-Debtor subsidiaries of MNC, including Mitel Incorporated Mexico S.A. de C.V.

---

[4]    The Debtors maintain additional Miscellaneous Accounts, which are described in more detail in the chart set forth in section I.B of this motion.

[5]    From time to time, funds may be transferred to additional Disbursement Accounts within the Cash Management System in connection with tax and legal disbursements on an as-needed basis.

### B.    Bank Accounts

18.    The Cash Management System is comprised of over 200 bank accounts, of which 32 are maintained by the Debtors, each of which is identified on **Exhibit B** attached to each of the Proposed Orders (such Debtor accounts, together with any other bank accounts that the Debtors may open in the ordinary course of business, the "Bank Accounts").  The Bank Accounts reside at two different banks (the "Banks"):  (a) JPMorgan Chase Bank, N.A. ("JPM"), the Debtors' primary cash management Bank at which each of the Debtors' operating Bank Accounts is located, and (b) HSBC Bank PLC ("HSBC"), where the Debtors maintain three inactive Bank Accounts.  As of close of business on March 9, 2025, there is approximately $6,680,797 of cash on hand in the Bank Accounts.

19.    The Bank Accounts are described in more detail in the following table:

| Accounts | Descriptions of Accounts |
|---|---|
| *Main Concentration Account* | |
| **Main Concentration Account** | The Main Concentration Account is maintained by MDI at JPM. |
| *JPM – 9468* | The Main Concentration Account receives funds from each of the Collection Accounts, as well as from the Foreign Exchange Conversion Accounts.  Funds held in the Main Concentration Account are directed, as needed, to the Company's Mitel Disbursement Accounts to fund disbursements from those Bank Accounts (as described below). |
| | The Main Concentration Account is subject to a deposit account control agreement in favor of Wilmington Savings Fund Society, FSB, in its capacity as successor collateral agent and administrative under the Prepetition Credit Documents ("WSFS"). |
| | As of the Petition Date, the Main Concentration Account had a balance of approximately $3,023,191. |

| Accounts | Descriptions of Accounts |
|---|---|
| *Collection Accounts* | |
| **Mitel Collection Accounts**<br><br>*JPM – 1217, 1263, 2000, 2308, and 4100* | MNI, Mitel Cloud Services, Inc., Mitel Business Systems Inc., Mitel Technologies, Inc., and MNC each maintain a Collection Account at JPM (the "<u>Mitel Collection Accounts</u>").<br><br>The Mitel Collection Accounts receive customer receipts from the sale of the Debtors' North American products and services. Customer receipts are deposited into one of the Mitel Collection Accounts, which correspond to the applicable line of business, primarily via ACH transfer. The Debtors maintain a lockbox at JPM, such that receipts may be deposited via paper checks, and the Debtors also receive a limited number of credit card payments and wire transfers. With the exception of the Mitel Collection Account maintained by MNC, the Collection Accounts are each "zero-balance" accounts, meaning their funds are swept daily to the Main Concentration Account, and they do not carry a cash balance at the end of each business day. With respect to the Mitel Collection Account maintained by MNI, funds are also swept automatically to certain Disbursement Accounts held by other Debtor entities or used to make disbursements directly in connection with MNI's operating costs. Unlike the other Mitel Collection Accounts, the Bank Account maintained by MNC carries a cash balance at the end of each business day. Funds aggregated into the Mitel Collection Account maintained by MNC are transferred manually on a daily basis either to the Main Concentration Account or one of the two Disbursement Accounts maintained by MNC, or they may be used to make disbursements directly in connection with MNC's operating costs. The Mitel Collection Accounts are not subject to any deposit account control agreements.<br><br>As of the Petition Date, the Mitel Collection Accounts had an aggregate balance of approximately $2,039,599. |
| **Unify Collection Account**<br><br>*JPM – 8523* | Unify Inc. also maintains a Collection Account at JPM (the "<u>Unify Collection Account</u>").<br><br>The Unify Collection Account receives customer receipts from the Debtors' North American Unify line of business. Unify customer receipts are deposited into the Unify Collection Account primarily via ACH transfer. Like the Mitel Collection Accounts, receipts are also deposited via paper checks, credit card payments, and wire transfers. Funds deposited into the Unify Collection Account are transferred manually on an ad hoc basis either to the Main Concentration Account or the General Disbursement Account (as defined below) held by Unify Inc. to make disbursements on account of the Company's Unify business. Funds are also transferred on an ad hoc basis from the Unify Collection Account to certain Unify non-Debtor affiliates outside of the United States and Canada. The Unify Collection Account is subject to a deposit account control agreement in favor of WSFS.<br><br>As of the Petition Date, the Unify Collection Account had a balance of approximately $91,076. |
| *Disbursement Accounts* | |
| **Payroll Account**<br><br>*JPM – 9433* | MDI maintains one Disbursement Account at JPM, which is used to process employee payroll and fund employee benefits (the "<u>Payroll Account</u>"). The Payroll Account is a "zero-balance" account that maintains no cash balance at the end of each day. The Payroll Account receives funds from the Main |

