**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| MLN US HOLDCO LLC., *et al.*,[1] | § § | Case No. 25-90090 (CML) |
| Debtors. | § § § | (Joint Administration Requested) |

**DECLARATION OF JANINE YETTER**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Janine Yetter, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Financial Officer of the debtor Mitel (Delaware), Inc. and an officer and/or director of many of the above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company").  On March 9 and 10, 2025 (the "Petition Date"), each of the Debtors commenced these chapter 11 cases for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

2.     I joined the Company in July 2018 as the Vice President of Finance.  In January 2023, I was appointed as the Chief Financial Officer.  In my current role, I am responsible for all financial functions including Tax, Treasury, Revenue Operations, Controllership & Accounting, Total Rewards, and Financial Planning & Analysis (FP&A).  I am a Certified Management Accountant, hold a Bachelor of Business Administration from the University of

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Mitel.  The Debtors' service address for purposes of these chapter 11 cases is:  2160 W Broadway Road, Suite 103, Mesa, Arizona 85202.

North Dakota, and have more than 30 years of experience in financial, technical, and operational roles.

3.      As Chief Financial Officer, I have independently reviewed, have become generally familiar with, and have personal knowledge regarding the Debtors' day-to-day operations, business, financial affairs, books and records, and the circumstances leading up to these chapter 11 cases.  A list of the Debtors is attached as **Exhibit A**, and a chart reflecting the Company's corporate structure is attached as **Exhibit B** (the "Organizational Chart").

4.      I submit this declaration (this "Declaration") in support of the Debtors' voluntary petitions (the "Petitions") and the Debtors' related requests for initial relief in the motions and applications filed contemporaneously herewith (the "First Day Motions"), as well as to assist the Court and parties in interest in understanding the circumstances that led the Debtors to commence these chapter 11 cases.  To that end, this Declaration provides background information about the Company's corporate history, business operations, capital structure, and recent challenges, and supports the Debtors' Petitions and the relief requested in the First Day Motions.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and personnel, my discussions with the Debtors' non-legal advisors, my review of business records maintained in the regular course of business and other relevant documents, or my opinion based on my professional experience.  In making this Declaration, I have relied in part on information and materials that the Debtors, my colleagues at the Debtors, and the Debtors' non-legal advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my benefit in preparing this Declaration.  Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change, but is

accurate to the best of my knowledge.  If called to testify, I could and would testify competently

as to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

## **Introduction**[2]

6.      As a global provider of on-premise, cloud, and hybrid business telecommunication

solutions, the Company helps small, midsize, and larger enterprise customers flexibly and reliably

connect and collaborate.  Over the last several years, the Company has grown through various

strategic acquisitions and partnerships.  These initiatives were designed to broaden the depth of

the Company's technical capabilities and offerings of software (including on-premise and cloud-

based software), hardware, and services provided globally to customers in a diverse range of

industries.

7.      While the Company has secured its position as a leader in the unified

communications (UC) market, its success has not been achieved without challenges.  In 2018, the

Company was acquired by Searchlight Capital Partners L.P. ("Searchlight").   Shortly after

Searchlight's acquisition,  cloud-delivered unified communications as a service ("UCaaS"), which

are cloud-based services that integrate various communication tools such as voice calls, video

conferencing, instant messaging, and email into a single platform, proliferated in the market.

Therefore, the Company prioritized investments in its UCaaS offerings, but ultimately fell behind

other market competitors in driving innovation around video and chat-based collaboration.  The

COVID-19 pandemic drove an overnight shift from in-office to video-enabled remote work from

home, resulting in decreasing demand for the Company's office-based traditional solutions and

increasing competition for UCaaS, which ultimately negatively impacted the Company's revenue

streams and profits.  Following this shift, the Company was forced to realign its UCaaS strategy

---

[2]     Capitalized terms used but not defined in this section have the meanings ascribed to them elsewhere in this
Declaration, or the Plan, as applicable.

and evaluate opportunities to innovate customer offerings, improve liquidity, and increase revenue. With these objectives in mind, the Company entered the strategic partnership with RingCentral, Inc. ("RingCentral") in the fall of 2021. Due to challenges that later emerged in the RingCentral partnership (as discussed herein) and the lingering impact of the pandemic, including increased supply chain costs for the Company's device business, the Company consummated the 2022 Transaction to address short term operating capital constraints, pursuant to which the Company issued the Senior Loans, as discussed in greater detail herein.

8.     Following the pandemic, the market shifted away from UCaaS offerings, with a greater emphasis on balancing remote work with a partial return to the office. Due to increases in cybersecurity threats and regulatory compliance requirements, customers in certain industries wanted the optionality of "hybrid" communications solutions for greater control and protection over their internal information technology, assets, and infrastructure. Hybrid solutions are communications solutions that enable organizations to deploy a tailored mix or combination of on-premise as well as private and public cloud infrastructure. In order to better capitalize on this emerging hybrid market opportunity, extend its geographic footprint in Europe and the United Kingdom, the Middle East, and Africa region ("EMEA"), and expand its enterprise focus, the Company consummated the Unify Acquisition in 2023 (as discussed herein), which resulted in the Company becoming the global leader in unified communications with more than 65 million active seats installed across 146 countries, as well as becoming the enterprise leader for unified communications in EMEA.

9.     Notwithstanding implementation of these strategic initiatives, the Company has continued to face liquidity constraints due to, among other things, the upfront cost of continued optimization of business operations, shifting capital to support evolving market opportunities,

servicing its debt payments, inflationary pressures, and a material increase in interest rates. These constraints have negatively impacted revenue generation and profitability. Further, in March 2023, certain of the lenders under the Junior Loans that did not participate in the 2022 Transaction (the "Junior Lenders") filed suit against certain Company entities and the lenders under the Junior Loans that participated in the 2022 Transaction (the "Senior Lenders") in the Supreme Court of the State of New York (the "New York Supreme Court"), alleging, among other arguments, that the 2022 Transaction violated their "sacred" rights under the Junior Credit Agreements (the "2022 Transaction Litigation"). The Company entities, the Senior Lenders, and other defendants each filed motions to dismiss the complaint, and in December 2023, the New York Supreme Court granted the motions to dismiss a subset of the counts, but declined to dismiss certain other causes of action. The parties cross-appealed the ruling, which appeals were argued before a five-judge panel of the New York Supreme Court's Appellate Division, First Judicial Department (the "NYS Appellate Division"), and on December 31, 2024, the NYS Appellate Division entered an order directing the New York Supreme Court to dismiss all counts of the Junior Lenders' complaint—expressly finding that the 2022 Transaction complied with the terms of the Junior Credit Agreements. In January 2025, the Junior Lenders sought a discretionary appeal at the New York State Court of Appeals (the "Court of Appeals") and in February 2025, the Company and other parties filed a joint opposition to the Junior Lenders' motion for leave to appeal to the Court of Appeals. Following entry into the RSA, and the parties' agreements and resolutions embodied therein, parties to the 2022 Transaction Litigation will, by March 10, 2025, jointly inform the Court of Appeals that the parties to the 2022 Transaction Litigation have reached a consensual settlement

on the outstanding issues in the 2022 Transaction Litigation, and request that the Court of Appeals refrain from issuing a ruling concerning any appeal.

10.    In early 2024, the Company retained advisors to explore various strategic alternatives and potential liquidity-enhancing transactions.  In connection with the assessment of these opportunities, the boards of directors of Debtors MLN TopCo Ltd. ("TopCo") and Mitel Networks (International) Limited ("MNIL" and the boards of directors collectively, the "Board") each appointed an independent director, Mr. Julian Nemirovsky, and established a special committee of the Board  (collectively, the "Special Committee").  In October 2024, Mr. Andrew C. Kidd was added as an additional independent director to the Board and was also appointed as an additional member of the Special Committee.  The Board delegated to the Special Committee the authority to evaluate strategic transactions and any potential conflict transactions.  Under the direction of the Special Committee, during the second and third quarters of 2024, the Company explored, and ultimately consummated, the following three strategic initiatives to bolster liquidity, maximize value for stakeholders, and best position the Company in a competitive industry: (a) entry into a $17 million asset-based lending facility (the "ABL Facility Transaction") in May 2024;  (b) renegotiation of the Company's RingCentral partnership through the sale of the Company's UCaaS business to RingCentral in June 2024, which allowed the Company to exit the existing partnership that was continuing to provide diminishing revenues (the "2024 RingCentral Transaction"); and (c) entry into a new strategic partnership with Zoom Communications, Inc. ("Zoom" and the underlying transaction, the "Zoom Transaction") in September 2024.

11.    As discussed in more detail herein, each of the ABL Facility Transaction, the 2024 RingCentral Transaction, and the Zoom Transaction was value accretive—enabling the Company to service its debt in the near term and best position the Company's business for the future by

expanding its market reach in telecommunications, specifically in the hybrid communications segment.  Notwithstanding these initiatives, by November 2024, the Company determined that it would not be able to pursue a refinancing of its existing funded indebtedness and would not be able to service its existing interest expense beyond the first quarter of 2025.  Accordingly, under the direction of the Special Committee, the Company began assessing and evaluating the Company's options to pursue a meaningful deleveraging transaction that would right-size the Company's balance sheet, materially reduce annual cash interest expense, and provide the Company with the necessary liquidity to execute on its go-forward business plan.  In late November 2024, the Company initiated engagement with its key stakeholders—including an ad hoc group of Senior Lenders (the "Ad Hoc Group") and the Ad Hoc Group Advisors (as defined in the Plan)[3] in an effort to achieve a consensual, long-term solution to the Company's outstanding debt obligations.

