# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 25-90090 (CML)** |
| **MLN US HOLDCO LLC, *et al.*,**[1] | § | **(Jointly Administered)** |
| | § | **Chapter 11** |
| ***Debtors*.** | § | |

### UNITED STATES TRUSTEE'S OBJECTION TO
### FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND TO
### APPROVAL OF JOINT PREPACKAGED
### CHAPTER 11 PLAN OF REORGANIZATION OF
### <u>MLN US HOLDCO LLC AND ITS DEBTOR AFFILIATES</u>
### *(Relates to the ECF Nos.* **[19 and 20]***)*

TO THE HONORABLE CHRISTOPHER M. LOPEZ,
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "**United States Trustee**"), hereby files this Objection (the "**Objection**") to approval of the *Joint Prepackaged Chapter 11 Plan of Reorganization of MLN US Holdco LLC and its Debtor Affiliates* (the "**Plan**") [ECF No. 20] and final approval of the accompanying Disclosure Statement for the Plan  (the "**Disclosure Statement**") [ECF No. 19] and represents as follows:

### <u>SUMMARY</u>

The United States Trustee objects to approval of the Plan and the Disclosure Statement because the Plan contains impermissible third-party releases and injunctions that render the Plan patently unconfirmable.  Specifically, the United States Trustee objects for the following reasons[2]:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Mitel. The Debtors' service address for purposes of these chapter 11 cases is: 2160 W Broadway Road, Suite 103, Mesa, Arizona 85202.

[2] The United States Trustee reserves all his rights to make additional arguments regarding the confirmability of the Plan and the adequacy of notice required for informed and affirmative consent.

A. The Plan imposes nonconsensual releases of non-debtor third parties by non-debtor third parties that are not authorized by the Bankruptcy Code;

B. The proposed opt-out provisions in the Ballots and the Non-Voting Notices— by which parties who (i) cast a vote to accept or reject the Plan, or (ii) are deemed to have accepted or rejected the Plan, or (iii) abstain from voting **and (with respect to (i)-(iii)) do not affirmatively opt out of the releases** are deemed to be bound by the Third-Party Releases—are ineffective to confer affirmative consent to the Third-Party Releases;

C. The Plan has permanent injunction and gatekeeper provisions to enforce the Third-Party Releases and exculpation in violation of Supreme Court precedent set forth in the *Purdue*[3] decision, Fifth Circuit precedent set forth in the *Highland II*[4] decision, and the Bankruptcy Code, and the Debtors have not met the standard for entry of such an injunction and the associated gatekeeper provisions; and

D. The Debtors should specify that the Plan does not release claims of governmental entities exercising their police and regulatory authority.

E. The Court should not waive the Rule 3020 Stay.

## **BACKGROUND**

### A.   **Procedural History**

1. On March 10, 2025, MLN US Holdco LLC and its affiliated debtors (collectively, the "**Debtors**") filed their Plan and the accompanying Disclosure Statement.

2. On March 11, 2024,  the Court entered the *Order (I) Scheduling Combined Hearing on (a) Adequacy of Disclosure Statement and (b) Confirmation of Prepackaged Plan; (II) Confirmation of Prepackaged Plan; (II) Conditionally Approving Disclosure Statement; (III) Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (V) Approving Notice and Objection Procedures for the Assumption of*

---

[3] *Harrington v. Purdue Pharma L.P.,* 603 U.S. 204, 144 S. Ct. 2071 ("*Purdue*")

[4] *Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.),* No. 23-10534, 2025 U.S. App. LEXIS 6320 (5th Cir. Mar. 18, 2025) ("*Highland II"*)

*Executory Contracts and Unexpired Leases; (VI) Conditionally (a) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (b) Waiving Filing of Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (VII) Granting Related Relief* (the "**Scheduling Order**") [ECF No. 76] approving in part (i) the Disclosure Statement conditionally (ii) the solicitation and notice procedures with respect to confirmation of the Plan (iii) the form of ballots (iv) the scheduling of the confirmation hearing and (v) notice and objection deadlines for confirmation of the Plan.