| Accounts | Descriptions of Accounts |
|---|---|
| | Concentration Account on a bi-weekly basis, and payroll disbursements are subsequently made automatically from the Payroll Account. The Payroll Account is not subject to any deposit account control agreement.<br><br>As of the Petition Date, the Payroll Account had no balance. |
| **General Disbursement Accounts**<br><br>*JPM – 4167, 4272, 4516, 5404, 7717, and 8580* | MDI, MNC, and Unify Inc. each maintain one or more Disbursement Accounts at JPM, which are used to make payments to third parties on account of their respective operating costs including, among other things, trade payables, insurance, taxes, legal fees, capital expenditure, and rent (the "General Disbursement Accounts"). With respect to the Debtors' Mitel business, the General Disbursement Accounts maintained by MDI are funded from the Main Concentration Account, and disbursements are made from each of the General Disbursement Accounts on a daily basis. The MDI General Disbursement Accounts ending in 4167 and 4516 are "zero-balance" accounts, meaning funds are swept daily to make disbursements, and they do not carry a cash balance at the end of each business day. The General Disbursement Accounts maintained by MNC receive funds from the Main Concentration Account, the Mitel Collection Account maintained by MNC, and the Foreign Exchange Conversion Accounts. Disbursements are made manually from the MNC General Disbursement Account ending in 4272 on a daily basis, and from the MNC General Disbursement Account ending in 7717 on a weekly basis. With respect to the Debtors' Unify business, funds are transferred manually on an as-needed basis from the Unify Collection Account to the General Disbursement Account maintained by Unify Inc., and funds are subsequently used to make disbursements on account of the Debtors' North American Unify operations. The General Disbursement Accounts ending in 7717 and 8580 are subject to deposit account control agreements in favor of WSFS.<br><br>As of the Petition Date, the General Disbursement Accounts had an aggregate balance of approximately $403,469. |
| **Tax and Legal Disbursement Accounts**<br><br>*JPM – 0325, 0802, 2828, 5713, 7786, 7788, and 9873* | Certain of the Debtors maintain Disbursement Accounts at JPM for the purpose of remitting taxes and legal expenses on behalf of the Mitel Debtors (the "Tax and Legal Disbursement Accounts"). Funds are transferred to the Tax and Legal Disbursement Accounts either from the Main Concentration Account, the Collection Account maintained by MNI, or the Foreign Exchange Conversion Accounts. Funds are also transferred to the Tax and Legal Disbursement Accounts maintained by Mitel Networks (International) Limited from certain Mitel non-Debtor affiliates outside of the United States and Canada. Funds are disbursed manually from the Tax and Legal Disbursement Accounts when amounts become due. The Tax and Legal Disbursement Account maintained by MLN US HoldCo LLC also draws on, and repays, the Incremental Revolving Loans in accordance with the Incremental Assumption Agreement. The Tax and Legal Disbursement Accounts ending in 0325, 0802, 2828, and 9873 are subject to deposit account control agreements in favor of WSFS.<br><br>As of the Petition Date, the Tax and Legal Disbursement Accounts had an aggregate balance of approximately $690,931. |