12.     As the Company advanced discussions with the Ad Hoc Group, the Special Committee determined that it was imperative to preserve the Company's liquidity to provide it with the necessary runway to work toward a consensual, value-maximizing restructuring transaction.  As a result, the Special Committee determined, in consultation with the Company's advisors, that it was not in the best interest of the Company's stakeholders to make scheduled interest payments due under the Junior Credit Agreements in December 2024.  This payment default under the Junior Credit Agreements triggered a cross-default under the Senior Credit Agreements.  Accordingly, on December 19, 2024, the Company entered into a forbearance agreement (the "Forbearance Agreement") with members of the Ad Hoc Group constituting the "Required Lenders" under the Senior Credit Agreements.  Pursuant to the Forbearance Agreement,

---

[3]     The Ad Hoc Group Advisors include (i) Davis Polk & Wardell LLP and (ii) Perella Weinberg Partners LP.

the Required Lenders agreed to forbear from taking enforcement actions with respect to certain Events of Default under the Junior Credit Agreements and the Senior Credit Agreements, and provided the parties with an opportunity to engage in earnest around a restructuring transaction through February 28, 2025. The Forbearance Agreement was subsequently extended through and including March 10, 2025, with the consent of the Required Lenders. During this time, the Company also sought to engage in discussions with the Junior Lenders in an effort to develop a broadly supported and comprehensive restructuring transaction and reached such an agreement prior to the Petition Date, as reflected herein.

13.     Through several weeks of extensive, arm's-length negotiations by and among the Company, Searchlight (in its capacity as sponsor to the Company and party to the RSA (as defined below)), the Ad Hoc Group, the Junior Lenders, and certain other Consenting Lenders (as defined in the RSA), the parties reached an agreement-in-principle on the material terms of a comprehensive restructuring transaction pursuant to a prepackaged chapter 11 plan (the "Restructuring Transactions"). The terms of the Restructuring Transactions are memorialized in the Restructuring Support Agreement, dated as of March 9, 2025 (the "RSA"), attached hereto as **Exhibit C**. The Company has broad support from its stakeholders to implement these Restructuring Transactions. As of the date hereof, holders of 100% of the ABL Loan Claims, 72.1% of the Priority Lien Claims, and over 81.1% of the Non-Priority Lien Term Loan Deficiency Claims have signed the RSA.

14.     Indeed, the Company, the Ad Hoc Group, and Searchlight, together with their respective advisors, conducted months of diligence and invested substantial time and effort considering various alternatives to drive consensus regarding the best path to address the Company's capital structure and liquidity constraints. The Company believes that consummation

of the Restructuring Transactions represents the best path forward for the Company to maximize the value of its business for the benefit of all its stakeholders, and deleverage the Company's balance sheet by approximately $1.15 billion and reduce annual cash interest expense by approximately $135 million.

15.     In connection with the RSA, and as set forth in more detail herein, certain members of the Ad Hoc Group and certain other holders of Priority Lien Loans have committed to provide post-petition debtor-in-possession financing to enable the Debtors to fund the chapter 11 process and continue their operations, including to fund wages, salaries, and benefits to the Debtors' employees, procure necessary goods and services, maintain trade terms with the Debtors' vendors, finance the cost of these chapter 11 cases, and meet other working capital needs of the Debtors (the "DIP Financing").  Additionally, as set forth in more detail herein, the Debtors expect to significantly deleverage their balance sheet by approximately $1.15 billion, and gain access to new capital to fund their go-forward, post-emergence operations through a committed exit term loan facility that will provide $64.5 million of new money (the "Exit Facility").

16.     I believe that the DIP Financing will benefit all stakeholders in these chapter 11 cases by providing the Debtors with the necessary liquidity to fund operations and by demonstrating to the Debtors' employees, vendors, and customers that the Debtors are entering chapter 11 on strong financial footing and will continue operating without interruption in the ordinary course.

17.     In conjunction with the commencement of these chapter 11 cases, the only Canadian Debtor, Mitel Networks Corporation ("MNC"), as the proposed "foreign representative" of this proceeding, is simultaneously seeking ancillary relief on behalf of its estate in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "Canadian Court")

pursuant to Part IV of the Companies' Creditors Arrangement Act ("CCAA," and that proceeding, the "CCAA Proceeding").  The principal purpose of the CCAA Proceeding is to request that the Canadian Court recognize MNC's chapter 11 case as a "foreign main proceeding" under Part IV of the CCAA to, among other things, protect MNC's assets and operations in Canada.  The CCAA Proceeding is particularly necessary to protect and preserve the value of the enterprise, as, although the United States are the center of main interests for MNC, the Company's Canadian operations, which are run through MNC, are key revenue generators for the Company and an essential part of any reorganized business.

18.     To familiarize the Court with the Company, its business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking pursuant to the First Day Motions, I have organized the rest of this Declaration as follows:

- **Part I** provides a general overview of the Company's corporate history;

- **Part II** provides a general overview of the Company's business operations;

- **Part III** provides an overview of the Company's prepetition capital structure;

- **Part IV** describes the events leading to the filing of these chapter 11 cases;

- **Part V** describes the Company's prepetition efforts to enhance liquidity, pursue several value maximizing transactions, and engage with stakeholders; and

- **Part VI** summarizes the terms of the proposed Restructuring Transactions, the objectives of these chapter 11 cases, and the relief requested in the First Day Motions.

## I.     <u>Corporate History</u>

19.     The Company is an award-winning global provider of on-premise, cloud, and hybrid business communications and collaboration solutions.  Through its various subsidiaries and affiliates, the Company sells (a) telecommunication hardware products, such as phones, handsets, and accessories, (b) software, and (c) corresponding subscription and professional support services

10

that allow small, midsize, and larger enterprises to communicate more efficiently and flexibly. Since its founding in 1973, the Company has continued to evolve to meet the demands of the telecommunications industry, from pioneering the virtualization of the on-premise private branch exchange (a private telephone network used within a company to handle inbound and outbound calls) to becoming a leading provider of unified communications through which the Company helps more than 65 million end users in 146 countries to connect, collaborate, and communicate. To further expand its business, in April 2010, the Company launched an initial public offering. The Company's stock was listed on the Nasdaq with the symbol MITL (and, since June 2012, on the Toronto Stock Exchange with the symbol MNW) until the Company was acquired by Searchlight in 2018.   Today, the Company's operations are primarily conducted by the United States, German, United Kingdom, and Canadian subsidiaries of TopCo, the ultimate parent and Cayman Islands-incorporated holding company.

### A.    Searchlight's Acquisition of the Company

20.    In April 2018, Searchlight entered into definitive documentation to acquire all of the outstanding common shares of MNC in a leveraged buyout for approximately $2 billion through MLN AcquisitionCo ULC ("MLN"), a British Columbia unlimited liability company formed by certain funds managed and/or advised by Searchlight (the "Searchlight Acquisition"). In November 2018, in order to consummate the Searchlight Acquisition, repay in full the Company's then-existing credit facility, and pay related transaction fees and expenses, Debtor MLN US HoldCo LLC and certain of its Debtor affiliates entered into:  (a) Legacy Senior Term Loans (as defined below) in the aggregate principal amount of $1.12 billion; and (b) Legacy Junior Term Loans (as defined below) in the aggregate principal amount of $260 million.  In addition, under the Legacy Senior Credit Agreement (as defined below), the Company entered into a $100 million revolving credit facility, which commitment was reduced to $90 million through an

amendment of the Legacy Senior Credit Agreement in October 2020 (the "Revolving Credit Facility").

21.     Pursuant to the terms of the Searchlight Acquisition, MLN acquired all of the shares of MNC in an all-cash transaction.  MNC and MLN amalgamated under Canadian law to form a new combined entity, Mitel Networks ULC ("New Mitel"), a British Columbia entity, which was eventually renamed "Mitel Networks Corporation."   The shares of MNC's United States subsidiaries were transferred from New Mitel to MLN US HoldCo LLC, a Delaware limited liability company, as reflected in the Organizational Chart.  As a result of the Searchlight Acquisition and the related transactions, MNC became a direct, wholly-owned subsidiary of MNIL.

### B.     The Company's Current Organizational Structure

22.     As reflected in the Organizational Chart attached as **Exhibit B**, TopCo owns 100% of the equity interests in its immediate subsidiary, MNIL, a private limited company incorporated under the laws of England and Wales.  Each of the Debtors is owned 100% by its direct parent and directly or indirectly owned 100% by TopCo.  TopCo is owned 99.89% by funds managed by Searchlight.[4]  All of the Debtors are board-managed entities, other than MLN US HoldCo LLC. Debtor MLN US TopCo, Inc. is the sole member of MLN US HoldCo LLC.

## II.     Business Operations

23.     The Company maintains operations across 146 countries in three primary markets: (a) the Americas, which includes the United States, Canada, the Caribbean, and Latin America; (b) EMEA; and (c) the continent of Asia and the Pacific region, including Australia and New Zealand.  As a result of its strategic partnerships and acquisitions, the Company is one of the largest

---

[4]     The remaining 0.11% is owned by an individual former employee of the Company.

global unified communications providers, and serves customers in a variety of industries, including media, hospitality, education, financial services, healthcare, retail, government, and legal services, among others.