3.      Pursuant to the Scheduling Order the following dates and deadlines were approved by the Court:

| Event | Date/Deadline (Central Time) |
|---|---|
| Voting Record Date | March 7, 2025 |
| Commencement of Solicitation | March 9, 2025 |
| Petition Date(s) | March 9 and March 10, 2025 |
| Mailing of Combined Notice | March 13, 2025 or as soon as practicable thereafter |
| Publication Deadline | March 27, 2025 |
| Plan Supplement Filing Deadline | April 3, 2025 |
| Plan/Disclosure Statement Objection Deadline | April 10, 2025, at 4:00 p.m. (Prevailing Central Time) |
| Plan Voting Deadline and Deadline to Return Release Opt Out Forms | April 10, 2025, at 5:00 p.m. (Prevailing Central Time) |
| Plan/Disclosure Statement Reply Deadline | April 15, 2025, at 4:00 a.m. (Prevailing Central Time) |
| Combined Hearing | April 17, 2025, at 11:00 a.m. (Prevailing Central Time) |
| Schedules and 2015.3 Deadline | May 8, 2025 |

**B.      Solicitation and Opt-Out Notices**

4.      The Scheduling Order approved: (a) the form of notice of the confirmation hearing, (b) the forms of ballots for voting classes (the "**Ballots**"), (iii) the form of non-voting status notice and accompanying opt-out form (collectively, the "**Non-Voting Notice**"), all of which contain the language describing the releases, exculpation, and injunction from <u>Article VIII</u> of the Plan, and a box to opt out of the Third-Party Releases.

5.      The following chart summarizes the Classes of Claims and Interests under the Plan and whether they are entitled to vote:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Loan Claims | Impaired | Entitled to Vote |
| 4 | Priority Lien Claims | Impaired | Entitled to Vote |
| 5 | Non-Priority Lien Term Loan Deficiency Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 9 | Existing Mitel Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

6.      Pursuant to the Scheduling Order, the Debtors were required to transmit the Solicitation Package and proposed Ballots to the holders of claims in Classes 3, 4, & 5, which classes are entitled to vote on the Plan. (collectively the "**Voting Classes**").

7.      Pursuant to the Scheduling Order, the Debtors were not required to solicit votes from Holders of Claims in Classes 1, 2, 6, 7, 8, or 9 (collectively the "**Non-Voting Classes**"), each

of which is deemed or presumed to accept or reject the Plan.  Instead, the Debtors were required to serve the Non-Voting Classes with the Non-Voting Notice and Opt-Out Form.

8.      As defined in the Plan, "Releasing Parties[5]," includes

- (i) all Holders of Claims that vote to accept the Plan or that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan;

- (ii) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; and

- (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan.

*Plan Art.I.A.184.*

9.      As such, the Plan would **deem** all those who fail to affirmatively opt out of the Third-Party Releases by returning either a Ballot or Opt Out Form with the opt out box selected— whether they return a ballot or not, and regardless of how they vote—to have **consented** to the Third-Party Release.

---

[5] Under the Plan, "'Releasing Parties' means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each Prepetition Agent; (e) each DIP Lender; (f) each DIP Backstop Party; (g) the DIP Agent; (h) the Exit Term Loan Facility Agent; (i) the Exit Term Loan Lenders; (j) all Holders of Claims that vote to accept the Plan or that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; and (l) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan. *Plan Art. I.A.184.*

10.     Indeed, the Third-Party Releases extend to all claims, even if the Releasing Party does not know or suspect such claims exist (*Plan Art. VIII.D*).

11.     Each form of Ballot for voting creditors provides a checkbox for the individual creditor to vote for or against the Plan and a separate checkbox for the individual creditor to opt-out of the Third-Party Release.  The Plan provides that voting creditors are deemed to consent to the Third-Party Release unless they affirmatively opt out of it on the Ballot, even if they choose not to vote at all.