| Accounts | Descriptions of Accounts |
|---|---|
| **Miscellaneous Accounts** | |
| **Foreign Operating Accounts**<br><br>*JPM – 5353, 5755, and 9938* | MEL maintains three Foreign Operating Accounts at JPM. Funds collected from the Company's Mitel business operations outside of the United States and Canada are transferred to the Foreign Operating Accounts maintained by MEL. Funds are also transferred from non-Debtor Unify Funding GmbH to the Foreign Operating Accounts held by MEL. From the MEL Foreign Operating Accounts, funds are either used to make disbursements on account of Mitel's trade payables or manually transferred to one of Foreign Exchange Conversion Accounts as may be needed. Funds collected from the Company's Mitel business operations outside of the United States and Canada are also transferred to the Foreign Operating Accounts maintained by non-Debtors Mitel Deutschland GmbH and Mitel Schweiz AG, and are subsequently transferred to the Foreign Exchange Conversion Accounts or are used to make disbursements on account of such non-Debtors' respective operations. The Foreign Operating Accounts are not subject to any deposit account control agreements.<br><br>As of the Petition Date, the Foreign Operating Accounts had an aggregate balance of approximately $410,878. |
| **Foreign Exchange Conversion Accounts**<br><br>*JPM – 0272, 1898, and 7874* | MNC maintains three Foreign Exchange Conversion Accounts at JPM for the purpose of converting receipts from Mitel and Unify business operations outside of the United States and Canada into USD, CAD, Euros, GBP, CHF, and other foreign currency. Funds are manually transferred from the Foreign Operating Accounts to the Foreign Exchange Conversion Accounts Funds on an ad hoc basis. Once converted into the appropriate currency, funds are manually transferred on an ad hoc basis to the Main Concentration Account, the General Disbursement Accounts maintained by MNC, or the Tax and Legal Disbursement Accounts maintained by Mitel Networks (International) Limited. Funds are also transferred manually from the Foreign Exchange Conversion Accounts to certain non-Debtor subsidiaries of MNC. The Foreign Exchange Conversion Accounts are not subject to a deposit account control agreement.<br><br>As of the Petition Date, the Foreign Exchange Conversion Accounts had a balance of approximately $11,567. |
| **Inactive Accounts**<br><br>*HSBC – 0231, 5545, and 5553*<br><br>*JPM – 3973* | MEL maintains three Bank Accounts at HSBC that hold *de minimis* amounts and are not in active use by the Debtors (the "HSBC Inactive Accounts"). MNC also maintains one Bank Account at JPM (the "JPM Inactive Account" and, collectively with the HSBC Inactive Accounts, the "Inactive Accounts"), which is no longer active and holds a *de minims* amount. The Debtors intend to use the JPM Inactive Account as the Carve-Out Account (as defined in the DIP Order) during the chapter 11 cases in accordance with the DIP Order. The Inactive Accounts are not subject to deposit account control agreements.<br><br>As of the Petition Date, the Inactive Accounts had an aggregate balance of approximately $10,086. |

| Accounts | Descriptions of Accounts |
|---|---|
| **Adequate Assurance Account**<br><br>*JPM – 2260* | The Debtors maintain a segregated Bank Account (the "Adequate Assurance Account") at JPM that the Debtors propose will hold an adequate assurance deposit for the benefit of the Debtors' utility provers throughout the course of these chapter 11 cases.[6] |

## II. The Bank Fees and Processing Fees

20.     The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System. Specifically, such fees include (a) service charges from the Banks incurred in connection with maintaining the Bank Accounts (the "Bank Fees"), and (b) charges and processing fees from payment processors including chargebacks, returns, and processing fees incurred in connection with credit and debit card transactions (the "Processing Fees").[7]

21.     The Debtors pay approximately $9,000 per month in Bank Fees and $50,000 per year in Processing Fees, which generally are automatically debited from the respective Bank Accounts. As of the Petition Date, the Debtors estimate that they owe the Banks approximately $25,000 in unpaid Bank Fees and Processing Fees.

## III. The Debtors' Corporate Cards

22.     As part of the Cash Management System, the Debtors provide certain of their employees in the U.S. and Canada with corporate credit cards (the "Corporate Cards" and, such program, the "Corporate Card Program") for authorized expenses, including miscellaneous expenses at the operating level related to among other things, travel, business meals, professional

---

[6]     The adequate assurance deposit is described further in the *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief,* filed substantially contemporaneously herewith.

[7]     Generally, the Processing Fees are 2.5% of gross sales on debit and credit card transactions.

subscriptions, office supplies, information technology, and general marketing.  The Corporate Card Program is provided pursuant to the Master Commercial Payment Services Agreement, dated as of March 1, 2018, between Amex Bank of Canada and Mitel Networks Corporation (as amended, supplemented, restated, or replaced from time to time, the "<u>Corporate Card Agreement</u>").  In accordance with the Corporate Card Agreement, the Corporate Cards are issued in the name of individual employees and are paid directly by the Debtors, although individual employees are held jointly and severally liable for changes incurred.  Payments are issued on a weekly basis from the JPM Bank Accounts ending in 1263 and 4100.  As of the Petition Date, the Debtors maintain approximately 310 Corporate Cards.   The Debtors' obligations under the Corporate Card Program are supported by a $250,000 letter of credit issued by UBS Switzerland AG in favor of American Express Travel Related Services Company, Inc.