24.     With a global geographic footprint and diverse customer base with a variety of needs, the Company maintains a broad communications products and services portfolio that offers businesses a range of premise-based, private and public cloud hardware and software solutions, and hybrid solutions with an integrated combination or mix of one or more of the foregoing.  The Company's business operations are facilitated through its employee resources and extensive third-party partner network and are divided into three categories:  (a) "unified communications" or "UC" products that deliver integrated voice, video, mobility, and other services in one interface, and the accompanying subscription services (the "Software and Subscription Products"); (b) comprehensive consultation and professional services (the "Professional and Support Services"); and (c) physical phones and accessories (the "Hardware Products").  Software and Subscription Products accounted for approximately 43% of the Company's revenue in fiscal year 2024.

A.      **Software and Subscription Products**

25.     The Company's Software and Subscription Products include "unified communications" and contact center software solutions, which are offered on-premise, in the cloud, or as a hybrid solution for customers.  "Unified communications and collaboration" technology or "UCC" combines collaboration tools into a single interface to organize the flow of communication across different endpoints, devices, and applications.  The Company sells a variety of customizable products to assist customers with streamlining internal and external engagement, communications, and transactions, including: (a) virtual business phone systems that deliver voice,

messaging, conferencing, and collaboration capabilities in a cost-effective manner; (b) all-in-one collaboration and meeting platforms; and (c) contact center products.

26.     The Company recognizes that collaboration and integration of different communication systems can enhance business productivity and promote efficiency.  For example, the Company offers several collaboration platforms, such as MiCollab, which combines voice, video, and instant messaging solutions on one interface.  Customers can also leverage their existing third-party applications for messaging and collaboration, such as Zoom, Microsoft Outlook, and Microsoft Teams, by integrating these applications into the Company's collaboration platform products.  The Company has also integrated artificial intelligence capabilities into its Software and Subscription Products.  For example, Zoom Workplace, an all-in-one application that became available to customers as part of the Company's new Zoom partnership (as discussed further below), includes the "AI Companion," which has capabilities to summarize meetings, emails, and chat threads, and compose chats and email drafts, among other things.  Further, the Company's contact center product options optimize customers' internal communications with employees as well as their engagement with external users.  For example, Mitel Workforce Optimization solutions improve internal employee performance and relationships through a variety of tools, such as tools enabling employees to check work schedules, make shift trades, or request vacation, and assisting supervisors to create schedules.    Another product, MiContact Center Business, is a consolidated interactive hub that helps the Company's customers manage all aspects of external user inquiries.

27.     Moreover, the Company also offers after-sale subscription-based software support programs for covered products, which provide knowledge support services and implement ongoing technical upgrades to maintain operational excellence.  Depending on the subscription level,

customers can have access to 24/7 software upgrade support and on-site and remote service responses. In total, Software and Subscription Products generated approximately $426 million in revenue for the Company in fiscal year 2024.

### B.     Professional and Support Services

28.     In addition to its Software and Subscription Products, the Company also offers end-to-end solution management, after-sale maintenance and support services for products, and professional consultation services through its global services organization and extensive partner network to help customers maximize their investment in the Company. Professional consultation services include, but are not limited to:   (a) assessment services regarding the integration, application customization, migration, and implementation of the Company's products to meet customer business requirements; (b) application integration to adapt the Company's products and solutions to the customer's business applications to improve user experience and productivity; (c) migration and implementation services to address the customer's core needs for successful solution deployment, which includes technical design, rollout support, integration and acceptance testing; (d) training to help guide customers on how to use the Company's products; and (e) transition and connectivity services that focus on the transition of service delivery into a managed services model. In total, Professional and Support Services generated approximately $276 million in revenue for the Company in fiscal year 2024 and accounted for approximately 28% of the Company's overall revenue in fiscal year 2024.

### C.     Hardware Products

29.     The Company's Hardware Product offerings support both on-premise and cloud-based software and can be tailored to customers' specific working style. Hardware Products primarily consist of telephone products, which include WiFi and Bluetooth-enabled desk phones, wireless phones, conferencing equipment, consoles, endpoints, and headsets. In total, Hardware

Products generated approximately $205 million in revenue for the Company in fiscal year 2024 and accounted for approximately 20% of the Company's overall revenue in fiscal year 2024.

### D.    Partner Program

30.    The Company has a presence in over 146 countries with a sales model that recognizes revenue through both direct sales by the Company and indirect sales by more than 6,000 third-party channel and distributor partners (the "Partners").   Through its Partners, the Company maintains customer loyalty, increases sale opportunities and customer satisfaction, drives revenue generation, and remains competitive within the telecommunications market. Partners are also critical to the Company's global reach and success.   Indeed, the Company generates 88% of sales globally indirectly through this broad-based network of Partners.   More specifically, products are sold by:  (a) the Company directly to its end users; (b) channel partners, who purchase products from the Company and subsequently sell products and/or services to end-user customers; and (c) distributor partners, who purchase products from the Company and subsequently sell products and/or services to channel partners, who then resell to end users.

### E.    The Debtors' Employees

31.    As of the Petition Date, the Debtors collectively employ approximately 760 individuals (collectively, the "Employees"), including approximately 757 full-time Employees and approximately three part-time Employees.  The vast majority of these Employees sit in the United States or Canada and are employed by Debtors Mitel Networks, Inc., Mitel (Delaware), Inc., or MNC.  A smaller number of Employees are employed by other Debtor entities, including five individuals employed by Debtor Mitel Europe Limited who sit in the United Kingdom.   The Debtors also retain both independent contractors (collectively, the "Independent Contractors") and temporary workers, who are either sourced from a staffing agency or are employed directly by the Debtors, to fulfill duties in the ordinary course of business on a short or long-term basis

16

(such temporary workers, collectively, the "Temporary Staff" and the Temporary Staff together with the Independent Contractors, the "Contingent Staff").  As of the Petition Date, the Debtors engage approximately 57 Independent Contractors and approximately 162 Temporary Staff.

32.     The Employees and the Contingent Staff perform a wide range of functions critical to the Debtors' operations and the administration of these chapter 11 cases.  In many instances, the Employees and the Contingent Staff include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, possess unique skills and experience, and/or have developed relationships that are essential to the Debtors' businesses.

III.   **Prepetition Capital Structure**

A.   **Funded Indebtedness**

33.     As of the Petition Date, the aggregate outstanding principal amount of the Debtors' funded indebtedness is approximately $1.31 billion.  The following table summarizes the funded debt obligations as of the Petition Date (which reflects the 2022 Transaction):

| Description | Secured Funded Debt | Maturity | Appx. Principal Amount Outstanding (as of March 2025) |
|---|---|---|---|
| ABL Loans | Swiss ABL Loans | May 2027 | $3 million |
| | Non-Swiss ABL Loans | May 2027 | $14 million |
| Senior Loans | Priority Lien Term Loans | October 2027 | $156 million |
| | Incremental Revolving Loans | November 2025 | $65 million |
| | Second Lien Term Loans | October 2027 | $576 million |
| | Third Lien Term Loans | October 2027 | $125 million |
| | Third Lien Additional Facility | October 2027 | $32 million |
| | Legacy Senior Term Loans | November 2025 | $235 million |

| Description | Secured Funded Debt | Maturity | Appx. Principal Amount Outstanding (as of March 2025) |
|---|---|---|---|
| Junior Loans | Legacy Junior Term Loans | November 2026 | $108 million |
| | | **Total Secured Funded Debt** | **$1.31 billion** |

1.     **ABL Loans**

34.     On May 30, 2024, the Debtors and certain non-Debtor affiliates entered into two single-draw asset-based term loan lending facilities in an aggregate principal amount of $17 million.

35.     *Swiss ABL Loan Credit Agreement*.  Non-Debtor Mitel Schweiz AG as borrower, TopCo, MNIL, MLN US TopCo Inc. ("U.S. Holdings"), U.S. PCI Services, LLC as Administrative Agent and Collateral Agent ("PCI"), and certain guarantors and lenders are parties to that certain *Term Loan Credit Agreement*, dated as of May 30, 2024 (as may be further amended, restated, supplemented, waived, or otherwise modified from time to time, the "Swiss ABL Loan Credit Agreement").  Pursuant to the Swiss ABL Loan Credit Agreement, lenders provided the Company with asset-based term loans in the aggregate principal amount of $2.75 million (the "Swiss ABL Loans").

36.     As of the date hereof, approximately $3 million of Swiss ABL Loans remains outstanding, *plus* all accrued and unpaid interest, fees, costs, expenses, charges, indemnities, and all other unpaid obligations.

37.     *Non-Swiss ABL Loan Credit Agreement*.  MLN US HoldCo LLC, as Borrower (the "Borrower"), TopCo, MNIL, U.S. Holdings, PCI, as administrative and collateral agent, and certain guarantors and lenders are parties to that certain *Term Loan Credit Agreement*, dated as of

May 30, 2024 (as may be further amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>Non-Swiss ABL Loan Credit Agreement</u>" and together with the Swiss ABL Loan Credit Agreement, and all ancillary documentation, the "<u>ABL Credit Documents</u>"). Pursuant to the Non-Swiss ABL Loan Credit Agreement, lenders provided the Company with asset-based term loans in the aggregate principal amount of $14.25 million (the "<u>Non-Swiss ABL Loans</u>" and, together with the Swiss ABL Loans, the "<u>ABL  Loans</u>").  As of the date hereof, approximately $14 million of Non-Swiss ABL Loans remains outstanding, *plus* all accrued and unpaid interest, fees, costs, expenses, charges, indemnities, and all other unpaid obligations.