12.     As authorized by the Scheduling Order, non-voting creditors were sent only a Non-Voting Notice, which provided information about how to obtain the Debtors' full solicitation package but did not include any of the documents themselves.  Further, the Non-Voting Notice included an Opt Out Form with a checkbox for the non-voting parties to use to opt out of the Third-Party Release and then return it to the Debtors.  The Plan provides that non-voting creditors are deemed to consent to the Third-Party Release if they do not timely return a completed and executed Opt Out Form, with the opt out box checked, even though they are not entitled to vote on the Plan.

13.     Finally, Art. VIII.F of the Plan provides for a permanent injunction to enforce the Third-Party Releases upon confirmation as well as a further "gatekeeping" provision that requires all persons or entities seeking to pursue any claim against those who are exculpated or released under the Plan to first seek bankruptcy court approval to bring the claim, and provides that the bankruptcy court will have exclusive jurisdiction to adjudicate the underlying cause of action.

## C.     Governing Law

14.     Article I. Section D of the Plan sets the laws of the State of New York as the governing law for the Plan.

## **OBJECTIONS**

### A.      **Statutory Standards**

15.      Pursuant to Section 1125(b) of the Bankruptcy Code, the proponent of a plan may not solicit its acceptance unless there is transmitted to creditors "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing adequate information." 11 U.S.C. § 1125(b).  Implicitly, such adequate information includes a representation that the proposed plan is one that can be confirmed.

16.      If there is a defect that makes a plan patently or inherently unconfirmable, the Court may consider and resolve that issue at the disclosure statement stage before requiring parties to proceed with solicitation of the plan and a contested confirmation hearing.  *In re American Capital Equipment, LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012).  *See also, In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).

17.      If the plan is patently unconfirmable on its face, the approval of the disclosure statement must be denied. *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re American Capital Equipment, LLC*, 688 at 154 (3d Cir. 2012)(the Court's equitable powers under 11 U.S.C. § 105 permit the Court to control its own docket and, therefore, to decline to approve a disclosure statement when the plan it supports may not be confirmable). A plan is patently unconfirmable when confirmation defects cannot be overcome by creditor voting and the confirmation defects relate to matters upon which the material facts are not in dispute or have been fully developed at the disclosure statement hearing.  *Id*. at 154-55.

18.      Section 1129(a) of the Bankruptcy Code sets forth the requirements for confirming a chapter 11 plan, when each impaired class of claims votes to approve the plan.  Among other things, a plan must comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).

19.     The Debtors bear the burden of establishing that the Plan complies with all elements of section 1129.  *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009).

**B.     Objection No. 1 – The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases**

20.     The Supreme Court has definitively held that non-consensual third-party releases are not authorized under the Bankruptcy Code.  *Harrington v. Purdue Pharma L.P.,* 603 U.S. 204, 144 S. Ct. 2071, 2082-88 (2024).  This has long been the conclusion held by the Fifth Circuit Court of Appeals. *See Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem broadly to foreclose ***non-consensual*** non-debtor releases and permanent injunctions") ("*Pacific Lumber*")(emphasis added).

21.     The Supreme Court in *Purdue* did not address whether ***consensual*** non-debtor releases can be included in a chapter 11 plan and confirmation order.

22.     But the opt-out mechanism of the Plan cannot be a substitute for the affirmative consent required by state law. In addition, the Plan imposes these Third-Party Releases on numerous parties that are not even entitled to opt out, much less provide actual consent to the releases[6].  Thus, the Debtors will not be able to show that any of the Releasing Parties have affirmatively consented to the non-debtor Third-Party Releases.

**i.     *State Contract Law Applies, Not Federal Law***

23.     The foundation of a consensual release is an agreement between the parties. Whether non-debtor parties have reached an agreement—including an agreement to release one's

---

[6] The United States Trustee believes that the Debtors have agreed to acceptable language in the revised Plan that would resolve this objection, but the proposed revisions remained unfinalized as of the writing of this objection.

claims against another (i.e., not to sue)—is governed by state law. The only exception is if there is federal law that preempts applicable state contract law in some specific context. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

24.    No such exception applies here. The Bankruptcy Code does not define a "consensual release." It contains no provision that addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor. And no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors, where such consent would not otherwise be found to exist as a matter of state law.