23.     The Corporate Card Program is an integral part of the Debtors' Cash Management System.  Employees' continued use of the Corporate Cards for procurement of qualifying expenses is essential to the continued operation of the Debtors' business.  On average, in the 12 months prior to the Petition Date, the Debtors monthly spend using the Corporate Cards was approximately $134,000.  The Debtors have implemented internal mechanisms that will permit them, with the assistance of their advisors, to accurately track the balances incurred on the Corporate Cards.

24.     If the Corporate Card Program is discontinued, the Debtors' ability to fund operational disbursements would be disrupted, to the detriment of all parties in interest, any the Debtors' employees may be held liable for charges incurred.  As of the Petition Date, the Debtors owe approximately $65,000 on account of the Corporate Card Program.  Accordingly, the Debtors seek authority to pay any amounts due and owing, whether related to the prepetition

or postpetition period, under the Corporate Card Program and to continue this program in the ordinary course of business on a postpetition basis.

## IV.    Intercompany Transactions[8]

25.    The Debtors conduct various business transactions with each other and with certain of their non-Debtor affiliates in the ordinary course of business (the "Intercompany Transactions" and, each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "Intercompany Claim"), including moving cash within the Cash Management System between different Debtors and between Debtors and their non-Debtor affiliates. As a result, there may be Intercompany Claims owing among the Debtors or their non-Debtor affiliates at any given time, including outstanding prepetition Intercompany Claims. With the help of the Cash Management System and the Debtors' treasury and accounting personnel, the Debtors are able to track and account for each Intercompany Transaction and the resulting Intercompany Claim. While the majority of the Debtors' Intercompany Transactions are not governed by formal intercompany loans, the Debtors maintain, and will continue to maintain, records of these transfers of cash on a postpetition basis, such that each Intercompany Claim can be ascertained, traced, and accounted for, including any amounts that may be owed to or by each Debtor on account thereof.

26.    The Debtors and each of their affiliates operate an integrated, international enterprise. In the ordinary course of the Debtors' business, and as described in more detail herein, receivables generated by certain non-Debtor affiliates outside of the United States and Canada are transferred either directly or indirectly to MEL or MNC, and are subsequently used to make disbursements in accordance with the Cash Management System. Additionally, intercompany

---

[8]    For the avoidance of doubt, the Debtors are not seeking authority by this motion to engage in transactions with affiliates that are not direct or indirect subsidiaries of the Debtors. Any reference to Intercompany Transactions herein shall apply only to transactions by and among non-Debtor affiliates that are direct or indirect subsidiaries of the Debtors.

transfers are made from the Transfer Account to certain non-Debtor entities, including foreign affiliates, in the ordinary course.  In these instances, the Debtors provide funds to certain non-Debtor entities, and receive funds from non-Debtor entities, to fund procurement and maintenance activities, satisfy outstanding service invoices, and pay third party vendors in the ordinary course.  Intercompany Claims are booked between the Debtors and non-Debtors with respect to these amounts and are closely monitored by the Company's accounting personnel. The Company typically reconciles these amounts on a quarterly basis.  Due to the adverse consequences that may arise if certain of the Debtors' operating affiliates were severed from the Cash Management System, the Debtors seek authority to continue such the Intercompany Transactions in the ordinary course of business, consistent with past practice.  Importantly, the funds flowing to non-Debtors through the Cash Management System to enable the non-Debtors to pay third-party expenses is less than the amounts received and swept back to the Debtor entities through the Cash Management System; thus, maintaining the status quo is in the best interest of the Debtors and each of their stakeholders.  Continuing this historical ordinary course practice will benefit the Debtors' stakeholders, because without the ability to continue this practice, the non-Debtor entities' operations will be materially disrupted, and the Debtors will lose cash generated from the non-Debtors' operations.

27.     The Intercompany Transactions ensure the efficient and smooth functioning and operations of the Debtors' business, as certain of the Debtors are better suited to perform certain functions to the business on behalf of the Debtors and their non-Debtor affiliates.  If the Debtors were required to cease the Intercompany Transactions, their operations would be materially disrupted, resulting in possible degradation of value to the detriment of their estates and creditors. Additionally, the Debtors respectfully request authority to grant administrative expense status

pursuant to sections 364(a) and 503(b) of the Bankruptcy Code to any Intercompany Transactions that arise after the Petition Date, subject and junior to any claims including adequate protection claims, granted in connection with the use of cash collateral in accordance with any interim and final orders, as applicable. If such postpetition Intercompany Transactions are accorded administrative priority status, each Debtor contributing funds to, or utilizing the funds of, another affiliate will continue to receive credit, or bear ultimate repayment responsibility, for such funds, as applicable. For the avoidance of doubt, all postpetition Intercompany Transactions between Debtors and non-Debtors shall be subject to the Approved Budget (as defined in the DIP Order) in accordance with the DIP Order.