38.    The ABL Loans are secured by a separate collateral package from the Senior Loans and Junior Loans.  The obligations under the ABL Credit Documents are guaranteed by TopCo, MNIL, MNC, all United States subsidiaries (except Mitel Cloud Service of Virginia, Inc.), all German subsidiaries, all United Kingdom subsidiaries (except Inter-Tel Europe Limited and Mitel Networks Pension Trustee Company Limited), and Mitel Schweiz AG (collectively, the "<u>Guarantors</u>").

## 2.    Senior Loans

39.    As part of the 2022 Transaction, (a) the Company issued $156 million in new money Priority Lien Term Loans, and (b) the Company purchased certain of the Junior Loans in exchange for $701 million of Second Lien Term Loans and Third Lien Term Loans.  Specifically, the Company purchased certain Legacy Senior Term Loans in exchange for Second Lien Term Loans, certain Legacy Junior Term Loans in exchange for Third Lien Term Loans, and, in March 2023, the Company purchased certain Legacy Senior Term Loans in exchange for the Third Lien Additional Facility.  As a result, the Senior Loans are senior in priority to the Junior Loans.

40.    Following the 2022 Transaction, the Senior Loan Facilities are comprised of three separate credit facilities in the following order of priority: (a) the Priority Lien Term Loans and

the Incremental Revolving Loans; (b) the Second Lien Term Loans; and (c) the Third Lien Term Loans and the Third Lien Additional Facility (as such terms are defined herein).

41.     Further, as part of the 2022 Transaction, the Senior Lenders holding Senior Loans obtained security interests on additional Company collateral, including the assets of certain subsidiaries in the United Kingdom and Germany.   The obligations under the Senior Loan Facilities are guaranteed by the Guarantors, excluding Mitel Schweiz AG.[5]   The Senior Loan Facilities are described in greater detail below.

42.     *Priority Lien Credit Agreement.*   Borrower, TopCo, MNIL, U.S. Holdings, Wilmington Savings Fund Society, FSB, as successor collateral and administrative agent (the "Senior Collateral Agent"), and certain guarantors and lenders are parties to that certain *Priority Lien Credit Agreement*, dated as of October 18, 2022 (as amended pursuant to that certain *Amendment No. 1* dated as of November 18, 2022, and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Priority Lien Credit Agreement"). Pursuant to the Priority Lien Credit Agreement, lenders provided the Company with term loans in the aggregate principal amount of $156 million (the "Priority Lien Term Loans").  As of the date hereof, approximately $156 million of Priority Lien Term Loans remains outstanding, *plus* all accrued and unpaid interest, fees, costs, expenses, charges, indemnities, and all other unpaid obligations.

43.     *Incremental Revolving Loans.*   The Priority Lien Credit Agreement provides that the Borrower may request that the lender parties thereto provide additional incremental term loan

---

[5]     Certain of the Guarantors located in Germany and the United Kingdom are non-Debtor entities.  Pursuant to the RSA, the Senior Lenders agree not to pursue remedies against the foreign non-Debtor Guarantors as long as the RSA is in effect. Through the Restructuring Transactions, the existing liens on the collateral securing the Prepetition Term Loans will be released and extinguished. The obligations under the Exit Facility will encumber these non-Debtor entities' assets upon emergence.

or revolving commitments.  On November 18, 2022, Borrower, TopCo, MNIL, U.S. Holdings, the Senior Collateral Agent, and certain lenders executed that certain *Incremental Assumption Agreement* (as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Priority Incremental Assumption Agreement").  Pursuant to the Priority Incremental Assumption Agreement, the commitments of the pre-existing Revolving Credit Facility were reduced from $90 million to $65 million (the "Incremental Revolving Loans").  As of the date hereof, approximately $65 million of the Incremental Revolving Loans (including letters of credit issued thereunder) remains outstanding, *plus* all accrued and unpaid interest, fees, costs, expenses, charges, indemnities, and all other unpaid obligations.

44.    *Second Lien Term Loans.*  Borrower, TopCo, MNIL, U.S. Holdings, the Senior Collateral Agent, and certain guarantors and lenders are parties to that certain *Second Lien Credit Agreement*, dated as of October 18, 2022 (as amended pursuant to that certain *Amendment No. 1* dated as of November 18, 2022, and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Credit Agreement").  Pursuant to the Second Lien Credit Agreement, lenders provided the Company with term loans in the aggregate principal amount of $576 million (the "Second Lien Term Loans").  As of the date hereof, approximately $576 million of Second Lien Term Loans remains outstanding, *plus* all accrued and unpaid interest, fees, costs, expenses, charges, indemnities, and all other unpaid obligations.

45.    *Third Lien Term Loans.*  Borrower, TopCo, MNIL, U.S. Holdings, the Senior Collateral Agent, and certain guarantors and lenders are parties to that certain *Third Lien Credit Agreement*, dated as of October 18, 2022 (as amended pursuant to that certain *Amendment No. 1* dated as of November 18, 2022, and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Third Lien Credit Agreement").  Pursuant to the Third

Lien Credit Agreement, lenders provided the Company with term loans in the aggregate principal amount of $125 million (the "Third Lien Term Loans").

46.     *Third Lien Additional Facility.*  In addition, under the Third Lien Credit Agreement, the Borrower may by written notice to the Senior Collateral Agent request additional incremental loans up to $80 million.  On March 9, 2023, Borrower, TopCo, MNIL, U.S. Holdings, the Senior Collateral Agent, and certain lenders executed that certain *Incremental Assumption Agreement* (as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Third Lien Incremental Assumption Agreement" and together with the Priority Lien Credit Agreement, the Priority Incremental Assumption Agreement, the Second Lien Credit Agreement, the Third Lien Credit Agreement, and all ancillary documentation, the "Senior Credit Agreements").  Under the Third Lien Incremental Assumption Agreement, lenders provided the Company with term loans in the aggregate principal amount of $32 million (the "Third Lien Additional Facility" and together with the Priority Lien Term Loans, the Incremental Revolving Loans, the Second Lien Term Loans, and the Third Lien Term Loans, the "Senior Loans" and the facilities thereunder, the "Senior Loan Facilities").

47.     As of the date hereof, approximately $157 million of Third Lien Term Loans remains outstanding, including amounts under the Third Lien Additional Facility, *plus* all accrued and unpaid interest, fees, costs, expenses, charges, indemnities, and all other unpaid obligations.

### 3.     Junior Loans

48.     *Legacy Senior Credit Agreement.*  Borrower, TopCo, MNIL, U.S. Holdings, Ankura Trust Company, LLC as successor collateral and administrative agent (the "Junior Collateral Agent" and together with the Senior Collateral Agent, the "Collateral Agents") certain guarantors and lenders are parties to that certain *First Lien Credit Agreement*, dated as of November 30, 2018 (as amended pursuant to that certain *Amendment No. 1* dated as of October

18, 2022, *Amendment No. 2* dated as of October 18, 2022, and *Amendment No. 3* dated as of October 18, 2022, and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Legacy Senior Credit Agreement").  Pursuant to the Legacy Senior Credit Agreement, lenders provided the Company with term loans in the aggregate principal amount of $235 million (the "Legacy Senior Term Loans").  As of the date hereof, approximately $235 million of Legacy Senior Term Loans remains outstanding, *plus* all accrued and unpaid interest, fees, costs, expenses, charges, indemnities, and all other unpaid obligations.

49.    *Legacy Junior Credit Agreement.*  Borrower, TopCo, MNIL, U.S. Holdings, the Legacy Collateral Agent, and certain guarantors and lenders are parties to that certain *Second Lien Credit Agreement*, dated as of November 30, 2018 (as amended pursuant to that certain *Amendment No. 1* dated as of October 22, 2022 and *Amendment No. 2* dated as of October 18, 2022, and as may be further amended, restated, supplemented, waived, or otherwise modified from time to time, the "Legacy Junior Credit Agreement" and together with the Legacy Senior Credit Agreement and all ancillary documentation, the "Junior Credit Agreements" and collectively with the ABL Credit Documents and the Senior Credit Agreements, the "Credit Documents").  Pursuant to the Legacy Senior Credit Agreement, lenders provided the Company with term loans in the aggregate principal amount of $108 million (the "Legacy Junior Term Loans" and together with the Legacy Senior Term Loans, the "Junior Loans" and together with the Senior Loans, the "Prepetition Term Loans").  As of the date hereof, approximately $108 million of Legacy Junior Term Loans remains outstanding, *plus* all accrued and unpaid interest, fees, costs, expenses, charges, indemnities, and all other unpaid obligations.

50.    The Junior Loans are secured by assets of the Debtors in the United States and Canada, as well as the assets of Debtors TopCo and MNIL.  The obligations under the Junior Loans

are guaranteed by the Guarantors, excluding Unify Inc., the United Kingdom subsidiaries, the German subsidiaries, and Mitel Schweiz AG.