25.    Nor does 11 U.S.C. § 105(a) itself confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Accordingly, any authority to include third-party releases in a plan must derive from some other source of law. Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.[7]

---

[7] Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well

26.     As courts have recognized, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state-law contract principles serve as controlling authority when considering whether a release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506, 507 (Bankr. D.N.J. 1997) (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  As one court recently held, because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re Tonawanda Coke Corp*., 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 144 S. Ct. at 2086).  Accordingly, "any such consensual agreement would be governed by state law." *Id.*

---

established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").  That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

27.     Here, the Debtors will be unable to meet their burden of establishing that the releasing parties have affirmatively agreed to release their property rights in a manner sufficient to demonstrate consent under state law.

### ii.     *Under State Law, Silence Is Not Acceptance*

28.     The "general rule of contracts is that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; see also, e.g., *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer").  Moreover, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); accord 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.); *Reichert v. Rapid Investments, Inc*., 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."). Instead, under state law, an agreement to release claims—like any other contract—generally requires a manifestation of assent to that agreement. See, e.g., RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."). Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must be affirmatively shown to exist. See, e.g., id.; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

29.     There are only very limited exceptions to that principle. "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases, the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

30.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id*. And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id*. § 69, cmt. c; *see also Patterson,* 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

31.     Both New York and Texas common law, as a point of reference, are in accord.[8] *See, e.g.*, *Advantage Physical Therapy v. Cruse*, 165 S.W.3d 21 (Tex. App. 2005) (quoting Restatement (Second) of Contracts § 69 (1981)); *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors*, Inc., 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting Restatement (Second) of Contracts § 69 (1981))].  Absent limited exceptions not triggered here, silence and inaction are not assent to an offer.  See *Texas Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 131-33 (Tex. 2000) (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991). *See also Urban Green Techs., LLC v. Sustainable Strategies*, 2050 LLC, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017).

32.     As the Fifth Circuit explained: "Tacit acquiescence between relative strangers ignores the basic tenets of contract law. . . .   While there may be exceptions in cases involving parties with longstanding relationships, generally speaking, 'silence or inaction does not constitute acceptance of an offer.'"  *Imperial Ind. Supply Co v. Thomas*, 825 F. App'x 204, 207 (5th Cir.

---

[8] While the Plan provides that its construction and enforcement is governed by the laws of the State of New York, debtors cannot choose the law to apply to contracts between non-debtors. Rather, ordinary choice of law principles govern which state's law applies to contracts between non-debtors; although a choice of law analysis may not be necessary absent any assertion that there is a difference in potentially applicable state laws governing what constitutes consent.  *See Smallhold*, 2024 WL 4296938, at *13 n.57.

Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)).

### iii.    *Failing to Opt-Out Does Not Constitute Consent.*

33.     Here, beyond the named parties, the Plan lists as "Releasing Parties" and forces the granting of the Third-Party Release by the following parties, without their affirmative consent: (i) all Holders of Claims or Interests that vote to accept the Plan but fail to affirmatively opt out; (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided in the Plan; (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (iv) and all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan.

34.     Consequently, the Plan imposes a broad non-debtor Third-Party Release on any Holder of a Claim or Equity Interest who votes to accept or reject the Plan, abstains from voting, or is deemed to accept or reject the Plan and on others, *unless they return an opt out form*.

35.     An affirmative agreement—something more than a mere failure to opt out—is required for a non-debtor release to be consensual. *See In re Tonawanda Coke Corp*., 662 B.R. 220, 222-23 (Bankr. W.D.N.Y. 2024); *Patterson*, 636 B.R. at 686.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking offered benefits. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). For example, the *Patterson court*, in applying black letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id*. at 688.

36.     The Ninth Circuit's decision in *Norcia*, F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), and by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), illustrates the point. In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *Id*. The customer did not take any steps to opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

37.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290.