## V. The Cash Management System's Compliance with the U.S. Trustee Guidelines and the Bankruptcy Code

### A. U.S. Trustee Authorized Depositaries

28. The *Guidelines for Debtors-in-Possession, Office of the United States Trustee Southern and Western Districts of Texas Region 7*, Effective August 1, 2022 (the "U.S. Trustee Guidelines") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"). Of the Debtors' 32 Bank Accounts, 29 are maintained at JPM, which is an authorized depository under the U.S. Trustee Guidelines and is insured by the Federal Deposit Insurance Corporation (the "FDIC"), and the majority of the JPM Bank Accounts are maintained within the United States.[9] The remaining three Bank Accounts are maintained at HSBC, which is not an authorized depository under the U.S. Trustee Guidelines. Notably, the HSBC Bank Accounts are maintained

---

[9] Certain of the JPM Bank Accounts are maintained by foreign Debtors and are held in Canadian, United Kingdom, and Luxembourg branches of JPM, in close proximity to the foreign Debtors' respective operations (the "Foreign JPM Accounts").

by MEL, which is a foreign Debtor.  The HSBC Bank Accounts are each located in the United Kingdom in close proximity to MEL's operations.  Moreover, the Bank Accounts maintained at HSBC are all Inactive Accounts holding *de minimis* balances, and are used as "back up accounts" by MEL in the event new accounts become needed in the ordinary course of the Debtors' business operations.  JPM and HSBC are well-capitalized and financially stable institutions.  Accordingly, it would be onerous, unnecessarily inconvenient, and would fail to produce any realizable benefits to the Debtors' estates to require the Debtors to close the Bank Accounts held at HSBC, or the Foreign JPM Accounts, and open new debtor-in-possession accounts.  The Debtors therefore request that the Court waive the U.S. Trustee Guidelines in this respect.

**B.      Waiver of Strict Compliance with Section 345(b) of the Bankruptcy Code**

29.      Section 345(a) of the Bankruptcy Code authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  Section 345(b) of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the court "for cause" orders otherwise.  A bond or deposit of securities described in section 345(b)(1) and (2), however, is not required "with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States." 11 U.S.C. § 345(b).  As set forth above, the vast majority of the Bank Accounts are maintained at JPM, which is an FDIC-insured authorized depository under the U.S. Trustee Guidelines, and most of the JPM Bank Accounts are maintained in the United States.  Accordingly, the Debtors seek a waiver of strict compliance with section 345(b) of the Bankruptcy Code as to the JPM Bank Accounts in the United States.

30.     MEL, which is incorporated in the United Kingdom, maintains three Bank Accounts at HSBC in the United Kingdom in close proximity to its operations. HSBC is a well-capitalized and sophisticated financial institution, and is insured by the Financial Services Compensation Scheme (the "FSCS"). The Foreign JPM Accounts held in the United Kingdom and Luxembourg branches of JPM—an authorized depository with respect to its U.S. branches—and are insured by the FSCS and Deposit Guarantee Scheme Directive (the "DGSD"), respectively. The Foreign JPM Accounts in Canada are not insured by the FDIC or its equivalent in Canada. The Foreign JPM Accounts are all maintained by Debtors organized under the laws of Canada, the United Kingdom, and Luxembourg, and are held in close proximity to the Debtors' respective foreign operations. The Debtors benefit from maintaining these local Bank Accounts in order to conduct their operations and seek to maintain their banking relationships, consistent with prepetition operational practices. Requiring the Debtors to transfer these Bank Accounts to a designated authorized depository would place a needless and excessive administrative burden on the Debtors and impose significant costs to the Debtors' estates. Also, if the Debtors are not permitted to maintain these Bank Accounts, the applicable Debtors will be unable to effectively conduct their operations and fund operational disbursements to vendors, employees and other third-parties, creating additional operational disruption and expenses to the detriment of the Debtors' business and estates. Accordingly, to the extent the Cash Management System does not strictly comply with section 345 of the Bankruptcy Code and/or the U.S. Trustee Guidelines, the Debtors respectfully request a 45-day waiver of such requirements, subject to the Debtors' right to seek further extensions thereof.