### B.   Omnibus Intercreditor Agreement

51.    The Collateral Agents, TopCo, MNIL, U.S. Holdings, Borrower, and Debtor and non-Debtor entities party thereto, entered into that certain *Omnibus Intercreditor Agreement*, dated as of October 18, 2022 (as may be further amended, restated, supplemented, waived, or otherwise modified from time to time, the "Omnibus Intercreditor Agreement").  The Omnibus Intercreditor Agreement governs, among other things, the rights, interests, obligations, priority, and positions of the liens and claims to the "Common Collateral" (as defined in the Omnibus Intercreditor Agreement) under the Senior Loans and the Junior Loans.[6]   I understand that the Omnibus Intercreditor Agreement sets forth the agreements between the Collateral Agents with respect to the priority of liens on, and security interests in, the Common Collateral, and the respective rights and remedies of the various lenders, among other things.

52.    Pursuant to the Omnibus Intercreditor Agreement, the parties thereto agreed that (a) any lien on the Common Collateral securing obligations under the Priority Lien Credit Agreement and Priority Incremental Assumption Agreement is senior to the liens securing the Second Lien Credit Agreement, Third Lien Credit Agreement and Third Lien Incremental Assumption Agreement, Legacy Senior Credit Agreement, and Legacy Junior Credit Agreement (in such order); (b) any lien on the Common Collateral securing the Second Lien Credit Agreement is subordinate to the liens securing the Priority Lien Credit Agreement and Priority Incremental Assumption Agreement and senior to the liens securing the Third Lien Credit Agreement, Third Lien Incremental Assumption Agreement, Legacy Senior Credit Agreement, and Legacy Junior

---

[6]    The ABL Loans are not subject to the Omnibus Intercreditor Agreement.

Credit Agreement (in such order); (c) any lien on the Common Collateral securing the obligations under the Third Lien Credit Agreement and Third Lien Incremental Assumption Agreement is subordinate to the liens securing the Priority Lien Credit Agreement, Priority Incremental Assumption Agreement, and Second Lien Credit Agreement, and senior to the liens securing the Legacy Senior Credit Agreement and Legacy Junior Credit Agreement (in such order); (d) any lien on the Common Collateral securing the obligations under the Legacy Senior Credit Agreement is subordinate to the liens securing the Priority Lien Credit Agreement, Priority Incremental Assumption Agreement, Second Lien Credit Agreement, Third Lien Credit Agreement, and Third Lien Incremental Assumption Agreement; and (e) any lien on the Common Collateral securing the obligations under the Legacy Junior Credit Agreement is subordinate to the liens securing the Priority Lien Credit Agreement, Priority Incremental Assumption Agreement, Second Lien Credit Agreement, Third Lien Credit Agreement, Third Lien Incremental Assumption Agreement, and Legacy Senior Credit Agreement.

**IV.    Events Leading to the Filing of These Chapter 11 Cases**

**A.    Impact of COVID-19 Pandemic, Market Pressures, and Operational Challenges**

53.    Over the last several years leading up to the Petition Date, the Company experienced a confluence of industry and other external headwinds that created unanticipated costs and adversely impacted the Company's operations and liquidity.  Businesses shifted to remote work during the COVID-19 pandemic, accelerating the proliferation of team chat and video collaboration platforms in the market, but reducing the need for certain of the Company's communications products and services that were primarily developed for an in-office environment. Following the COVID-19 pandemic, customers in certain industries, such as government, healthcare, banking, and manufacturing, implemented return-to-office policies and additional

requirements to manage increased security and resiliency risks threatening to disrupt their business.  As a result, the market has increasingly trended toward utilizing hybrid communications solutions to address workplace, business continuity and specialized regulatory requirements. Following this shift, the Company identified the opportunity to pivot with the market by leveraging its strengths to enable it to compete effectively. However, liquidity constraints limited the Company's ability to shift resources, optimize business operations, and fuel profitable growth. Moreover, inflationary pressures due to disrupted supply chains and constrained manufacturing over multiple years contributed to inventory constraints and higher material costs for the Company's Hardware Products, including from the purchase and production of chips.  In addition, higher federal interest rates further negatively impacted the Company's financial and liquidity position.

54.     From 2021 to 2023, the Company undertook several strategic initiatives to address these headwinds, losses from its strategic partnerships, and operational liquidity challenges including, among other things, pursuing a liability management transaction in 2022 to address then-existing liquidity issues.  A summary of these initiatives is set forth below.

**B.     RingCentral 2021 Strategic Partnership**

55.     In November 2021, the Company announced a strategic partnership with RingCentral, a provider of UCaaS solutions (the "2021 RingCentral Partnership").  RingCentral became the Company's exclusive UCaaS cloud provider, pursuant to which the Company's customer base would migrate from the Company's UCaaS and on-premise platforms to RingCentral's Message Video Phone (MVP) platform, a cloud-based all-in-one message, video, and voice application.  The 2021 RingCentral Partnership was designed to provide a migration path for the Company's global customer base to upgrade to RingCentral's modern cloud-based

communications platforms, while allowing the Company to focus on, and continue investing in, its flagship UC products, services, and partnerships.

56.     RingCentral paid $650 million to acquire certain of the Company's intellectual property rights to its UCaaS solution platform, called "MiCloud Connect," access to its UCaaS customer base, and its "CloudLink" technology, a platform that allows migration from on-premise phone systems to the cloud, and other technology that the Company developed to integrate on-premise customers with cloud applications. Through this acquisition, RingCentral planned to migrate the Company's customers to their MVP platform in the cloud while still utilizing Mitel's on-premise technology for voice.

57.     Through the first quarter of 2022, customer migration levels from the Company to RingCentral's cloud platform were slower than projected, but began to significantly improve in the second half of the year.  However, as the Company began to see increased customer migrations to RingCentral, toward the end of the fourth quarter of 2022, the partnership became plagued with numerous disputes related to the incremental migration payments and other payments due from RingCentral to the Debtors under the agreements.  As a result, in January 2023 and (to address ongoing challenges) in June 2023, certain Debtor entities and RingCentral entered into agreements to, among other things, settle disputes related to payments and address other operational issues under the partnership agreements (collectively, the "RingCentral Settlements").

C.     **2022 Transaction and Subsequent Litigation**

58.     By 2022, the Company had approximately $1.2 billion of debt under the Junior Loans and the Revolving Credit Facility.  The Company was at risk of liquidity shortfalls due to, among other things, challenges related to the 2021 RingCentral Partnership itself (specifically, slower than expected customer migrations), and the lingering effects of COVID-19.  As a result, the Company began evaluating transactions to generate additional liquidity and pursue other

strategic partnerships to position itself for long-term success, such as through the Unify Acquisition (as described herein).

59.     Following an extensive analysis of its options and after evaluating various proposals, the Company, with the assistance of its advisors, determined that it was in the best interest of the Company and its stakeholders to pursue an out-of-court recapitalization with the Senior Lenders that formed a majority of its then existing lenders under the Junior Loans, pursuant to which the Company would issue new money incremental secured debt to the Senior Lenders that had priority over the Junior Loans.  As part of the transaction: (a) the new Senior Loans maintained a first priority position relative to the Junior Loans; and (b) the Senior Lenders received the opportunity to sell their existing Junior Loans to the Company in exchange for higher-priority obligations.  In turn, the Company negotiated the purchase at a discount to par to reduce the Company's overall debt burden (collectively, the "2022 Transaction").

60.     The 2022 Transaction was consummated in October 2022 and resulted in the Company purchasing the Senior Lenders' Junior Loans for approximately $701 million of Second Lien Term Loans and Third Lien Term Loans, which have priority over the existing Junior Loans held by the Junior Lenders that did not participate in the 2022 Transaction.  Further, the Company issued $156 million in new money Priority Lien Term Loans.[7]

### 1.     Litigation Challenging 2022 Transaction

61.     In March 2023, the Junior Lenders commenced the 2022 Transaction Litigation against certain Company Defendants,[8] Searchlight, Credit Suisse AG, Cayman Islands Branch as the predecessor collateral and administrative agent ("Credit Suisse"), and the Senior Lenders in

---

[7]     A detailed description of the Company's existing funded debt as of the Petition Date is set forth in Section III of this Declaration.

[8]     "Company Defendants" means TopCo, MNIL, U.S. Holdings, and Borrower.

New York State Supreme Court seeking a judgment invalidating the 2022 Transaction and damages for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference, and fraudulent transfer.[9]  The Junior Lenders alleged, among other things, that the 2022 Transaction breached the Junior Credit Agreements by violating their "sacred" consent rights.[10]  Defendants in the litigation, including the Company Defendants, filed responsive papers setting forth the legal and factual bases upon which the 2022 Transaction complied with the terms of the Junior Credit Agreements.[11]

62.     In May 2023, the Company Defendants, the Senior Lenders, the Junior Collateral Agent, and Searchlight each moved to dismiss the Junior Lenders' claims.[12]  On June 8, 2023, Senior Lenders managed by either Nuveen Asset Management, LLC or Teachers Advisors, LLC (collectively, "Nuveen") filed an answer and asserted crossclaims against the Company Defendants and the Senior Lenders for fraudulent transfer and against the Senior Lenders for breach of contract.[13]

63.     On December 5, 2023, in a bench ruling, New York Supreme Court Justice Jennifer G. Schecter denied the motion to dismiss the Junior Lenders' claims for breach of certain express contractual provisions, but dismissed the Junior Lenders' implied covenant of good faith

---

[9]    *Complaint*, *Ocean Trails CLO VII v. MLN TopCo Ltd.*, No. 651327/2023 [Docket No. 1] (N.Y. Sup. Ct. Mar. 14, 2023), *as amended* [Docket No. 30] (N.Y. Sup. Ct. May 26, 2023) ("Amended Compl.").