38.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly—because there was no applicable federal law— the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132–33 (Tex. 2000). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting

the arbitration agreement." *Norcia,* 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer did take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." 845 F.3d at 1286 (quotation marks and citation omitted).

39.      The Ninth Circuit explained that there are two exceptions to this rule—when the offeree has a duty to respond, or when the offeree retains the offered benefits—but held neither exception applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id*. at 1286.

40.      Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors. Likewise, voting on a chapter 11 plan cannot be equated with consent to release non-debtor third parties. Not only are the non-debtor released parties not signatories to the chapter 11 plan, chapter 11 plans are creatures of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not a contract to resolve claims between non-debtors.  As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors ... [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

iv.     ___Voting to accept a Plan Without Opting Out Does Not Provide the Required Affirmative Consent___

41.     Thus, voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. See RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

42.     As an initial matter, merely voting to approve a plan is not an expression of consent to a non-debtor release. *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.,* 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (reaching same conclusion). As explained in *Arrowmill*, a voluntary release arises only "because the creditor agrees" to it. 211 B.R. at 507 (emphasis in original). There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release. Instead, the "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id.* (citation and alterations omitted). Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan" in order to destroy its rights under nonbankruptcy law. Id. (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998). Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill,* 211 B.R. at 507.

43.     Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors. Voting to accept a plan but remaining silent about a

non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

44.     Creditors who vote for a plan without opting out of a non-debtor release are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). The only benefits received by the creditors are distributions from the debtor's chapter 11 plan. Thus, "[e]ssentially, creditors are being asked to give releases to third parties for no consideration." *Tonawanda Coke Corp.,* 662 B.R. at 222. Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the non-debtor releases, consent to the non-debtor release cannot be inferred from mere acceptance of the benefits of the debtor's plan. *See Norcia*, 845 F.3d at 1286 (explaining that customer's failure to opt out did not imply his consent where warranty applied regardless, meaning that customer did not thereby obtain any additional benefit). Further, non-debtors have no right to prevent a debtor's creditors from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance of an offer to release non-debtors. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

45.     Nor does voting to approve a chapter 11 plan while remaining silent about a non-debtor release "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter

11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors. Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims against the debtor.

46.     And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty. *See Norcia*, 845 F.3d at 1285-86. Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt out. *See, e.g.,* 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison, Inc.,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). A claimant's vote in favor of a plan while remaining silent regarding a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

## *v.*     *Voting To Reject A Plan Without Opting Out Is Not Consent To Release Non-Debtors.*

47.     For the same reasons, releases cannot be imposed on those who vote to reject the plan but do not opt out.  It is implausible to suggest that a party returning a ballot rejecting the plan, but neglecting to opt out of the third-party release, is evidencing consent to the third-party release.  Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan.  *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap*

*for the careless or inattentive creditor.*"  533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

> ### vi.   <u>Not Voting and Not Opting Out Does Not Constitute Consent to Release Non-Debtors.</u>

48.   Even more obviously, as courts have previously held, the releases cannot be imposed on those who do not vote and do not opt out.  *See Smallhold,* 2024 WL 4296938, at *2; *SunEdison*, 576 B.R. at 458–61; *Chassix Holdings*, 533 B.R. at 81–82; *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  This applies both to those creditors who simply abstain from voting and those creditors who are not entitled to vote on a plan.  Those who abstain from voting cannot be said to be consenting to anything—they are taking no action with respect to the plan. The same is true for those who have no right to vote on a plan—whether an unimpaired creditor who is deemed to accept the plan or an impaired creditor receiving nothing under a plan who is deemed to reject the plan.  Creditors who do not vote on a plan do not manifest consent to a non-debtor release by failing to return an opt out form.

49.   Thus, even where there are conspicuous warnings in the ballots or an opt out form that silence or inaction will constitute consent to a release, that is not sufficient to recast a party's silence as consent to the release.  *SunEdison*, 576 B.R. at 458–61.  Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan.[9]  And creditors who have no intention of voting in the first place are unlikely to do so.  Moreover, parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases.  *SunEdison*, 576 B.R. at 461.