C.     **Business Forms and Books and Records**

31.     As part of the Cash Management System, the Debtors use a variety of preprinted business forms (including checks, letterhead, correspondence forms, invoices, and other business forms) in the ordinary course of business (collectively, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records").  To avoid a significant disruption to their business operations and to minimize administrative expense to their estates, the Debtors request authorization to continue using all the Business Forms and Books and Records in a manner consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession.

## Basis for Relief

I.     **Maintaining the Existing Cash Management System Is Essential to the Debtors' Ongoing Operations and Restructuring Efforts**

32.     The U.S. Trustee Guidelines ostensibly require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for payment of taxes including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor in possession status of the chapter 11 debtor, including checks that bear the designation "debtor in possession" and reference the bankruptcy case number on such checks; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.  *See U.S. Trustee Guidelines*.  These guidelines are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of

20

prepetition claims.  Considering, however, the breadth and complexity of the Debtors' business and financial affairs and the sheer volume of collections, disbursements and movement of funds through the Cash Management System on a daily basis, enforcement of these provisions of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt, if not cripple, the Debtors' operations.  Accordingly, the Debtors respectfully request that the Court allow them to operate each of the Bank Accounts that comprise the Cash Management System as each was maintained in the ordinary course of business before the Petition Date as described herein.

33.     Continuation of the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  Bankruptcy courts treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter," *see In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987) and have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  *In re Columbia Gas Sys. Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (observing that cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

34.     Here, requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to

the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the ability to quickly create status reports on the location and amount of funds, which ability, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  As a result, any disruption of the Cash Management System would have a severe and adverse effect on the Debtors' restructuring efforts.  Indeed, absent the relief requested herein, requiring the Debtors to adopt a new, segmented cash management system would severely disrupt the Debtors' ordinary course operations, needlessly destroying the value of the Debtors' business enterprise.  By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts, ensuring customer receipts are timely received, and eliminating administrative inefficiencies.  Maintaining the current Cash Management System will allow the Debtors' treasury and accounting personnel to focus on their daily responsibilities.

35.     The Debtors respectfully submit that parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Bank Accounts and performance of the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that Debtor entities will not make unauthorized payments on account of prepetition obligations.  Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition claims without the prior approval of the Debtors' treasury and accounting departments. In light of such protective measures maintaining the Cash Management System is in the best interests of the Debtors' estates and creditors.

36.     Accordingly, the Debtors respectfully request the Court authorize the continued use of the existing Cash Management System to facilitate the Debtors' transition into chapter 11. Specifically, the Debtors respectfully request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. The Debtors further respectfully request that the Court authorize and direct each of the Banks to receive, process, honor, and pay any and all checks, wire transfer, credit card, ACH payments and other instructions, and drafts payable through, or drawn or directed on, such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, wires, credit card, or ACH payments are dated prior to or subsequent to the Petition Date.  The Debtors also respectfully request that, to the extent any Bank honors a prepetition check or other item drawn on any Bank Account, either at the direction of the Debtors or in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition.  Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether the Debtors may pay a particular item in accordance with a Court order or otherwise.

## II.     The Court Should Authorize the Debtors to Continue the Corporate Card Program and Pay Bank Fees and Processing Fees, Including Prepetition Amounts Related Thereto

37.     The Debtors request authority to continue paying outstanding amounts on account of the Cash Management System, such as Bank Fees and Processing Fees, and to continue the Corporate Card Program in the ordinary course of business and consistent with past practice, as well to pay any prepetition amounts related thereto in the Debtors' reasonable discretion.

38.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In doing so, these courts acknowledge that several legal theories rooted in sections 363(b) and 105(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

39.     Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Courts within the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession [*sic*] or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").  Courts emphasize that the business judgment rule is not an onerous standard and that it "is flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re State Park Building Grp., Ltd.*, 313 B.R. 251, 254 (N.D. Tex 2005) (observing that trustees must "[articulate some] business justification," but "[g]reat judicial deference is given to the [t]rustee's exercise of business judgment"); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