[10]   Amended Compl. ¶¶ 22, 78, *Ocean Trails CLO VII*; *see also Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss* at 31–32, *Ocean Trails CLO VII*, No. 651327/2023 [Docket No. 83] (N.Y. Sup. Ct. Aug. 11, 2023).

[11]   *Mitel Defendants' Memorandum of Law in Support of Motion to Dismiss* at 10–16, *Ocean Trails CLO VII*, No. 651327/2023 [Docket No. 43] (N.Y. Sup. Ct. May 31, 2023) ("Mitel Mem.").

[12]   Mitel Mem.; *Credit Suisse AG, Cayman Islands Branch's Memorandum of Law in Support of Its Motion to Dismiss*, *Ocean Trails CLO VII*, No. 651327/2023 [Docket No. 47] (N.Y. Sup. Ct. May 31, 2023); *Participating Lenders' Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Amended Complaint*, *Ocean Trails CLO VII*, No. 651327/2023 [Docket No. 45] (N.Y. Sup. Ct. May 31, 2023); *Memorandum of Law in Support of Defendant Searchlight Capital Partners, LP's Motion to Dismiss the Complaint*, *Ocean Trails CLO VII*, No. 651327/2023  [Docket No. 42] (N.Y. Sup. Ct. May 31, 2023).

[13]   *Answer and Crossclaims* at 79–82, *Ocean Trails CLO VII*, No. 651513/2023 [Docket No. 57] (N.Y. Sup. Ct. June. 8, 2023).

and fair dealing, fraudulent transfer, and tortious interference claims, as well as all of Nuveen's cross-claims.[14]  The parties, except for Nuveen, cross-appealed this ruling and, after oral argument in October 2024, on December 31, 2024, the NYS Appellate Division unanimously affirmed the dismissal of the breach of implied covenant of good faith and fair dealing, fraudulent transfer, and tortious interference claims and unanimously reversed the New York Supreme Court's decision denying the motions to dismiss with respect to the other causes of action, concluding that (a) the 2022 Transaction did not breach the Junior Credit Agreements and (b) the Senior Credit Agreements and the amendments to the Junior Credit Agreements are "valid and enforceable contracts."[15]  The NYS Appellate Division directed the Clerk to enter judgment dismissing all claims.[16]  In January 2025, the Junior Lenders sought a discretionary appeal at the Court of Appeals and, in February 2025, the Company Defendants, the Senior Lenders, Searchlight, and Credit Suisse filed a joint opposition to the Junior Lenders' motion for leave to appeal to the Court of Appeals.  Consistent with the Restructuring Transactions under the RSA, the parties to the 2022 Transaction Litigation will jointly inform the Court of Appeals that a consensual settlement on the outstanding issues in the 2022 Transaction Litigation has been reached, and request that the Court of Appeals refrain from issuing a ruling concerning any appeal of the Financing Litigation Ruling (as defined in the RSA).  Upon consummation of the Restructuring Transactions, the appeal shall be dismissed.

---

[14]  Hr'g Tr. at 29:8–25; 34:15–35:18; 48:15–49:15; 53:5–54:22; 57:5–10, *Ocean Trails CLO VII*, No. 651327/2023 [Docket No. 178] (N.Y. Sup. Ct. Dec. 15, 2023).

[15]  *See Ocean Trails CLO VII v. MLN TopCo Ltd.*, No. 2024-00169, slip op. at 2–3 [Docket No. 37] (N.Y. App. Div. Dec. 31, 2024).

[16]  *Id.* at 1, 3.

### D. 2023 Unify Acquisition

64. To further expand its geographic footprint and large enterprise customer base within the unified communications industry, in September 2023, the Company acquired Debtor Unify Inc. and certain of its non-Debtor affiliates, the unified communications and collaboration communications business of the French-based Atos group ("Atos"), making the Company the second largest unified communications company in the world (the Unify entities collectively, "Unify" and such acquisition, the "Unify Acquisition").   The Unify Acquisition, among other things, broadened the Company's reach primarily in EMEA and better positioned the Company to address the increasing demand for hybrid communications solutions.  In a value-maximizing and cost-effective transaction, the Company acquired Unify's voice platforms, collaboration and contact center products, device and endpoint portfolio, and related intellectual property.  The Company also acquired certain corresponding contracts that Atos was previously party to, including agreements with NICE Systems UK Limited, which provides cloud and on-premises enterprise software solutions (collectively with any affiliates that transact with the Company, "NICE").

## V. Pursuit of Strategic Alternatives to Address Liquidity Challenges and Stakeholder Engagement

### A. Retention of Professionals

65. As part of the Company's ongoing efforts to enhance its liquidity ahead of the Legacy Senior Term Loans' maturity in November 2025, the Company retained each of Paul, Weiss, Rifkind, Wharton & Garrison LLP, as restructuring counsel, PJT Partners LP, as investment banker, and FTI Consulting, Inc., as financial advisor, in 2024 to explore strategic alternatives. Together with the Company, the advisors analyzed the Company's capital structure, potential

sources of liquidity, and available financial runway in order to address the Company's balance sheet and its ability to service its debt payments as they came due.

### B.      Appointment of Independent Directors and Special Committee

66.      In February 2024, in recognition of the importance of the Company's independent review of its strategic alternatives, TopCo and MNIL appointed Mr. Julian Nemirovsky as an independent director of their respective boards.  In addition, in May 2024, the Board established the Special Committee and appointed Mr. Nemirovsky as a member of the Special Committee.  In October 2024, Mr. Andrew Kidd was added as an additional independent director at TopCo and MNIL, and was also appointed as an additional member of the Special Committee.

67.      Among other things, the Board delegated exclusive authority to the Special Committee to (a) plan for and assess potential strategic alternatives in connection with a potential restructuring and reorganization of the Company, including filing the chapter 11 cases by the Company, as well as ancillary or parallel insolvency proceedings in various jurisdiction as may be necessary or advisable, with certain limitations; (b) conduct a special review of the respective company's governance, financial transactions, and business operations to assess the potential viability of legal claims that may be brought by various parties against the board or the ultimate beneficial holder(s) of equity interests in the Company; and (c) consider, negotiate, approve, authorize, and act upon any matter, as determined by the Special Committee presents conflicts of interest between the respective company and related entities.

68.      The Special Committee met regularly from June 2024 to the Petition Date with the Company's management and advisors to evaluate, consider, assess, and direct the Company with respect to conflict and restructuring matters.  As part of this process, the Special Committee directly oversaw the Company's engagement with its lenders regarding a comprehensive restructuring transaction.

C.  **Prepetition Liquidity-Enhancing Transactions**

69.  By early 2024, the Company was working to integrate the Unify business into its operations and seeking to derive further cost savings from that integration, which were materializing more slowly than anticipated.  Further, as the 2021 RingCentral Partnership was focused exclusively on migrations to RingCentral's fully cloud-based platform, it had failed to meet emerging market needs for a hybrid communications solution, hindering the strategic partnership's success and long-term viability.  In connection with its evaluation of its liquidity position in the second quarter of 2024, in consultation with its advisors and following extensive analysis, the Company determined that it would be in the best interests of the Company and its stakeholders to pursue the 2024 RingCentral Transaction and the Zoom Transaction to extend its liquidity runway, implement its go-forward business plan, and better position itself for discussions with the Company's stakeholders.  In light of the Company's near-term liquidity needs, the Company consummated the ABL Facility Transaction to provide the necessary liquidity runway to negotiate and enter into the 2024 RingCentral Transaction.  As a result of the 2024 RingCentral Transaction, the Company had sufficient liquidity through the start of the fourth quarter of 2024 and was able to pursue a partnership with Zoom catered to the largest segment of the communications market focused on hybrid solutions, which the Company anticipates will support additional, long-term business growth opportunities.  In the short term, as a result of the Zoom Transaction, the Company secured sufficient liquidity to support its operations through the first quarter of 2025.  As set forth in more detail below, each of the ABL Facility Transaction, the 2024 RingCentral Transaction, and the Zoom Transaction were value accretive transactions that provided the Company with critical liquidity and enabled it to maximize value for stakeholders.

1.  **ABL Facility Transaction**

70.     In September 2023, the Company launched a competitive financing process for an asset-based lending facility of up to $20 million to obtain additional operational flexibility. The Company approached over 60 financing sources, including asset-based lenders, credit funds, and banks.  The Company hired KPMG International Limited ("KPMG"), which conducted a field examination on inventory and accounts payable, and Hilco Global ("Hilco"), which conducted an appraisal initially on legacy Mitel inventory.  When the field examination and appraisal were updated to include Unify inventory following the close of the Unify Acquisition, the Company and its advisors reapproached the market in January 2024.  In April 2024, BTG Pactual US ("BTG") sent the Company a term sheet and began exclusively negotiating with the Company.  In May 2024, the Company and BTG executed the ABL Credit Documents, which provided principal in the amount of $17 million.  As a result of the ABL Facility Transaction, the Company was able to pursue the 2024 RingCentral Transaction, which further enhanced the Company's liquidity position.