---

[9] Here, the plan and associated materials, including the disclosure statement, run in excess of approximately 380 pages.  *See* Disclosure Statement.

50.     Accordingly, the court in *SunEdison* rejected the debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to or reject the plan should be deemed their consent to the release. *Id*. at 460–61.  The court found that the nonvoting creditors' silence was not misleading and did not signify their intention to consent to the release (finding that silence could easily be attributable to other causes).  *Id*. at 460-61.

51.     Simply put, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release." *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)."  *Wash. Mut., Inc.*, 442 B.R. at 355.

52.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix Holdings*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy."  *Smallhold, Inc.*, 2024 WL 4296938, at *12; *see also id.* at *10 (discussing *Chassix*).  As the court in *Emerge Energy Services, LP*, similarly explained, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as implied consent through a party's silence or inaction.  No. 19-

11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).  "[B]asic

contract principles" require affirmative assent, not inferences drawn from inaction that in fact may

reflect only "[c]arelessness, inattentiveness, or mistake."  *Id.*

53.     Furthermore, failure to return an opt out form is not consent because—whether they

are asked to vote or not—claimants have no reason to expect that an offer to contract with non-

debtors will be included in the plan solicitation.  As the Third Circuit has explained, there can be

no presumption that someone has agreed to contractual provisions of which they are "on notice,"

unless "there is a reasonable basis to conclude that consumers will have understood the document

contained a bilateral agreement."  *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-

118 (3d Cir. 2017).

**C.     Objection No. 2 – The application of the Injunction and the Associated Gatekeeper
Provisions to Enforce Third-Party Releases and Exculpation Violate Purdue and the
Bankruptcy Code and the Debtors will be unable to demonstrate the standard for
entry of an Injunction and Associated Gatekeeper**

54.     Finally, this Court may not approve the provisions in Art. VII.F that (i) enjoin

interference with the Plan; (ii) enforce the non-debtor releases nor (iii) seek to direct all released

claims to the bankruptcy court.[10]

55.     The Fifth Circuit recently made this point clear with its *Highland II* decision when

it stated, "[e]ven before *Purdue Pharma*, this court had held the same: that any provision that non-

consensually releases non-debtors from liability for debts and/or conduct, **and any injunction that**

**acts to shield non-debtors from such liability**, must be struck from a bankruptcy confirmation

plan." *Highland II* at *12, (*citing, In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009))(Fifth

---

[10] As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support
of a non-consensual, third-party release ***in exactly one context***: asbestos-related bankruptcies, and
these cases are not asbestos-related.  *See Purdue*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(e)).

Circuit case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions."); *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1059, 1061-62 (5th Cir. 2012); *In re Zale Corp.*, 62 F.3d at 760 ("[W]e must overturn a § 105 injunction if it effectively discharges a nondebtor."). (**emphasis added**). The Fifth Circuit further clarified that

> the proper reading of *Highland I* is to require the bankruptcy court to narrow the definition of 'Protected Parties' used in the Gatekeeper Clause coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision, to read simply: 'collectively, (i) the Debtor; (ii) the Independent Directors, for conduct within the scope of their duties; (iii) the Committee; and (iv) the members of the Committee in their official capacities, for conduct within the scope of their duties.' Both (1) the opinion's plain language and (2) the change made to the opinion on rehearing elucidate this holding.

*Id.* at *14; quoting *In re Highland Cap. Mgmt., L.P. (Highland I)*, 48 F.4th 419 (5th Cir. 2022).

56.     As an initial matter, the language in Art. VIII.F that would broadly enjoin "all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns," from taking any action to "interfere with the implementation or Consummation of this Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to this Plan" must be stricken or limited to the Debtors as the only Exculpated Parties.  This is the same provision the Fifth Circuit in *Highland II* clarified must be limited to only address those parties entitled to exculpation.  *Id*.