40.     Section 105(a) of the Bankruptcy Code and the so-called "doctrine of necessity" empower the bankruptcy court to exercise its broad grant of equitable powers to permit the payment of prepetition obligations when such payment is essential to the continued operation of a debtor's business.  The doctrine of necessity permits a bankruptcy court to authorize the payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.  *See, e.g.*, *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (finding payment of prepetition claims prior to confirmation of reorganization plan is permitted where these transactions "are at once individually minute but collectively immense and critical to the survival of the business of the debtor."); *see also In re CEI Roofing, Inc.*, 315 B.R. 50, 56, 60–61 (Bankr. N.D. Tex. 2004) (holding that payment of certain prepetition claims under the doctrine of necessity is "based on both common sense and the express provisions of the Bankruptcy Code"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2004) (authorizing the debtors to pay certain prepetition claims because "[t]he court d[id] not wish [the] [d]ebtors' businesses seriously damaged"); *In re CoServ, L.L.C.*, 273 B.R. at 497 (recognizing the "doctrine of necessity" and stating that in certain situations, a debtor's fiduciary duty to maximize estate value for all parties can only be satisfied through the payment of a prepetition claim).  The rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11—to facilitate the continued operation and rehabilitation of the debtor.  *See id.* at 498 (citing *In re Just For Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999)); 2 COLLIER ON BANKRUPTCY ¶ 105.02[4][a] (16th ed. 2024) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

41.     The Corporate Card Program provides the Debtors with a streamlined system for funding necessary business expenses and contributes to the efficiency of the Debtors' business operations.   Moreover, to the extent the Corporate Card Program is discontinued, the Debtors' individual employees may be held personally liable for expenses incurred.   With respect to the Bank Fees and Processing Fees, such amounts are modest and are crucial to ensure that there are no unnecessary disruptions to the Cash Management System that could cause immediate and irreparable harm to the Debtors' estates.   Therefore, the Debtors respectfully request that the Court authorize the Debtors to continue to pay amounts owed on account of the Cash Management System, including the Corporate Card Program and any Bank Fees or Processing Fees, whether arising prepetition or postpetition in the ordinary course of business.

42.     Finally, the Debtors respectfully request that the Court authorize the Debtors to continue to pay any obligations incurred in connection with the Bank Accounts and further authorize the Banks to chargeback returned items to the Bank Accounts, whether such items are dated prior to, on, or subsequent to the Petition Date, in the ordinary course of business.

### III.     The Debtors Should Be Granted Authority to Use Existing Business Forms and Books and Records

43.     As part of the Cash Management System, the Debtors use the Business Forms and maintain the Books and Records, in each case in the ordinary course of business.   To avoid a significant disruption to their business operations and to minimize administrative expense to their estates, the Debtors request that they be authorized to continue to use their Business Forms, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.   The Debtors submit that, given the limited nature of the preprinted Business Forms, parties in interest will not be prejudiced if the Debtors are authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition

Date.  Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing forms would be an unnecessary additional expense.

## IV.    The Court Should Authorize the Debtors To Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Expense Status to Postpetition Intercompany Balances

44.    The Debtors' funds move through the Cash Management System as described above and, at any given time, there may be Intercompany Claims owing by and between Debtor entities and by and between Debtor entities and certain non-Debtor affiliates.[10]  The Intercompany Transactions are a matter of routine in the Debtors' business as part of the Cash Management System, and are also the sort of transactions that are common among many business enterprises that operate through multiple affiliates.  The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors will continue to maintain records of such Intercompany Transactions during these chapter 11 cases.

45.    Because these Intercompany Transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business and consistent with prepetition practices without need for further Court order.  If the Debtors were unable to continue the Intercompany Transactions, the Cash Management System and related administrative controls would be disrupted to detriment of the Debtors and their estates.  Additionally, the Debtors would

---

[10]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Debtors submit the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and therefore do not require this Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.  Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their business as debtors in possession.

not obtain the benefit of the cash flow generated by the non-Debtor affiliate operations, and the Debtors' foreign operations would lose access to critical funding.  Accordingly, the Debtors respectfully submit that the continued performance of the Intercompany Transactions, in the Debtors' discretion, is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue performing such Intercompany Transactions on a postpetition basis.

46.    To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request, pursuant to section 503(b)(1) of the Bankruptcy Code, that all postpetition Intercompany Claims against one Debtor by another Debtor or a non-Debtor affiliate be accorded administrative expense status, subject and junior to any claims or liens, including adequate protection claims and DIP Superpriority Claims granted in connection with the use of cash collateral in accordance with any interim and final orders, as applicable.[11]   This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.  Further, the requested relief applies only to the Intercompany Transactions.

## V.    Cause Exists for Waiving Strict Compliance with Section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines

47.    Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).

---

[11]    Notwithstanding the administrative expense status requested for the Intercompany Transactions, all Debtors reserve their rights to dispute any Intercompany Transaction (or payment made on account of an Intercompany Claim) on any ground, including the methodology for calculation of such Intercompany Transaction or Intercompany Claim, and to claw back or avoid such payments or transactions, as applicable.