## 2.     2024 RingCentral Transaction

71.     By 2024, the Company continued to face challenges under the 2021 RingCentral Partnership and the relationship did not meaningfully improve following the RingCentral Settlements.  As part of its efforts to extend its liquidity runway, the Company explored options to exit the relationship in a mutually value maximizing transaction.  In June 2024, the Company entered into a new transaction with RingCentral to sell the Company's remaining cloud business to RingCentral, license back CloudLink from RingCentral, and resolve prior disputed payments in

a transaction that netted the Company approximately $30 million of incremental liquidity and terminated the existing 2021 RingCentral Partnership and corresponding agreements.[17]

72.     Along with the $30 million in consideration, the 2024 RingCentral Transaction also eliminated several exclusivity provisions that restricted the Company's ability to pursue other value maximizing strategic partnerships, like the Zoom Transaction.

### 3.     Zoom Transaction

73.     In September 2024, to address market demand, the Company entered into a strategic partnership with Zoom, which also generated additional liquidity for the Company. Under the partnership, Company and Zoom will jointly develop, promote, and sell an exclusive hybrid cloud and on-premise solution that combines Zoom Workplace and Zoom AI Companion with the Company's flagship communications platform.  Pursuant to the Zoom Transaction, Zoom will serve as the Company's exclusive UCaaS offering within its overall UC portfolio and the Company's partners and sales teams will sell the Zoom-first experience as a core part of the unique hybrid communications solution or help customers migrate to Zoom if UCaaS is their preferred deployment model.  Among other things, Zoom provided the Company with material incremental liquidity, and the partnership is expected to continue to bring in additional value to the Company as hybrid communications solutions emerge as the future of the telecommunications business and position the Company at the forefront of the market.

74.     The ABL Facility Transaction, 2024 RingCentral Transaction, and Zoom Transaction each provided the Company with critical liquidity and positioned the Company to promote continued growth in its go-forward business.  With the support of these value-maximizing

---

[17]    Unify also had a partnership with RingCentral preceding the 2023 Unify Acquisition, separate and apart from the 2021 RingCentral Partnership.  Under the 2024 RingCentral Transaction, the Unify-RingCentral partnership was also terminated and the parties mutually released and settled any claims and remaining amounts due.

transactions, the Company then pivoted to engage the Senior Lenders with respect to a long-term solution to address its capital structure.

### D.   Stakeholder Engagement

75.    Following execution of the ABL Facility Transaction, 2024 RingCentral Transaction, and Zoom Transaction, the Company understood that an effective and long-term solution to deleverage its capital structure was required and that this would necessitate broad-based support from its various stakeholders.  Therefore, in November 2024, under the direction of the Special Committee, the Company initiated arm's-length, good-faith discussions with the Ad Hoc Group around a consensual prepackaged restructuring.

76.    By early December 2024, recognizing that the Company needed to preserve liquidity and work with key stakeholders to implement a comprehensive restructuring transaction, the Special Committee determined that it was in the best interest of the Company to forego the December 19, 2024 interest payment due in connection with the Junior Loans.  Simultaneously, the Special Committee recommended that the Company and its advisors engage with the Ad Hoc Group to put a forbearance in place pursuant to which the Ad Hoc Group members representing the "Required Lenders" under the Senior Credit Agreements would not exercise remedies against the Company on account of the Events of Default triggered by the Company's non-payment of interest and other defaults under the Junior Credit Agreements and the Senior Credit Agreements. The terms of this forbearance were negotiated with the members of the Ad Hoc Group and, on December 19, 2024, the Company, Senior Collateral Agent, and members of the Ad Hoc Group entered into that certain *Forbearance Agreement,* dated December 19, 2024, pursuant to which the "Required Lenders" agreed to forbear from exercising remedies through and including January 30, 2025, which period was further extended (a) through and including February 28, 2025 under the *Amended and Restated Forbearance Agreement*, dated January 30, 2025, and (b) further extended

through and including March 10, 2025 with the consent of the Required Lenders (the "Forbearance Period").  During the Forbearance Period, the Company engaged with members of the Ad Hoc Group and Searchlight to develop the Restructuring Transactions, and the parties also successfully engaged with the Junior Lenders to reach a fully consensual restructuring.

77.     After considering in-court proposals, in consultation with its advisors, the Special Committee and Company determined that implementing the terms of the Restructuring Transactions (as defined in the RSA and described herein) through a chapter 11 plan of reorganization (and a concurrent recognition proceeding under the CCAA in Canada) was optimal, as it maintains the maximum achievable creditor support, is fair to all creditors and other stakeholders, and best positions the Company for success upon emergence.  On March 9, 2025, the Debtors entered into the RSA with members of the Ad Hoc Group, the Junior Lenders, and Searchlight, BTG Pactual US as the ABL Lender, and certain other holders of Priority Lien Loans, and launched solicitation of the Debtors' prepackaged plan of reorganization.

## VI.     The Objectives of, and the Means for Implementing, These Chapter 11 Cases

### A.     The Restructuring Support Agreement

78.     The terms of the Restructuring Transactions are set forth in the RSA and a chapter 11 plan attached as Exhibit A to the RSA (the "Plan").[18]  The RSA envisions a substantial deleveraging of the Debtors' balance sheet by over $1.15 billion and a reduction of $135 million in annual cash interest expense.  The delevered capital structure contemplated by the RSA will position the reorganized Debtors for long-term growth following their emergence from these chapter 11 cases and to continue making critical investments to successfully perform in their competitive industry.  Pursuant to the RSA and subject to the conditions specified therein, the

---

[18]     The following description of the Restructuring Transactions is for informational purposes only and is qualified in its entirety by reference to the RSA and the Plan.

members of the Ad Hoc Group have agreed to, among other things, support the Restructuring Transactions and vote in favor of the Plan.

79.     The RSA and Plan contemplate the following key terms of the Restructuring Transactions:

(a)     receipt of an aggregate principal amount of $60 million of DIP New Money Term Loans which, together with the DIP Upfront Premium and the DIP Backstop Premium, will be converted into exit term loans on the Effective Date;

(b)     the roll-up and equitization of an aggregate principal amount of $62 million of Priority Lien Loans held by the DIP Lenders;

(c)     entry into the Exit Facility, comprised of:

i.   Tranche A-1 Term Loans in an aggregate principal amount equal to $20 million; and

ii.  Tranche A-2 Term Loans, consisting of (A) $69 million of converted DIP New Money Term Loans (inclusive of all fees and premiums payable-in-kind), (B) approximately $51 million in New Money Tranche A-2 Term Loans (inclusive of all fees and premiums payable-in-kind);

(d)     the Consenting Junior Lenders' Fee Consideration on account of the settlement with the Junior Lenders consists of (i) $1.25 million in cash and (ii) $3.75 million of Incremental Tranche A-2 Term Loans issued to the Junior Lien Financing Parties (or their designee(s)), which shall not consist of New Money Tranche A-2 Term Loans;

(e)     (i) lenders that commit to funding the Tranche A-1 Term Loans will each receive their pro rata share of the Tranche A-1 Backstop Premium, in the form of New Common Equity; (ii) lenders that commit to funding the New Money Tranche A-2 Term Loans will each receive their pro rata share of the Tranche A-2 Term Loan Backstop Premium, payable-in-kind; and (iii) lenders that actually fund the New Money Tranche A-2 Term Loans will each receive their pro rata share of the Tranche A-2 Term Loan Funding Premium in the form of New Common Equity, subject to further dilution by the MIP Equity Pool;

(f)     lenders that commit to funding the DIP New Money Term Loans and New Money Tranche A-2 Term Loans (which, for the avoidance of doubt, excludes Incremental Tranche A-2 Exit Term Loans) will additionally

receive their pro rata share of the DIP Backstop Premium in the form of DIP New Money Term Loans and the Tranche A-2 Term Loan Backstop Premium in the form of New Money Tranche A-2 Term Loans, respectively;

(g)     the equitization of Allowed Priority Lien Claims and Non-Priority Lien Term Loan Deficiency Claims, in each case, subject to dilution on account of any DIP Equitization Shares, any New Common Equity issued in connection with the Tranche A-1 Term Loan Backstop Premium, any New Common Equity issued in connection with the Tranche A-2 Term Loans Funding Premium, and the MIP Equity Pool;

(h)     the ABL Loan Claims shall continue in full force and effect against the Reorganized Debtors on the Effective Date in accordance with the Amended and Restated ABL Loan Credit Agreements, subject to a waiver of change of control triggers on account of the restructuring and extensions of deadlines for deliverables under the ABL Loan Credit Agreements;

(i)     Allowed General Unsecured Claims will be Unimpaired under the Plan and treated in the ordinary course;

(j)     the cancellation of all Existing Mitel Interests on the Effective Date; and

(k)     the Company, the Consenting Sponsor, the Senior Lenders, and the Junior Lenders will seek to the dismiss the 2022 Transaction Litigation.

80.     In connection with the negotiation and documentation of the Restructuring Transactions, the Company also engaged in arm's-length, good-faith negotiations with Atos and NICE to address certain disputes between the parties and the parties' go-forward operational relationship.  Prior to the Petition Date, the Company, Atos, and NICE entered into settlement agreements (the "Atos/NICE Prepetition Agreements") to provide a framework for the Debtors' go-forward relationship with these key operational counterparties upon consummation of the Restructuring Transactions.  Entry into the Atos/NICE Prepetition Agreements was a condition precedent to effectiveness of the RSA and the Debtors' assumption of the Atos/NICE Prepetition Agreements as of the Effective Date is a condition precedent to effectiveness of the Plan and consummation of the Restructuring Transactions contemplated thereby.

81.    The terms of the Atos/NICE Prepetition Agreements require the Debtors to assume such agreements pursuant to a standalone order authorizing such assumption pursuant to section 365 of the Bankruptcy Code.  The Debtors have accordingly filed a motion contemporaneously herewith to assume the Atos/NICE Prepetition Agreements, effective as of the Effective Date.  Assumption of the Atos/NICE Prepetition Agreements is an essential precondition to consummation of the Restructuring Transactions and therefore a sound exercise of the Debtors' business judgment.

82.    Further, in connection with the consummation of the Restructuring Transactions, the Company conducted a comprehensive analysis of its leases and have filed a motion contemporaneously herewith to reject one of the Debtors' leases in order to implement its go-forward business plan.  Rejection of this lease is in the best interests of the Debtors and represents the sound exercise of the Debtors' business judgment to exit a burdensome obligation.

### 1.    RSA Milestones

83.    The RSA contemplates the following timeline for implementation of the Restructuring Transactions, which includes corresponding milestones for the CCAA Proceeding:

| Deadline | Milestone |
|---|---|
| No later than March 10, 2025 | Pursuant to and consistent with Section 5.07(a) of the RSA, the Financing Litigation Parties (as defined in the RSA) will jointly inform the Court of Appeals that the Financing Litigation Parties have reached a consensual settlement on the outstanding issues in the Financing Litigation, and request that the Court of Appeals refrain from issuing a ruling concerning any appeal of the Financing Litigation Ruling |
| No later than March 12, 2025 | Entry of the Interim DIP Order and Scheduling Order |

| Deadline | Milestone |
|---|---|
| No later than March 24, 2025 | Entry of the Initial Recognition Order, Supplemental Order, and Interim DIP Recognition Order by the CCAA Court |
| No later than April 8, 2025 | Entry of the Final DIP Order |
| No later than April 18, 2025 | Entry of the Final DIP Recognition Order by the CCAA Court |
| No later than April 23, 2025 | Entry of the Confirmation Order |
| No later than May 3, 2025 | Entry of the Confirmation Recognition Order by the CCAA Court |
| No later than May 23, 2025, subject to further extensions | Consummation of the Plan |

The RSA provides that the Plan Effective Date milestone may be extended, with the consent of the Required Consenting Senior Lenders, by a further 30 days solely to obtain the necessary regulatory approvals needed for the Plan to be consummated.  Failure to meet such milestones may give rise to certain termination rights in favor of the "Required Consenting Senior Lenders" under the RSA.

80.     Given the substantial benefits of the Restructuring Transactions, I believe that the proposed Restructuring Transactions currently represent the best available path forward to right-size the Debtors' balance sheet and position the Debtors for future success following these chapter 11 cases.  I further believe that reaching consensus on the Restructuring Transactions prior to commencing these chapter 11 cases (and the related CCAA Proceeding) was critical to ensuring a smooth landing in chapter 11 and providing the Debtors with a plan on which to build additional stakeholder support for the Debtors' restructuring, which will maximize the value of the Debtors' estates and their going-concern business.  Moreover, I understand that the Debtors' obligations

under the RSA are subject to a fiduciary out, thus ensuring that the Debtors are able to continue considering all unsolicited offers during these chapter 11 cases.

**B.    The Debtors' Need for Liquidity and the Proposed DIP Financing**

81.    As described above and pursuant to the DIP Motion (as defined below) filed contemporaneously herewith, in connection with the RSA, certain members of the Ad Hoc Group and certain other holders of Priority Lien Loans (in such capacity, the "<u>DIP Backstop Parties</u>") have committed to provide the Debtors with the necessary financing to implement a comprehensive restructuring in these chapter 11 cases and the concurrent CCAA Proceeding through the DIP Financing.   In addition, (i) all holders of Priority Lien Loans will have the opportunity to participate in the DIP Financing and/or financing of the New Money Tranche A-2 Term Loans, provided they sign onto the RSA by March 14, 2025 (the "<u>New Money Election Date</u>") and (ii) all DIP Backstop Parties and Tranche A-2 Term Loan Backstop Parties (to the extent such DIP Backstop Party or Tranche A-2 Term Loan Backstop Party has committed to fund at least its pro rata share of the DIP New Money Term Loans and/or the New Money Tranche A-2 Term Loans) will have the opportunity to participate in financing the Tranche A-1 Term Loan Facility provided they elect to do so by the New Money Election Date.

82.    As set forth in the Schlappig Declaration, the Debtors marketed the opportunity to provide the necessary liquidity to support the administration of these chapter 11 cases and the concurrent CCAA Proceeding to various parties.  Notwithstanding this marketing effort, the only actionable proposal received by the Debtors for postpetition financing was that offered by the DIP Backstop Parties, presented to this Court for approval in the DIP Motion.

83.    I personally participated in the negotiation and analysis of the DIP Financing, specifically the sizing and initial draw components of the DIP Facility, along with the lenders' adequate protection packages contemplated in the proposed Interim DIP Order.  These negotiations

were hard-fought and conducted at arm's-length.  Without the proceeds of the DIP Financing and access to cash collateral, the Debtors lack the liquidity necessary to continue operations.  The DIP Financing provides the Debtors with sufficient liquidity to operate their business, administer these chapter 11 cases and the CCAA Proceeding to pursue a restructuring that will significantly deleverage their balance sheets, and implement operational initiatives that will position the Debtors to succeed upon emergence from chapter 11.  I believe that the terms of the DIP Financing and the proposed order approving the DIP Motion are fair and reasonable under the circumstances, and the best alternative available to the Debtors.  Furthermore, the milestones established under the RSA and incorporated into the DIP Financing are reasonable and obtainable, while also ensuring the Debtors' restructuring will be implemented in an efficient and timely fashion.

84.     Finally, and perhaps most importantly, as stated above, the Debtors require immediate access to the DIP Financing and cash collateral to continue operations and avoid a value-destructive liquidation.  The use of the proceeds of the DIP Facility is governed by the Approved Budget (as defined in the DIP Motion).  It is my view, in consultation with the Debtors' advisors, that the Approved Budget is sufficient and provides the Debtors with the necessary liquidity, as well as flexibility, to implement the restructuring contemplated by the RSA.  Without this Court's approval of the DIP Financing, the Debtors will have no alternative other than to consider liquidation.

**VII.    First Day Motions**

85.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases seeking various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring process.  The First Day Motions include:

A.      **Administrative Motions**

(a)     Notice of Designation as Complex Chapter 11 Bankruptcy Case ("<u>Complex Case Designation</u>");

(b)     Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief ("<u>Joint Administration Motion</u>");

(c)     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors, (B) File a Consolidated List of the 30 Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information; (II) Approving the Form and Manner of Notifying Creditors of the Commencement of these Chapter 11 Cases; and (III) Granting Related Relief ("<u>Creditor Matrix Motion</u>"); and

(d)     Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent ("<u>Claims Agent Retention Application</u>").

B.      **Operational Motions Requesting Immediate Relief**

(a)     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms and Books and Records, and (D) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief ("<u>Cash Management Motion</u>");

(b)     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief ("<u>Wages Motion</u>");

(c)     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims in the Ordinary Course of Business; (II) Granting Administrative Expense Priority to All Outstanding Orders; and (III) Granting Related Relief ("<u>All-Trade Motion</u>");

(d)     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief ("<u>Taxes Motion</u>");

(e)     Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures

for Resolving Additional Assurance Requests, and (IV) Granting Related Relief ("<u>Utilities Motion</u>");

(f)    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Interests of MLN US TopCo Inc. and Claims Against the Debtors and (II) Granting Related Relief ("<u>NOL Motion</u>");

(g)    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer and Partner Programs and Contracts, and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief ("<u>Customer Programs Motion</u>");

(h)    Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code; (II) Approving the Form and Manner of Notice Related Thereto; and (III) Granting Related Relief (the "<u>Stay Enforcement Motion</u>");

(i)    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees and Commissions, (D) Honor the Terms of Premium Financing Agreements and Pay Premiums Thereunder; (E) Enter into New Agreements to Finance Premiums in the Ordinary Course of Business, and (F) Maintain Their Surety Bond Program, and (II) Granting Related Relief ("<u>Insurance Motion</u>");

(j)    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; and (C) Grant Liens and Provided Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing; and (V) Granting Related Relief (the "<u>DIP Motion</u>"); and

(k)    Debtor's Emergency Motion for Entry of an Order (I) Authorizing Mitel Networks Corporation to Act as Foreign Representative; and (II) Granting Related Relief.

86.    The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing and use cash collateral on an interim basis, honor employee-related wage and benefits obligations, pay certain prepetition accounts payable claims in the ordinary course of

business, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to preserve the value of their enterprise and successfully implement their restructuring.

87.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

88.     I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and such facts shall be deemed incorporated herein by reference as if fully stated herein. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' business.

89.     For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these chapter 11 cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 10, 2025                                          */s/ Janine Yetter*
                                                                                   Janine Yetter