57.     Similarly, in *Highland II*, the Fifth Circuit also held that the *Barton* doctrine would allow for a gatekeeping provision, but only for claims brought "'against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity' in a bankruptcy proceeding, even if the bankruptcy court would not have jurisdiction to actually adjudicate those claims"  *Id.* at *13–*14 (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015).

Accordingly, the gatekeeping language provided for in Art. VIII.F must be stricken from the Plan or, again, limited to cover only the Debtors.

58.     Finally, the injunction to enforce the release in Art. VIII.F must also be stricken. This provision simply adds third parties to the typical "discharge injunction" provided to the Debtors, but the Fifth Circuit has repeatedly made clear that there is no authority for a court to enter such an injunction as to non-debtors.  Although the Debtors have attempted to manufacture "consent" for the third-party release, it does not extend to this injunction.  No party has been asked for their consent to the injunction or the court performing the role of gatekeeper.

59.     This Court also may not approve the injunction enforcing the third-party release by barring claims against non-debtors. *Purdue* held that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. See *Purdue*, 603 U.S. at 227. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See Id*. at 222 (citing 11 U.S.C. § 524(g)).

60.     Even if the third-party release was consensual, that would not mean that the court has authority to impose an injunction. An injunction is critically different from a consensual non-debtor release. The legal effect of a consensual release is based on the parties' agreement. *See Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). The non-debtor parties themselves are altering their relations; the court is not using its judicial power to effect that change. An injunction, by contrast, relies on the court's power to enter orders binding on parties. The court must therefore have both constitutional and statutory authority

to enter an injunction. And, once such jurisdiction and authority are established, the court still must determine that an injunction is warranted. But jurisdiction, authority, and a showing that injunctive relief is warranted are all absent here.

61.     First, the bankruptcy court lacks jurisdiction to enter a permanent injunction barring claims between non-debtors.  *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 755, 757 (1995).  While 28 U.S.C. § 1334(b) provides concurrent jurisdiction over civil proceedings "related to" a bankruptcy case, the enjoined claims between non-debtors do not "relate to" Debtors' chapter 11 case.

62.     "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and in any way impacts upon the handling and administration of the bankrupt estate." *Zale*, 62 F.3d at 752.  "For jurisdiction to attach, the anticipated outcome of the action must both (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999).  Post-confirmation jurisdiction is more limited.  "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).  "No longer is expansive bankruptcy court jurisdiction required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id*. (cleaned up).

63.     Here, the claims between non-debtors are not property of Debtors or the estate, will not impact the estate, and do not bear on the execution of Debtors' plan.  "[T]he state law causes of action" barred by the injunction "do not bear on the interpretation or execution of the debtor's

plan." *Craig's Stores*, 266 F.3d at 391.  Nor would the post-confirmation pursuit of such claims against non-debtors have any impact on Debtors' bankruptcy estate, which ceases to exist at confirmation.  Accordingly, the bankruptcy court has no jurisdiction to enjoin those claims. *Craig's Stores*, 266 F.3d at 391; *Zale*, 62 F.3d at 756-57.

64.     The bankruptcy court also lacks jurisdiction to enter injunctive relief because Debtors lack standing to seek it.  A party seeking injunctive relief must have standing to do so. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Wells Fargo Bank, N.A. v. Stewart (In re Stewart)*, 647 F.3d 553, 557 (5th Cir. 2011).  To have standing, the party seeking injunctive relief must show "that he has sustained or is immediately in danger of sustaining some direct injury" and "the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 105; *see also Stewart*, 647 F.3d at 557.  "Absent such a showing, there is no case or controversy regarding prospective relief, and thus no basis in Article III for the court's power to issue an injunction."[11]  *Stewart*, 647 F.3d at 557; *accord Lyons*, 461 U.S. at 101-02. Debtors have made no such showing here.  Accordingly, the bankruptcy court lacks jurisdiction to enter injunctive relief barring the released claims.

65.     Second, there is no authority in the Bankruptcy Code for the injunction barring claims between non-debtors.  Debtors cannot rely on section 105(a) for this authority because it "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But nothing in the Code authorizes the court to use its judicial power to bar claims between non-debtors. *Id*. at 227.

---

[11] Although the bankruptcy court is not an Article III court, "[a] party that lacks standing to support jurisdiction in an Article III court also lacks standing for that claim to be adjudicated by a bankruptcy court." *Stewart*, 647 F.3d at 557.

66.     Finally, such an injunction is not warranted by the traditional factors that support injunctive relief.  A party seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *id*. (noting that an injunction is an "extraordinary remedy").

67.     In light of the foregoing, the injunction and gatekeeping provisions are unlawful and must be limited to the parties that are properly exculpated under a plan, which in the present case is the Debtors and no other parties.

**D.     Objection No. 4 – The Debtors should clarify that claims of governmental entities are not released.[12]**

68.     The "police and regulatory power" exception to the automatic stay found at 11 U.S.C. § 362(b)(4) is designed to ensure that the stay "does not impede government's ability to protect public health and safety." *In re Wyly*, 526 B.R. 194, 198 (Bankr. N.D. Tex. 2015). Preserving governmental entities' ability to protect public health and safety is particularly important in the context of a food production and distribution company.

---

[12] The United States Trustee believes that the Debtors have agreed to acceptable language in the proposed form of confirmation order that would resolve this objection, but the proposed confirmation order remained unfinalized.  Therefore, the United States Trustee is including the objection herein to preserve the argument for the confirmation hearing if necessary.

69.     The Disclosure Statement does not contain adequate information as to whether governmental police and regulatory powers are preserved. The Debtors should modify the Disclosure Statement and Plan to clarify that no party shall be released from any causes of action or proceedings brought by any governmental entity in accordance with its regulatory functions, including but not limited to criminal and environmental matters.   The United States Trustee requests that the Debtors include the following language in the Plan:

> Nothing in the Plan, the Confirmation Order, or other related Plan documents (collectively, "Plan Documents"), shall
>
> (i)     cause the cause the United States of America, inclusive of its agencies and sub-agencies (the "United States") or any state or local authority to be a Releasing Party under the Plan Documents; or
>
> (ii)    affect or impair the exercise of the United States' or any state or local authority's police and regulatory powers.

### E.     The Court Should Not Waive the Rule 3020 Stay

70.     The U.S. Trustee objects to the request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot."  Id.

71.     Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review.  See In re Chemtura Corp. No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010).  Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of

its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay.  Id.; see also In re Adelphia Comm. Corp., 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review").  "An orderly bankruptcy process depends on a concomitantly efficient appeals process," In re Syncora Guarantee Inc., 757 F.3d 511, 517 (6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay.

72.    Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review.  The Court should thus deny their request to waive Rule 3020(e)'s stay.

## **<u>CONCLUSION</u>**

73.    The Court should not approve the Disclosure Statement and the Plan should not be confirmed because doing so will impermissibly impose third-party releases on parties who have not affirmatively and unambiguously consented to such broad third-party releases.  The Debtors' use of the opt-out provisions in the solicitation materials and Plan are not sufficient to confer a party's manifested consent to the third-party releases contained in the Plan. Absent the Debtors showing appropriate consent from all parties affected by the third-party releases in the Plan, the Court should not approve the Disclosure Statement and should not confirm the Plan.

WHEREFORE, the United States Trustee respectfully request this Court deny approval of the Disclosure Statement, deny confirmation of the Plan, and grant such other and further relief as it may deem just and proper.

Date: April 10, 2025

Respectfully Submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE
REGION 7, SOUTHERN AND WESTERN
DISTRICTS OF TEXAS

By: */s/ Jayson B. Ruff*
    Jayson B. Ruff, Trial Attorney
    Michigan Bar No. P69893
    Jayson B. Ruff
    515 Rusk, Suite 3516
    Houston, Texas 77002
    (713) 718-4650 – Telephone
    (202) 573-6960- Cell
    Email: Jayson.B.Ruff@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on April 10, 2025, I caused a true and correct copy of foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices on the date this was filed.

    */s/ Jayson B. Ruff*
    Jayson B. Ruff