For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345 of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the Court "for cause" orders otherwise.  11 U.S.C. § 345(a)–(b).[12] As set forth above, all of the Debtors' bank accounts located in the United States are maintained at JPM—an authorized depository under the U.S. Trustee Guidelines in this district which is insured by the FDIC.  Accordingly, the Court should waive strict compliance with section 345 of the Bankruptcy Code as to these Bank Accounts maintained at JPM.

48.    All of the Bank Accounts maintained outside of the United States are held at either (a) the Canadian, United Kingdom, or Luxembourg branches of JPM, an authorized depository with respect to its U.S. branches, and which foreign branches in the United Kingdom and Luxembourg are insured by the FSCS or DSGD; or (b) HSBC, a well-capitalized bank that is insured by the FSCS.  As set forth above, the HSBC Bank Accounts all hold *de minimis* amounts and are inactive at this time.  Requiring the Debtors to close the HSBC Bank Accounts or the Foreign JPM Accounts would place a needless administrative burden on the Debtors, create a material disruption in the Debtors' ability to make necessary disbursements in a timely fashion, and delay customer collections.  Moreover, the inability to continue with their existing Cash Management System will impose unnecessary costs on the Debtors' estates, forcing key personnel

---

[12]   Strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in a case such as this, be inconsistent with section 345(a) of the Bankruptcy Code, which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money."  Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause."  140 Cong. Rec. H. 10,767 (Oct. 4, 1994), 1994 WL 54773.

to focus on recreating a new cash management system when their efforts must be focused on managing the business and operations at this critical juncture.  The Debtors believe that JPM and HSBC are each well-capitalized and financially stable institutions, and accordingly, cause exists to waive strict compliance Bankruptcy Code section 345 and the U.S. Trustee Guidelines with respect to the non-authorized depositories and allow the Debtors to continue to maintain the Bank Accounts in the ordinary course of business.  Pursuant to this motion, the Debtors request a 45-day waiver of the requirements under section 345 and the U.S. Trustee Guidelines, subject to the Debtors' right to seek further extensions thereof.  The Debtors will engage in good faith with the U.S. Trustee to determine what arrangements, if any, can practicably be implemented for the Debtors to come into compliance with such requirements or as otherwise may be agreed to by the U.S. Trustee.

### Processing of Checks and Electronic Funds Transfers Should be Authorized

49.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, anticipated access to cash collateral, and proceeds of the DIP Facility.  Additionally, under the Cash Management System, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe that there is minimal risk that checks or wire transfer requests that the Court has not authorized will be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable Banks, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion without regard to whether any checks or wire transfer requests were issued before or after the Petition Date.

## Emergency Consideration

50.     Pursuant to Local Rule 9013-1, the Debtors respectfully request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring efforts.  Accordingly, the Debtors respectfully request that the Court grant the relief requested in this motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

51.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies the requirements of Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this motion is necessary for the Debtors to operate their business without the risk of interruption and to preserve value for their estates through these chapter 11 cases.

## Reservation of Rights

52.     Nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or

admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Notice**

53.     The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the administrative agents under the Prepetition Credit Documents; (d) counsel to the Ad Hoc Group; (e) counsel to the DIP Agent; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the Banks; and (i) any party that

has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

54.     A copy of this motion is available on (a) the Court's website, at https://www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Stretto, Inc., at https://cases.stretto.com/Mitel.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders, substantially in the form attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: March 10, 2025

Respectfully submitted,

*/s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
Eric M. English (TX Bar No. 24062714)
M. Shane Johnson (TX Bar No. 24083263)
James A. Keefe (TX Bar No. 24122842)
Jack M. Eiband (TX Bar No. 24135185)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:    (713) 226-6000
Facsimile:    (713) 226-6248
Email:    jhiggins@porterhedges.com
             eenglish@porterhedges.com
             sjohnson@porterhedges.com
             jkeefe@porterhedges.com
             jeiband@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
John T. Weber (*pro hac vice* pending)
Sean A. Mitchell (*pro hac vice* pending)
Leslie E. Liberman (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:    (212) 373-3000
Facsimile:    (212) 757-3990
Email:    pbasta@paulweiss.com
             jweber@paulweiss.com
             smitchell@paulweiss.com
             lliberman@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Local Rule 9013-1(i).

*/s/ Janine Yetter*
Janine Yetter

## **Certificate of Service**

I certify that, on March 10, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins