**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MLN US HOLDCO LLC, *et al.*,[1] | § | Case No. 25-90090 (CML) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**DEBTORS' (I) MEMORANDUM OF LAW IN
SUPPORT OF (A) FINAL APPROVAL OF THE DEBTORS'
DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THE
DEBTORS' PLAN AND (II) REPLY TO U.S. TRUSTEE OBJECTION THERETO**

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Mitel.  The Debtors' service address for purposes of these chapter 11 cases is:  2160 W Broadway Road, Suite 103, Mesa, Arizona 85202.

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ........................................................................................... 2

BACKGROUND ................................................................................................................... 3

I.      The Restructuring Support Agreement ..................................................................... 3

II.     Solicitation and Filing of Plan Documents ............................................................. 6

        A.     Voting Results ............................................................................................... 10

        B.     Limited Objections ....................................................................................... 12

ARGUMENT ....................................................................................................................... 13

I.      The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable Notice Requirements .......................................................................... 13

        A.     The Debtors Provided Sufficient Notice of the Hearing and Objection Deadline for Final Approval of the Disclosure Statement ................................... 13

        B.     The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and Should Be Approved ....................................................................... 15

                1.     The Disclosure Statement Contains Adequate Information ................... 15

                2.     The Disclosure Statement Demonstrates that the Debtors Complied with Applicable Nonbankruptcy Law. ..................................................... 17

        C.     The Solicitation Procedures Complied with the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order ....................................................... 20

                1.     The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Bankruptcy Rules ......................................... 21

                2.     The Voting Record Date Complied with Bankruptcy Rules and the Scheduling Order ..................................................................................... 22

                3.     The Debtors' Solicitation Period Complied with Bankruptcy Rule 3018 and the Scheduling Order ........................................................ 22

                4.     The Debtors' Vote Tabulation Was Appropriate and Complied with the Scheduling Order ......................................................................... 23

                5.     Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Scheduling Order .......................... 23

                6.     Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith .................................................................................. 25

II.     The Plan's Settlement and Compromises Are Reasonable and Satisfy Bankruptcy Rule 9019 .......................................................................................... 25

        A.     The Plan Settlement Should Be Approved ....................................................... 27

III.   The Plan Satisfies Each Requirement for Confirmation Under Section 1129 of the Bankruptcy Code and Should Be Confirmed ........................................................................ 29

  A.   Section 1129(a):  The Plan Meets Each of the Applicable Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code .......................... 30

    1.   Section 1129(a)(1):  The Plan Complies with the Applicable Provisions of the Bankruptcy Code ............................................................ 30

    2.   Section 1129(a)(2):  The Debtors Have Complied with the Bankruptcy Code ....................................................................................... 49

    3.   Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Is Not by Any Means Forbidden by Law .................................................... 51

    4.   Section 1129(a)(4):  The Plan Provides that Professional Fees and Expenses Are Subject to Court Approval ............................................... 52

    5.   Section 1129(a)(5):  The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders ........................ 53

    6.   Section 1129(a)(6):  The Plan Does Not Contain Any Rate Changes ...... 53

    7.   Section 1129(a)(7):  The Plan Satisfies the "Best Interests" Test ............ 54

    8.   Section 1129(a)(8):  The Plan Has Been Accepted by Each Impaired Voting Class ............................................................................................ 56

    9.   Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims .......................................................................... 57

    10.   Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan ................................................................................... 57

    11.   Section 1129(a)(11):  The Plan Is Feasible .............................................. 58

    12.   Section 1129(a)(12):  All Statutory Fees Have or Will Be Paid Under the Plan ........................................................................................ 61

    13.   Section 1129(a)(13):  The Plan Does Not Modify Retiree Benefits ......... 61

  B.   Section 1129(b):  The Plan Satisfies the "Cram-Down" Requirements ............... 61

    1.   The Plan Does Not Discriminate Unfairly ............................................... 62

    2.   The Plan Is Fair and Equitable ............................................................... 64

  C.   Section 1129(c):  The Plan Is the Only Plan Currently on File ........................... 66

  D.   Section 1129(d):  The Purpose of the Plan Is Not Tax or Securities Law Avoidance ..................................................................................................... 66

  E.   Section 1129(e):  Does Not Apply to the Plan .................................................... 66

IV.   The U.S. Trustee Objection to the Plan Should Be Overruled ......................................... 66

  A.   The U.S. Trustee Improperly Relies on *Purdue* and Non-Binding State Law ..... 66

  B.   The Third-Party Release Is Consistent with this Court's Precedents and Provides Adequate Notice ................................................................................ 70

C.     The Injunction and the Gatekeeping Provision Are Consistent with Fifth
       Circuit Law and Plans Confirmed in this District.................................................. 73

D.     The Modified Plan Addresses the Remaining Points in the
       U.S. Trustee Objection............................................................................................ 74

CONCLUSION ........................................................................................................................... 75

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*In re Acis Cap. Mgmt., L.P.*,
    No. 18-30264, 2019 WL 406137 (Bankr. N.D. Tex. Jan. 31, 2019) ......................................34

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)................................................................................54

*Aetna Cas. & Sur. Co.* v. *Clerk, U.S. Bankr. Ct. (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996).................................................................................................31

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988)...............................................................................53

*In re Applegate Prop., Ltd.*,
    133 B.R. 827 (Bankr. W.D. Tex. 1991)..............................................................................15

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989).............................................................................62

*Bank of Am. Nat'l Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)................................................................................................54, 64

*In re Bigler LP*,
    442 B.R. 537 (Bankr. S.D. Tex. 2010) ...................................................................25, 38, 41

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985)...................................................................................63

*In re Cajun Elec. Power Co-op, Inc. (Cajun III)*,
    230 B.R. 715 (Bankr. M.D. La. 1999) ................................................................................58

*In re Camp Arrowhead, Ltd.*,
    451 B.R. 678 (Bankr. W.D. Tex. 2011)..........................................................................41, 74

*Cantwell-Cleary Co.* v. *Cleary Packaging, LLC (In re Cleary Packaging, LLC)*,
    36 F.4th 509 (4th Cir. 2022) ..............................................................................................34

*In re Chapel Gate Apartments, Ltd.*,
    64 B.R. 569 (Bankr. N.D. Tex. 1986)...............................................................................52

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)................................................................................53

*In re CJ Holding Co.*,
    597 B.R. 597 (S.D. Tex. 2019) ..........................................................................41, 68, 74

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) ........................................................................29, 49

*In re Deming Hosp., LLC*,
    No. 11-12-13377, 2013 WL 1397458 (Bankr. D.N.M. Apr. 5, 2013)...................................31

*In re Derosa-Grund*,
  567 B.R. 773 (Bankr. S.D. Tex. 2017) ................................................................38

*In re Diamond Sports Grp., LLC*,
  No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) ................................48, 67

*In re Divine Ripe, L.L.C.*,
  554 B.R. 395 (Bankr. S.D. Tex. 2016) ................................................................15

*In re Drexel Burnham Lambert Grp. Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................................50

*In re Eagle Bus Mfg., Inc.*,
  134 B.R. 584 (Bankr. S.D. Tex. 1991) ................................................................31

*Fin. Sec. Assurance Inc.* v. *T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997) ................................................59

*Floyd* v. *Hefner*,
  No. 03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006) ................................15

*FOM P.R. S.E.* v. *Dr. Barnes EyeCenter Inc.*,
  255 F. App'x 909 (5th Cir. 2007) ................................................................41

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................63

*In re Garza*,
  605 B.R. 817 (Bankr. S.D. Tex. July 2019) ................................................................34

*In re Glob. Ocean Carriers Ltd.*,
  251 B.R. 31 (Bankr. D. Del. 2000) ................................................................65

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ................................................................65

*Harrington* v. *Purdue Pharma L.P.*,
  603 U.S. 204 (2024) ........................................................................ *passim*

*Heartland Fed. Sav. & Loan Ass'n* v. *Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*,
  994 F.2d 1160 (5th Cir. 1993) ................................................................29, 58, 59

*In re Highland Capital Management, L.P.*,
  32 F.4th 353, 360–62 (5th Cir. 2025) ................................46, 47, 48, 73, 74

*In re Hornblower Holdings LLC*,
  No. 24-90061 (MI) (Bankr. S.D. Tex. June 6, 2024) ................................................48

*In re Idearc, Inc.*,
  423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315
  (5th Cir. 2011) ................................................................27, 38, 62

*In re Indep. Cont. Drilling, Inc.*,
  No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) ................................................68, 74

v

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ................................................................59

*In re Intrum AB*,
No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) .......................................67

*ION Media Networks, Inc.* v. *Cyrus Select Opportunities Master Fund Ltd. (In re ION Media Networks, Inc.)*,
419 B.R. 585 (Bankr. S.D.N.Y. 2009) ..............................................................65

*In re J T Thorpe Co.*,
308 B.R. 782 (Bankr. S.D. Tex. 2003) ..............................................................29

*In re J.D. Mfg., Inc.*,
No. 07-36751, 2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008)........................15

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987)..........................................................................62

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
*aff'd sub nom. Kane* v. *Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .........................63

*Kane* v. *Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988).............................................................................62

*In re Kolton*,
No. 89-53425-C, 1990 WL 87007 (Bankr. W.D. Tex. Apr. 4, 1990)......................63

*In re Lakeside Glob. II, Ltd.*,
116 B.R. 499 (Bankr. S.D. Tex. 1989) ..............................................................58

*In re Landing Assocs., Ltd.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993).........................................................53, 58

*Liberty Nat'l Enters.* v. *Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*,
115 F.3d 650 (9th Cir. 1997) ...........................................................................63

*In re M&S Assocs. Ltd.*,
138 B.R. 845 (Bankr. W.D. Tex. 1992)..............................................................59

*Mabey* v. *Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.) (Cajun II)*,
150 F.3d 503 (5th Cir. 1998) .......................................................................15, 52

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022) .................................................................69

*In re McCommas LFG Processing Partners, LP*,
No. 07-32222, 2007 WL 4234139 (Bankr. N.D. Tex. Nov. 29, 2007)....................34

*Mercury Cap. Corp.* v. *Milford Conn. Assocs., L.P.*,
354 B.R. 1 (D. Conn. 2006) ............................................................................58

*In re Mirant Corp.*,
  348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3
  Claimholders* v. *New Mirant Entities*, No. 06-CV-744-A, 2006 WL 3780884
  (N.D. Tex. Dec. 26, 2006) .................................................................................26

*In re Mirant Corp.*,
  No. 03-46590, 2005 WL 6443614 (Bankr. N.D. Tex. Dec. 9, 2005) ......................................31

*Ocean Trails CLO VII* v. *MLN Topco Ltd.*,
  225 N.Y.S.3d 192 (App. Div. 2024) ......................................................................27

*Ocean Trails CLO VII* v. *MLN TopCo Ltd.*,
  Index No. 651327/2023 .................................................................................28

*Off. Comm. of Equity Sec. Holders* v. *Off. Comm. of Unsecured Creditors (In re
  Adelphia Commc'ns Corp.)*,
  544 F.3d 420 (2d Cir. 2008)..............................................................................62

*Off. Comm. of Unsecured Creditors* v. *Cajun Elec. Power Coop., Inc. ex rel.
  Mabey (In re Cajun Elec. Power Coop., Inc.) (Cajun I)*,
  119 F.3d 349 (5th Cir. 1997) .............................................................................25

*Off. Comm. of Unsecured Creditors* v. *Moeller (In re Age Refin., Inc.)*,
  801 F.3d 530 (5th Cir. 2015) .............................................................................26

*Otto* v. *Tex. Tamale Co. (In re Tex. Tamale Co., Inc.)*,
  219 B.R. 732 (Bankr. S.D. Tex. 1998) ...................................................................14

*In re Phoenix Petrol. Co.*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) ....................................................................16

*In re Pilgrim's Pride Corp.*,
  No. 08-45664, 2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010) ......................................41

*In re Pipeline Health Sys., LLC*,
  No. 22-90291, 2025 WL 686080 (Bankr. S.D. Tex. Mar. 3, 2025).........................................68

*In re Pisces Energy LLC*,
  No. 09-36591, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009)....................................31

*Pizza of Haw., Inc.* v. *Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) ...........................................................................58

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc.* v. *Anderson*,
  390 U.S. 414 (1968).................................................................................26, 38

*In re Prudential Energy Co.*,
  58 B.R. 857 (Bankr. S.D.N.Y. 1986) ......................................................................59

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)..............................................................................45

*Republic Supply Co.* v. *Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) ...........................................................................41

*Rivercity* v. *Herpel (In re Jackson Brewing Co.)*,
 624 F.2d 599 (5th Cir. 1980) ....................................................................26, 38

*In re Robertshaw US Holding Corp.*,
 662 B.R. 300 (Bankr. S.D. Tex. 2024) ......................................................... *passim*

*In re Roqumore*,
 393 B.R. 474 (Bankr. S.D. Tex. 2008) ....................................................26, 27, 38

*Save Our Springs (S.O.S.) All., Inc.* v. *WSI (II)-COS, L.L.C. (In re Save Our*
 *Springs (S.O.S.) All., Inc.)*,
 632 F.3d 168 (5th Cir. 2011) ..................................................................................58

*In re Scioto Valley Mortg. Co.*,
 88 B.R. 168 (Bankr. S.D. Ohio 1988)....................................................................16

*In re Sentry Operating Co. of Tex., Inc.*,
 264 B.R. 850 (Bankr. S.D. Tex. 2001) ...................................................................30

*Sequa Corp.* v. *Christopher (In re Christopher)*,
 28 F.3d 512 (5th Cir. 1994) .....................................................................................14

*In re Spirit Airlines, Inc.*,
 No. 24-11988, 2025 WL 737068, at *12 (Bankr. S.D.N.Y. Mar. 7, 2025) ...........72

*In re Star Ambulance Serv., LLC*,
 540 B.R. 251 (Bankr. S.D. Tex. 2015) ...................................................................30

*In re Tex. Extrusion Corp.*,
 844 F.2d 1142 (5th Cir. 1988) .........................................................................15, 54

*In re The Container Store Grp., Inc.*,
 No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025)................................. *passim*

*In re Treyson Dev., Inc.*,
 No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) ....................42

*In re U.S. Brass Corp.*,
 194 B.R. 420 (Bankr. E.D. Tex. 1996) ..............................................................15, 16

*In re Ultra Petrol. Corp.*,
 No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) ..........................................72

*In re Vitro Asset Corp.*,
 No. 11-32600, 2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013)...................30

*In re Vroom, Inc.*,
 No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025)................................. *passim*

*Walters* v. *Hunt (In re Hunt)*,
 146 B.R. 178 (Bankr. N.D. Tex. 1992)...................................................................14

*In re Wesco Aircraft Holdings, Inc.*,
 No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025)...............................................67

*Williams* v. *Placid Oil Co. (In re Placid Oil Co.)*,
 753 F.3d 151 (5th Cir. 2014) ..................................................................................13

*In re Wool Growers Cent. Storage Co.*,
   371 B.R. 768 (Bankr. N.D. Tex. 2007) ..............................................................42

*In re WorldCom, Inc.*,
   No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ....................59

## STATUTES

11 U.S.C. § 101(9) ..............................................................................................34

11 U.S.C. § 105 ...................................................................................................46

11 U.S.C. § 507(a) .........................................................................................57, 61

11 U.S.C. § 362(a) ..............................................................................................34

11 U.S.C. § 365 ......................................................................................36, 48, 49

11 U.S.C. § 524(g) ..............................................................................................67

11 U.S.C. § 1107(a) ..............................................................................................7

11 U.S.C. § 1108 ...................................................................................................7

11 U.S.C. § 1114 .................................................................................................61

11 U.S.C. § 1122 ...........................................................................................*passim*

11 U.S.C. §§ 1123(a)(1)–(7) ..........................................................................*passim*

11 U.S.C. §§ 1125(a)–(e), (g) .......................................................................*passim*

11 U.S.C. §§ 1126(a)–(g) .............................................................................*passim*

11 U.S.C. §§ 1129(a)(1)–(16) .......................................................................*passim*

11 U.S.C. §§ 1129(b)–(e) .............................................................................*passim*

11 U.S.C. § 1145 .....................................................................................19, 20, 34

11 U.S.C. § 1146 .................................................................................................34

28 U.S.C. § 157(b)(2)(L) ......................................................................................46

28 U.S.C. § 1930 ............................................................................................31, 61

## OTHER AUTHORITIES

Fed. R. Bankr. P. 2002(b) ..........................................................................9, 13, 14

Fed. R. Bankr. P. 3017(a), (d), (e) ...............................................................*passim*

Fed. R. Bankr. P. 3018(a)–(c), (e) ................................................................*passim*

Fed. R. Bankr. P. 3020(e) ...................................................................................75

Fed. R. Bankr. P. 9019 ............................................................................13, 25, 29

H.R. Rep. No. 95-595 (1977) ..........................................................................30, 49

S. Rep. No. 95-989 (1978) ...................................................................................30

Securities Act, Regulation D..................................................................................18, 19, 20

Securities Act, Regulation S ..................................................................................18, 19, 20

Securities Act, Rule 144A.........................................................................................19, 20

Securities Act, Rule 902(k).............................................................................................19

Securities Act, Section 4(a)(2) ..............................................................................18, 19, 20

The above-captioned debtors and debtors in possession (the "Debtors") submit this memorandum of law (a) in support of an order (i) approving, on a final basis, the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of MLN US HoldCo LLC and Its Debtor Affiliates* [Docket No. 19] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), and (ii) confirming the *Modified Joint Prepackaged Plan of Reorganization of MLN US HoldCo LLC and Its Debtor Affiliates* filed at Docket No. 249 (as modified, amended, or supplemented from time to time, the "Plan"), and (b) reply to the objection to Confirmation of the Plan.

In further support of Confirmation of the Plan and final approval of the Disclosure Statement, prior to or substantially contemporaneously with the filing of this brief (the "Confirmation Brief"), the Debtors also filed the following documents:

(a)  *Declaration of Janine Yetter in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 18] (the "First Day Declaration");

(b)  *Certificate of Service* [Docket No. 179] (the "Solicitation Certificate");

(c)  *Certificate of Publication* [Docket No. 195] (the "Publication Certificate");

(d)  *Declaration of Brian Karpuk of Stretto, Inc. Regarding the Solicitation and Tabulation of Votes Cast on the Modified Joint Prepackaged Chapter 11 Plan of Reorganization of MLN US HoldCo LLC and Its Debtor Affiliates* filed substantially contemporaneously herewith (the "Voting Report");

(e)  *Declaration of Janine Yetter, Chief Financial Officer, in Support of Confirmation of the Modified Joint Prepackaged Chapter 11 Plan of Reorganization of MLN US HoldCo LLC and Its Debtor Affiliates* filed substantially contemporaneously herewith (the "Yetter Declaration");

(f)  *Declaration of Michael Schlappig in Support of Confirmation of the Modified Joint Prepackaged Chapter 11 Plan of Reorganization of MLN US HoldCo LLC and Its Debtor Affiliates* filed substantially contemporaneously herewith (the "Schlappig Declaration"); and

(g)  *Declaration of Paul A. Stroup in Support of Confirmation of the Modified Joint Prepackaged Chapter 11 Plan of Reorganization of MLN US HoldCo LLC and Its Debtor Affiliates* filed substantially contemporaneously herewith (the "Stroup

Declaration" and, collectively with Voting Report and Schlappig Declaration, the "Supporting Declarations").

## PRELIMINARY STATEMENT[2]

1.      After extensive, arm's-length negotiations over several months, the Debtors are now seeking final approval of the Disclosure Statement and confirmation of the Plan, which, upon consummation, will implement a prepackaged restructuring supported by the Debtors' major stakeholders, as contemplated by the Restructuring Support Agreement.  The Debtors are proceeding to confirmation with all Voting Classes voting overwhelmingly to accept the Plan.  Specifically, of the Holders that voted, Holders of 100.0% in principal amount of the ABL Loan Claims, 95.4% in principal amount of the Priority Lien Claims, and 100.0% in principal amount of the Non-Priority Lien Term Loan Deficiency Claims voted to accept the Plan.

2.      As set forth below and in the Supporting Declarations, the Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' business, maximizes stakeholder recoveries, and protects the jobs of the Debtors' employees, while leaving General Unsecured Claims Unimpaired.  Pursuant to the Restructuring Transactions, the Plan contemplates a $1.15 billion deleveraging of the Debtors' balance sheet and a reduction of $135 million in annual cash interest expense.  Following Consummation of the Plan, the Debtors will emerge with approximately $160.8 million in principal amount of debt obligations and new money exit financing to fund emergence costs and execute on their business plan.

3.      Notwithstanding the broad stakeholder support for the Plan, the United States Trustee for the Southern District of Texas (Region 7) (the "U.S. Trustee") objects to the

---

[2]     Capitalized terms used in the Preliminary Statement have the meanings ascribed to them in the remainder of this Confirmation Brief, the Plan or the Disclosure Statement, as applicable.  All references to an Article refer to the applicable article of the Plan unless otherwise specified herein.

Third-Party Release set forth in Article VIII.D of the Plan, the opt-out mechanism related thereto, and the Plan's injunction provision (the "U.S. Trustee Objection").[3]  As explained in greater detail below, this objection lacks merit as the Third-Party Release and injunction employed by the Debtors are fully consistent with the Supreme Court's decision in *Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204 (2024) ("*Purdue*"), practice in the Fifth Circuit, and the precedents of this Court in complex chapter 11 cases.  Furthermore, this Court has recently and repeatedly overruled substantially identical objections from the U.S. Trustee.

4.      For the reasons set forth herein and based upon the evidence to be adduced at the Combined Hearing, the Court should approve the Disclosure Statement on a final basis, confirm the Plan over the U.S. Trustee's objection, and permit the Debtors to emerge from these Chapter 11 Cases for the benefit of all stakeholders.

## BACKGROUND

## I.      THE RESTRUCTURING SUPPORT AGREEMENT

5.      Prior to commencing these Chapter 11 Cases, on March 9, 2025, the Debtors and the Consenting Stakeholders entered into the Restructuring Support Agreement after several months of extensive arm's-length negotiations.  Among other things, the Restructuring Support Agreement contemplates, with the support of all of the Debtors' key stakeholders, the prepackaged restructuring, to be implemented through the Plan, including a balance sheet restructuring that will deleverage approximately $1.15 billion of the Debtors' $1.31 billion prepetition debt obligations.

---

[3]     *United States Trustee's Objection to Final Approval of the Disclosure Statement and to Approval of Joint Prepackaged Chapter 11 Plan of Reorganization of MLN US HoldCo LLC and Its Debtor Affiliates* [Docket No. 229].

6.      In order to administer these Chapter 11 Cases, the Restructuring Support Agreement provides for debtor-in-possession financing and the consensual use of cash collateral. In addition, the Plan contemplates that, upon emergence, the Debtors will have access to the Exit Term Loan Facility Documents, which will provide approximately $71 million in new money exit term loans (inclusive of fees and premiums payable-in-kind) to fund emergence costs and the Debtors' go-forward operations.

7.      Specifically, the Restructuring Support Agreement contemplates, and the Plan implements, among other things:

(a)      receipt of an aggregate principal amount of $60 million of DIP New Money Term Loans which, together with the DIP Upfront Premium and the DIP Backstop Premium, will be converted into Tranche A-2 Term Loans on the Effective Date;

(b)      the roll-up and equitization of an aggregate principal amount of $62 million of Priority Lien Loans held by the DIP Lenders into New Common Equity, subject to dilution only by the MIP Equity Pool;

(c)      entry into the Exit Term Loan Facility, comprised of:

   i.      Tranche A-1 Term Loans in an aggregate principal amount equal to $20 million; and

   ii.      Tranche A-2 Term Loans, consisting of (A) $69 million of converted DIP New Money Term Loans (inclusive of fees and premiums payable-in-kind), (B) $51 million in New Money Tranche A-2 Term Loans (inclusive of fees and premiums payable-in-kind), and (C) $3.75 million of Incremental Tranche A-2 Term Loans, issued to the Junior Lien Financing Litigation Parties (or their designee(s)) on account of the Consenting Junior Lenders' Fee Consideration, but not consisting of New Money Tranche A-2 Term Loans;

(d)      issuance of the following additional consideration: (i) each lender that commits to funding the DIP New Money Term Loans will receive its pro rata share of the DIP Backstop Premium, payable-in-kind; (ii) each lander that commits to funding the Tranche A-1 Term Loans will receive its pro rata share of the Tranche A-1 Backstop Premium, in the form of New Common Equity; (iii) each lender that commits to funding the New Money Tranche A-2 Term Loans will receive its pro rata share of the Tranche A-2 Term Loan Backstop Premium, payable-in-kind; and (iv) each lender that actually funds the New Money Tranche A-2 Term Loans

4

will receive its pro rata share of the Tranche A-2 Term Loan Funding Premium in the form of New Common Equity, subject to further dilution by the MIP Equity Pool; *provided* that, for the avoidance of doubt, no New Common Equity will be issued on account of the converted DIP New Money Term Loans or the Incremental Tranche A-2 Term Loans; in each case, in accordance with the Plan;

(e)     the equitization of approximately $1.31 billion of Allowed Priority Lien Claims and Non-Priority Lien Term Loan Deficiency Claims, in each case, subject to dilution on account of any DIP Equitization Shares, any New Common Equity issued in connection with the Tranche A-1 Term Loan Backstop Premium, the Tranche A-2 Term Loan Funding Premium, and the MIP Equity Pool;

(f)     the ABL Loan Claims shall continue in full force and effect against the Reorganized Debtors on the Effective Date in accordance with the Amended and Restated ABL Loan Credit Agreements, subject to (i) a waiver of change of control triggers on account of the Restructuring Transactions, (ii) extensions of deadlines for deliverables under the ABL Loan Credit Agreements, (iii) additional amendments to facilitate implementation of the Restructuring Transactions, and (iv) the ABL Consent Fee being paid in full in cash to the Consenting ABL Lender on the Effective Date;

(g)     the Consenting Junior Lenders' Fee Consideration will be paid to the Junior Lien Financing Litigation Parties (or their designee(s)), which consists of (i) $1.25 million in cash and (ii) $3.75 million of Incremental Tranche A-2 Term Loans, but not consisting of New Money Tranche A-2 Term Loans;

(h)     Allowed General Unsecured Claims will be Unimpaired under the Plan and treated in the ordinary course;

(i)     the cancellation of all Existing Mitel Interests on the Effective Date;[4] and

(j)     the Company, the Consenting Sponsor, the Senior Lenders, and the Junior Lenders will dismiss the 2022 Transaction Litigation.

8.     Additionally, the Restructuring Support Agreement contemplates, and the Plan implements, the assumption of the Atos Settlement Agreement and NICE Settlement Agreement, which will provide a framework for the Debtors' go-forward relationship with key operational counterparties upon emergence from these Chapter 11 Cases.

---

[4]   The Restructuring Transactions Memorandum filed substantially contemporaneously herewith provides further information on certain transaction steps involving the Existing Mitel Interests.

9.      The Debtors' obligations under the Restructuring Support Agreement are subject to a fiduciary-out provision, thus ensuring that the Debtors have been able to consider unsolicited alternative proposals during these Chapter 11 Cases.  As of the date hereof, the Debtors have not received any viable alternative proposal that would provide greater value for all stakeholders in these Chapter 11 Cases.[5]

## II.      SOLICITATION AND FILING OF PLAN DOCUMENTS

10.      On March 9, 2025, prior to commencing these Chapter 11 Cases, but after the execution of the Restructuring Support Agreement, the Debtors launched solicitation of votes on the solicitation version of the Plan [Docket No. 20] by causing their claims, noticing, and solicitation agent, Stretto, Inc. (the "Solicitation Agent") to transmit, via electronic mail, copies of the solicitation package containing the Disclosure Statement, including the Plan and other exhibits thereto, a cover letter from the Debtors, and one or more Ballots, as applicable (the "Solicitation Package"), to Holders of (a) ABL Loan Claims in Class 3, (b) Priority Lien Claims in Class 4, and (c) Non-Priority Lien Term Loan Deficiency Claims in Class 5 (collectively, the "Voting Classes").[6]  The Debtors were not required to solicit votes from Holders of Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 6 (General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), and Class 9 (Existing Mitel Interests) (collectively, the "Non-Voting Classes") because the Holders in the Non-Voting Classes are either Unimpaired under the Plan and presumed to accept the Plan, or are deemed to reject the Plan.  Instead, in accordance with the Scheduling Order (as defined below), the Debtors caused the Solicitation Agent to distribute a notice of non-voting

---

[5]      Yetter Decl. ¶ 6.

[6]      Voting Report ¶ 8.

status (the "Notice of Non-Voting Status") to the Holders of Claims or Interests in the Non-Voting Classes, other than Holders in Class 7 and Class 8, on March 11, 2025.[7]  The Notice of Non-Voting Status also included a return form and instructions for such Holders to opt out of the Third-Party Release (as defined herein) at their election (the "Release Opt Out Form").  Further, the Disclosure Statement contained the Debtors' (a) valuation analysis prepared by PJT Partners, LP ("PJT"), the Debtors' investment banker, attached to the Disclosure Statement as Exhibit D (the "Valuation Analysis"); (b) the liquidation analysis prepared by FTI Consulting, Inc. ("FTI"), the Debtors' financial advisor, attached to the Disclosure Statement as Exhibit E (the "Liquidation Analysis"); and (c) financial projections (together with certain related assumptions) prepared by the Debtors' management and FTI, attached to the Disclosure Statement as Exhibit F (the "Financial Projections").

11.     Following the launch of solicitation, on March 9 and 10, 2025 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases, filing for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).[8] No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

12.     On March 10, 2025, the Debtors filed the solicitation versions of the Plan and Disclosure Statement, as well as several other motions requesting relief to continue the Debtors' operations in the ordinary course during the pendency of the Chapter 11 Cases, including authority to execute definitive documentation for debtor-in-possession financing and the

---

[7]   *See* Solicitation Certificate.

[8]   *Order (A) Directing Joint Administration of Related Chapter 11 Cases and (B) Granting Related Relief* [Docket No. 32].

consensual use of cash collateral in their *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 22].

13.     On March 11, 2025, after notice and hearing, this Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Conditionally Approving Disclosure Statement; (III) Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (VII) Granting Related Relief* [Docket No. 76] (the "Scheduling Order").

14.     The Scheduling Order:  (a) conditionally approved the Disclosure Statement; (b) finally approved the solicitation and voting procedures with respect to the Plan (the "Solicitation Procedures") and the Solicitation Package related thereto; (c) approved the Notice of Non-Voting Status, the Release Opt Out Form, and the Combined Notice (as defined below); (d) established notice and objection procedures with respect to Confirmation of the Plan and final approval of the Disclosure Statement; (e) set March 7, 2025 as the voting record date; (f) set April 10, 2025, at 5:00 p.m. (Central Time) as the deadline for Holders of Claims entitled to vote on the Plan to submit their votes (the "Voting Deadline"); (g) set April 10, 2025, at

8

4:00 p.m. (Central Time) as the date by which to file objections to the Plan and/or final approval of the Disclosure Statement (the "Objection Deadline"); and (h) scheduled the commencement of the hearing to consider confirmation of the Plan and final approval of the Disclosure Statement (the "Combined Hearing") for April 17, 2025, at 11:00 a.m. (Central Time).

15.     The materials in the Solicitation Package also established and communicated how the Solicitation Agent would tabulate the votes and elections contained in the Ballots. Those Solicitation Procedures provided that, among other things:  (a) a timely, properly completed Ballot submitted by a Holder of Claims in a Voting Class would supersede and revoke any prior Ballot(s) submitted by that Holder; (b) Ballots that attempt to partially accept and partially reject the Plan would not be counted; (c) illegible Ballots would not be counted; (d) Ballots containing insufficient information to identify the Holder would not be counted; (e) any form of ballot other than the official form of Ballot sent by the Voting Agent would not be counted; and (f) Ballots received after the Voting Deadline (provided that such Voting Deadline has not been extended) would not be counted.

16.     In addition, the Debtors also caused the Solicitation Agent to serve a notice of the Combined Hearing and the Objection Deadline (the "Combined Notice") to all Holders of Claims in the Voting Classes and all other parties in interest on March 12, 2025.[9]  Accordingly, the Combined Notice was distributed more than 28 calendar days before the Objection Deadline, as required by Bankruptcy Rule 2002(b).  As further authorized by the Scheduling Order, the Debtors caused the Solicitation Agent to publish a substantially similar Combined Notice in

---

[9]     *See* Solicitation Certificate.

the national edition of the *New York Times* on March 27, 2025, 21 days prior to the Combined Hearing.[10]

17.     On April 3, 2025, the Debtors filed the *Notice of Filing of Plan Supplement*, which included the following exhibits (including drafts or forms of such documents, as applicable):  (a) the Governance Term Sheet; (b) the Exit Term Loan Facility Term Sheet; and (c) the Schedule of Retained Causes of Action [Docket No. 193] (as modified, amended, or supplemented from time to time, the "Plan Supplement").

**A.     Voting Results**

18.     In accordance with the Bankruptcy Code, only Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims were entitled to vote on the Plan. Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired by the Plan or (b) Impaired by the Plan such that they will receive no distribution of property under the Plan.  As a result, the Non-Voting Classes were not entitled to vote on the Plan, and the Debtors did not solicit votes from the Holders of Claims and Interests in the Non-Voting Classes.

19.     Substantially contemporaneously with the filing of this Confirmation Brief, on April 15, 2025, the Solicitation Agent filed the Voting Report.  As set forth in the Voting Report, the Solicitation Agent tabulated the Ballots received by the Voting Deadline from Holders of Claims in the Voting Classes.[11]  All validly executed Ballots cast by Holders of Claims entitled to vote in the Voting Classes received by the Solicitation Agent on or before the Voting Deadline were tabulated in accordance with the Solicitation Procedures.

---

[10]     *See* Publication Certificate.

[11]     *See* Voting Report ¶ 16.

20.     The voting results, as reflected in the Voting Report, are summarized as follows:

| Class 3 Ballots – ABL Loan Claims | | | | | |
|---|---|---|---|---|---|
| | Count | % | | Dollars | % |
| Accept: | 1 | 100% | | $17,000,000 | 100% |
| Reject: | 0 | 0% | | $0.00 | 0% |
| Third-Party Release Opt Out: | 0 | | | | |
| Tabulated Ballot Totals: | 1 | | | $17,000,000 | |
| Not Tabulated: | 0 | | | | |

| Class 4 Ballots – Priority Lien Claims | | | | | |
|---|---|---|---|---|---|
| | Count | % | | Dollars | % |
| Accept: | 143 | 99.3% | | $110,087,283.50 | 95.4% |
| Reject: | 1 | 0.7% | | $5,321,635.03 | 4.6% |
| Third-Party Release Opt Out: | 1 | | | | |
| Tabulated Ballot Totals: | 144 | | | $115,408,918.53 | |
| Not Tabulated: | 0 | | | | |

| Class 5 Ballots – Non-Priority Lien Term Loan Deficiency Claims | | | | | |
|---|---|---|---|---|---|
| | Count | % | | Dollars | % |
| Accept: | 321 | 100% | | $1,001,293,996.73 | 100% |
| Reject: | 0 | 0% | | $0.00 | 0% |
| Third-Party Release Opt Out: | 5 | | | | |
| Tabulated Ballot Totals: | 321 | | | $1,001,293,996.73 | |
| Not Tabulated: | 1 | | | $78,262.42 | |

21.     Based on the Voting Report, the voting results indicate that each of the Voting Classes (Class 3 (ABL Loan Claims), Class 4 (Priority Lien Claims), and Class 5 (Non-Priority Lien Term Loan Deficiency Claims)) voted to accept the Plan.

22.     The Solicitation Agent was also designated to tabulate which Holders of Claims elected to not grant the Third-Party Release, either (a) in the case of Holders in the Non-Voting Classes, by submitting the Release Opt Out Form, or (b) in the case of Holders in the Voting Classes, checking the appropriate opt out box on their Ballot.  The Voting Report sets forth that

11 Holders of Claims that submitted Ballots or the Release Opt Out Forms validly elected to opt out of the Third-Party Release.[12]

23.     The Debtors refer the Court to the Plan, the Disclosure Statement, the Scheduling Order, the Plan Supplement, the Supporting Declarations, and the record of the Chapter 11 Cases for an overview of the Debtors' business and any other relevant facts that may bear on Confirmation of the Plan.  The Supporting Declarations and any testimony and other declarations that may be proffered or submitted in connection with the Combined Hearing are fully incorporated herein.

### B.     Limited Objections

24.     As noted above, the Debtors have received one formal objection to Confirmation of the Plan that remains unresolved.[13]   Additionally, in advance of Confirmation, the Debtors received informal comments from various parties with respect to the Plan.   The objections, informal comments, resolutions, and the Debtors' responses are summarized in the chart attached hereto as **Exhibit A** (the "Response Chart").   As set forth in the Response Chart, the Debtors have resolved these informal comments and reflected such resolutions in the proposed Confirmation Order and/or the modified Plan, each filed contemporaneously herewith, as applicable, except for the U.S. Trustee Objection.   The Debtors address the merits of the U.S. Trustee Objection in Part IV of this Confirmation Brief.

---

[12]   *See id.*, Ex. H.

[13]   Ingate Systems A.B. and Ingate Inc. (collectively, "Ingate"), a contract counterparty, filed the *Objection of Ingate Systems AB to: (A) Disclosure Statement; (B) Joint Prepackaged Chapter 11 Plan of Reorganization of MLN US HoldCo LLC and Its Debtor Affiliates; and (C) Cure Amount for the Ingate Contract* [Docket No. 230] (the "Ingate Objection").   As reflected in the Response Chart, the Debtors incorporated language into the Confirmation Order reserving all parties' rights, claims, and defenses under the OEM Agreement (as defined herein), and the Ingate Objection and any related disputes will be addressed separately from Confirmation of the Plan.

## ARGUMENT

25.     This Confirmation Brief is divided into four parts.  <u>First</u>, the Debtors request final approval of the Disclosure Statement.  <u>Second</u>, the Debtors address the applicable requirements for the settlements contained in the Plan pursuant to Bankruptcy Rule 9019 and explain why the Plan Settlement and other settlements in the Plan should be approved.  <u>Third</u>, the Debtors address and demonstrate that the Plan satisfies the confirmation requirements set forth in section 1129 of the Bankruptcy Code.  <u>Fourth</u>, the Debtors respond to the U.S. Trustee Objection and establish why it should be overruled, and, accordingly, request that the Court confirm the Plan.

## I.     THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE, AND THE DEBTORS COMPLIED WITH APPLICABLE NOTICE REQUIREMENTS

### A.     The Debtors Provided Sufficient Notice of the Hearing and Objection Deadline for Final Approval of the Disclosure Statement

26.     Under Bankruptcy Rule 3017(a), a hearing on the adequacy of the disclosure statement generally requires 28 days' notice.  Similarly, Bankruptcy Rule 2002(b) provides that parties in interest should receive 28 days' notice of the objection deadline and the hearing to consider approval of the disclosure statement.

27.     Consistent with longstanding Supreme Court precedent, the Fifth Circuit has found that due process requires that "notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency' of a proceeding."[14]  When evaluating the notice and the sufficiency thereof, courts will consider first, whether "the notice apprised the claimant of the pendency of the action," and second, whether "it was sufficiently

---

[14]     *See Williams* v. *Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151, 154 (5th Cir. 2014) (citing *Mullane* v. *Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

timely to permit the claimant to [act]."[15]  Whether a particular method of notice is reasonably calculated to inform interested parties is determined on a case-by-case basis.[16]

28.     As noted above, the Court entered the Scheduling Order on March 11, 2025, which among other things, scheduled the Combined Hearing, approved certain related objection and reply deadlines, and approved the form of Combined Notice and manner of service thereof. The Combined Notice informed recipients of, among other things: (a) the commencement of the Chapter 11 Cases, (b) the date and time set for the Combined Hearing, and (c) the Objection Deadline, and was served by the Solicitation Agent on March 12, 2025.[17]  Accordingly, the Debtors submit that all parties in interest had at least 36 days' notice prior to the Combined Hearing and 29 days' notice prior to the Objection Deadline, in compliance with both Bankruptcy Rule 3017(a) and Bankruptcy Rule 2002(b).

29.     Further, the Debtors caused the Publication Notice to be published in the national edition of the *New York Times* on March 27, 2025, which, among other things, disclosed the date of the Combined Hearing and the Objection Deadline.[18]  Both the Combined Notice and the Publication Notice included instructions regarding how to obtain the Plan and the Disclosure Statement free of charge through the Solicitation Agent's website.  Accordingly, the Debtors have satisfied Bankruptcy Rules 2002(b) and 3017(a).

---

[15]  *Sequa Corp.* v. *Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994) (applying two-part test); *Otto* v. *Tex. Tamale Co. (In re Tex. Tamale Co., Inc.)*, 219 B.R. 732, 739–40 (Bankr. S.D. Tex. 1998) (same).

[16]  *See Walters* v. *Hunt (In re Hunt)*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992) ("Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case.").

[17]  *See* Solicitation Certificate.

[18]  *See* Publication Certificate.

**B.** **The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and Should Be Approved**

**1.** **The Disclosure Statement Contains Adequate Information**

30. The primary purpose of a disclosure statement is to provide "adequate information" that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[19] "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[20] Courts within the Fifth Circuit and elsewhere acknowledge that bankruptcy courts have broad discretion in determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code.[21]

31. Courts generally look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

- the events that led to the filing of a bankruptcy petition;

- the relationship of the debtors with their affiliates;

---

[19] *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).

[20] *See, e.g., In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401 (Bankr. S.D. Tex. 2016) ("What constitutes adequate information is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties.") (quoting *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988))); *In re J.D. Mfg., Inc.*, No. 07-36751, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("'Adequacy' of information is a determination that is relative both to the entity (e.g. assets/business being reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is addressed."); *Floyd* v. *Hefner*, No. 03-5693, 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a "flexible standard"); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice . . . .").

[21] *See, e.g., Mabey* v. *Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.) (Cajun II)*, 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125 indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement, . . . the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of the case." (internal quotation marks and citations omitted)); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) ("A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case . . . ." (emphasis in original)).

- a description of the debtors' available assets and their value;

- the anticipated future of the companies;

- the source of information stated in the disclosure statement;

- the present condition of the debtors while in chapter 11;

- claims asserted against the debtors;

- the estimated return to creditors under a chapter 7 liquidation;

- the chapter 11 plan or a summary thereof;

- financial information, valuations, and projections relevant to the creditors' decision to accept or reject the chapter 11 plan;

- information relevant to risks posed to creditors under the plan;

- the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;

- litigation likely to arise in a nonbankruptcy context; and

- tax attributes of the debtors.[22]

32.    The Disclosure Statement contains adequate information and was previously approved on a conditional basis by this Court on March 11, 2025.  The Disclosure Statement contains descriptions and summaries of, among other things, (a) the Plan, (b) the Debtors' business operations, (c) key events leading to the commencement of these Chapter 11 Cases, (d) the Debtors' prepetition indebtedness, (e) the proposed capital structure of the Reorganized Debtors, (f) the Financial Projections demonstrating the Debtors' ability to meet their obligations

---

[22]    *See U.S. Brass*, 194 B.R. at 424–25 (citing *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)); *see also In re Phoenix Petrol. Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing factors that courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (setting forth a non-exhaustive list of 19 categories of information that may be included in a disclosure statement).  Disclosure regarding all of the aforementioned topics is not necessary in every case. *See U.S. Brass*, 194 B.R. at 425; *see also Phoenix Petrol.*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

under the Plan, (g) the Valuation Analysis setting forth the Debtors' estimated implied going-concern equity value upon emergence from chapter 11, (h) the Liquidation Analysis setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation, (i) securities disclosures with respect to the Plan, (j) risk factors associated with the Plan, and (k) federal tax law consequences of the Plan. Furthermore, the Consenting Stakeholders' advisors had an opportunity to review and comment on the Disclosure Statement in advance of solicitation to ensure that the Disclosure Statement contained adequate information for their respective clients.

33.     Accordingly, the Debtors submit that the Disclosure Statement contains sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations. Moreover, the Disclosure Statement contains "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated by the Plan, and should be approved.

### 2.     The Disclosure Statement Demonstrates that the Debtors Complied with Applicable Nonbankruptcy Law.

34.     The Debtors commenced the solicitation of votes on the Plan from Holders of Claims in the Voting Classes prior to commencing the Chapter 11 Cases.[23] To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code, as well as Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c). Similarly, section 1125(b) of the Bankruptcy Code prohibits solicitation of a plan unless the plan

---

[23]     Yetter Decl. ¶ 21.

(or a summary thereof) and "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" are transmitted to those persons whose votes are being solicited.  For the reasons set forth herein, the Debtors satisfied the requirements of the Bankruptcy Code and the Bankruptcy Rules in connection with the solicitation.

35.     Section 1126(b) of the Bankruptcy Code expressly permits a debtor to solicit votes from holders of claims and interests prepetition without a court-approved disclosure statement if the solicitation complies with applicable nonbankruptcy law—including generally applicable federal and state securities laws or regulations—or, if no such laws exist, the solicited holders receive "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.[24]

36.     To the extent that the Debtors' prepetition solicitation was deemed to constitute an offer of new securities, such solicitation procedures are exempt from securities law registration requirements pursuant to Section 4(a)(2), Regulation D, and/or Regulation S of the Securities Act, or any similar rules, regulations, or statutes, as applicable to any recipient deemed an offeree. Specifically, Section 4(a)(2) and Regulation D of the Securities Act create an exemption from the registration requirements under the Securities Act for certain transactions not involving a "public offering," and Regulation S creates an exemption from the registration

---

[24]     *See* 11 U.S.C. § 1126(b) ("[A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if— (1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title."); *see also id.* § 1125(g) ("[A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.").

requirements under the Securities Act for offerings deemed to be executed outside of the United States.

37.     To the extent the prepetition solicitation of votes is deemed to be a private placement of securities, the Debtors have complied with the requirements of Section 4(a)(2) of the Securities Act, and/or Regulation D and Regulation S thereunder, as applicable, such that these transactions are exempt from the registration requirements under the Securities Act. Specifically, the prepetition solicitation was made to those Holders of Class 3 (ABL Loan Claims), Class 4 (Priority Lien Claims), and Class 5 (Non-Priority Lien Term Loan Deficiency Claims) who certified that they were one of the following: (a) a "qualified institutional buyer" (as such term is defined in Rule 144A of the Securities Act); (b) an "accredited investor" (as such term is defined in Rule 501(a) of Regulation D of the Securities Act); or (c) located outside the United States and were a person other than a "U.S. person" (as defined in Rule 902(k) of Regulation S of the Securities Act).

38.     Pursuant to section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the New Common Equity issued on account of the DIP Equitization Shares, Priority Lien Claims, and Non-Priority Lien Term Loan Deficiency Claims will be freely transferable by the recipients thereof, subject to (a) any limitations that may be applicable to any Person receiving such securities that is an "affiliate" of the Reorganized Debtors as determined in accordance with applicable U.S. securities law and regulations or is otherwise an "underwriter" as defined in section 1145(b) of the Bankruptcy Code; (b) any transfer restrictions of such securities and instruments in the New Governance Documents; and (c) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments.

39.     The shares of New Common Equity issued to an entity that is an "underwriter" with respect to such securities (as such term is defined in section 1145(b) of the Bankruptcy Code) and shares of New Common Equity issued on account of the Tranche A-1 Term Loan Backstop Premium, the Tranche A-2 Term Loan Funding Premium, or for which section 1145 of the Bankruptcy Code is otherwise not permitted or not applicable, will be offered, issued and distributed in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or reliance on Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and subject to the restrictions in the New Organizational Documents.

40.     Accordingly, the prepetition solicitation meets the requirements of applicable nonbankruptcy law and, thus, complies with section 1126(b)(1) of the Bankruptcy Code Moreover, no party in interest has objected to final approval of the Disclosure Statement, much less on account of noncompliance with applicable nonbankruptcy law.

### C.     The Solicitation Procedures Complied with the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order

41.     Prior to the Petition Date, the Debtors distributed the Solicitation Packages to all Eligible Holders,[25] which consisted of Holders of Claims in each of the Voting Classes: Class 3 (ABL Loan Claims), Class 4 (Priority Lien Claims), and Class 5 (Non-Priority Lien Term Loan Deficiency Claims).  The Debtors distributed the Solicitation Packages (including the Ballots) only to Eligible Holders prior to entry of the Scheduling Order.  Subsequently, after the entry of

---

[25]   "Eligible Holder" means any Holder that is (a) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) or an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act) or (b) located outside the United States and is a person other than a "U.S. person" (as defined in Rule 902 under the Securities Act).

Scheduling Order and in accordance with the terms thereof, the Debtors caused the Solicitation Agent to distribute the Notice of Non-Voting Status to the members of the Non-Voting Classes, other than the Holders in Class 7 and Class 8, on March 11, 2025.[26]  The Notice of Non-Voting Status also included the Release Opt Out Form with instructions for such Holders to opt out of the Third-Party Release at their election.

42.     The solicitation was undertaken in accordance with sections 1125 and 1126 of the Bankruptcy Code.[27]  In addition, Bankruptcy Rule 3017(d) enumerates those materials that must be provided to holders of claims and interests for the purpose of soliciting votes to accept or reject a plan of reorganization.[28]  As set forth in more detail below, the solicitation complied with the Bankruptcy Code and the Bankruptcy Rules.

### 1.     The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Bankruptcy Rules

43.     Bankruptcy Rule 3017(d) requires the debtor to transmit a form of ballot, which substantially conforms to Official Form No. 314, only to "creditors and equity security holders entitled to vote on the plan."[29]  Bankruptcy Rule 3018(c) provides that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."[30]  As set forth in the Solicitation Certificate, each Eligible Holder received

---

[26]   *See* Solicitation Certificate.

[27]   *See* 11 U.S.C. § 1125(b) (debtors may solicit votes following filing if the holders of claims or interested solicited are sent a summary of the plan and an approved disclosure statement); 11 U.S.C. § 1125(g) (debtors may commence solicitation prior to filing chapter 11 petitions); *see also id.* § 1126(b)(2) (holders of claims or interests that accepted or rejected a plan before the commencement of a chapter 11 case are presumed to accept or deemed to reject the plan so long as the solicitation provided adequate information).

[28]   *See* FED. R. BANKR. P. 3017(d).

[29]   *See id.*

[30]   *See id.* at 3018(c).

the Solicitation Package, including the Ballots.[31]    The forms of Ballots distributed to the Voting Classes complied with the Bankruptcy Rules, are consistent with Official Form No. 314, and were approved by the Bankruptcy Court in the Scheduling Order.[32]    Further, there have been no objections to the sufficiency of the Ballots.    Based on the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(c).

### 2. The Voting Record Date Complied with Bankruptcy Rules and the Scheduling Order

44.    When a debtor solicits votes prepetition, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date specified in the solicitation."[33]    For a postpetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date the order approving the disclosure statement is entered or on another date fixed by the court . . . after notice and a hearing."[34]    The Scheduling Order, the Disclosure Statement, and the Ballots clearly identify March 7, 2025, as the Voting Record Date.[35]

### 3. The Debtors' Solicitation Period Complied with Bankruptcy Rule 3018 and the Scheduling Order

45.    The Debtors' solicitation period complied with Bankruptcy Rule 3018.    First, as set forth above, the Debtors caused the Plan and Disclosure Statement to be transmitted to all

---

[31]    *See* Solicitation Certificate.

[32]    *See* Scheduling Order.

[33]    FED. R. BANKR. P. 3018(b).

[34]    *Id.* at 3018(a).

[35]    *See* Scheduling Order ¶¶ 1, 13; Ex. 3A, 3B & 3C; Disclosure Statement, Art. XI.

Holders of Claims in each of the Voting Classes in accordance with Bankruptcy Rule 3018(b).[36]

Second, the solicitation period—which lasted from March 9, 2025 through April 10, 2025, for

Eligible Holders (32 days) and from March 11, 2025 through April 10, 2025, for Non-Eligible

Holders (30 days)—complied with the deadlines set forth in the Scheduling Order and were

adequate under the particular facts and circumstances of this case and applicable bankruptcy law.

Accordingly, the Debtors submit that they have satisfied the requirements of

Bankruptcy Rule 3018.

### 4. The Debtors' Vote Tabulation Was Appropriate and Complied with the Scheduling Order

46.     The Debtors request that the Court find that the tabulation of votes was completed

in a manner consistent with the Solicitation Procedures approved in the Scheduling Order and in

accordance with applicable bankruptcy law.   As described in the Solicitation Procedures and

the Voting Report, the Solicitation Agent used standard tabulation procedures in tabulating votes

from Eligible Holders.   Specifically, the Solicitation Agent reviewed and tabulated all valid

Ballots received through the Voting Deadline, each in accordance with the court-approved

Solicitation Procedures and the Disclosure Statement.[37]

### 5. Waiver of Certain Solicitation Package Mailings Is Reasonable and Appropriate and Complied with the Scheduling Order

47.     As further described in the Debtors' *Emergency Motion for Entry of an Order*

*(I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and*

*(B) Confirmation of Prepackaged Plan; (II) Conditionally Approving Disclosure Statement;*

*(III) Approving Solicitation Procedures and Form and Manner of Notice of Commencement,*

---

[36]   *See* Solicitation Certificate.

[37]   *See* Voting Report ¶¶ 15–16.

*Combined Hearing, and Objection Deadline; (IV) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (VII) Granting Related Relief* [Docket No. 21] (the "Scheduling Motion"), certain Holders of Claims or Interests in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 6 (General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), and Class 9 (Existing Mitel Interests) were not provided a Solicitation Package because such Holders are conclusively presumed to accept or deemed to reject the Plan pursuant to sections 1126(f) and (g) of the Bankruptcy Code. In the Scheduling Order, the Court approved the Solicitation Procedures, which provided that the Debtors would not mail a copy of the Solicitation Package to Holders of Claims or Interests presumed to accept or deemed to reject the Plan. As set forth above, the Court-approved Combined Notice was sent to the Debtors' full creditor matrix and provided instructions for obtaining copies of the Disclosure Statement and Plan, which are available at no cost on the Solicitation Agent's website. In addition, the Debtors sent the Court-approved Notice of Non-Voting Status with an attached Release Opt Out Form to all Holders of Claims and Interests in Non-Voting Classes in accordance with the Scheduling Order, except for Holders of Claims in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests), because such Holders are Affiliates of the Debtors.

### 6. Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith

48.     Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, . . . is not liable, on account of such solicitation . . . for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[38]  As set forth in the Disclosure Statement and the Scheduling Motion, and as demonstrated by the Debtors' compliance with the Scheduling Order,[39] the Debtors at all times solicited acceptances and rejection of the Plan in good faith and in compliance with section 1125 of the Bankruptcy Code. Therefore, the Debtors request that the Bankruptcy Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.     THE PLAN'S SETTLEMENT AND COMPROMISES ARE REASONABLE AND SATISFY BANKRUPTCY RULE 9019

49.     "The standard for evaluating the validity of a settlement contained in a Chapter 11 plan is the same as the standard for evaluating a settlement between a debtor and another party outside the context of a plan . . . . Stated differently, settlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under [Bankruptcy] Rule 9019."[40] Accordingly, approval should be given "if the settlement is 'fair and equitable and in the best interest of the estate.'"[41]  The "fair and equitable standard" incorporates the absolute priority rule when the debtor seeks approval of a settlement contained in a plan of reorganization, as is the

---

[38]   11 U.S.C. § 1125(e).

[39]   *See generally* Solicitation Certificate.

[40]   *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) (citing *In re MCorp Fin., Inc*., 160 B.R. 941, 951 (S.D. Tex. 1993)).

[41]   *Off. Comm. of Unsecured Creditors* v. *Cajun Elec. Power Coop., Inc. ex rel. Mabey (In re Cajun Elec. Power Coop., Inc.) (Cajun I)*, 119 F.3d 349, 355 (5th Cir. 1997) (quoting *Conn. Gen. Life Ins. Co.* v. *United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (additional citations omitted)).

case here.[42]  However, a creditor in a class of claims that accepts a plan cannot raise an absolute priority argument to a settlement.[43]

50.     To determine whether a settlement is fair and equitable, courts "apply [a] three-part test . . . with a focus on comparing 'the terms of the compromise with the likely rewards of litigation.'"[44]  Specifically, a bankruptcy court evaluates: (a) "the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law;" (b) "the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay;" and (c) "all other factors bearing on the wisdom of the compromise," including (i) "the best interests of the creditors, with proper deference to their reasonable views," and (ii) "the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion."[45]

51.     In determining whether a settlement is appropriate and should be approved, "a bankruptcy court need not 'conduct a mini-trial . . . .' [but r]ather . . . must 'apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision.'"[46] Although the debtor bears the burden of establishing that a settlement is fair and equitable based

---

[42]   *See Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 424 (1968) ("The requirements . . . that plans of reorganization be both 'fair and equitable,' apply to compromises just as to other aspects of reorganizations.").

[43]   *In re Mirant Corp.*, 348 B.R. 725, 739 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders* v. *New Mirant Entities*, No. 06-CV-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006) ("In the case at bar, however, because Class 3 Claims have been fully satisfied under the Plan, the Settlement cannot, as a matter of law, violate the absolute priority rule, and, hence, the fair and equitable standard.  The court therefore holds that the Settlement is 'fair and equitable,' giving that term its statutory meaning.").

[44]   *Off. Comm. of Unsecured Creditors* v. *Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *Rivercity* v. *Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)).

[45]   *Id.* (internal quotation marks omitted) (quoting *Jackson Brewing*, 624 F.2d at 602).

[46]   *Id.* at 541 (fourth and fifth alterations in original) (citations omitted).

on the balance of the above factors, "the [debtor's] burden is not high."[47]  Indeed, the court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness."[48]  Here, the Plan's settlements and compromises, including the Plan Settlement, are the result of good-faith, arm's-length negotiations among the parties, and readily satisfy the "lowest point in the range of reasonableness" required for the approval of settlements.

### A.    The Plan Settlement Should Be Approved

52.    Here, among other settlements, the Restructuring Support Agreement and Plan incorporate the Plan Settlement, pursuant to which the Junior Lien Financing Litigation Parties will receive the Consenting Junior Lenders' Fee Consideration on the Effective Date, consisting of (a) $1.25 million in Cash and (b) $3.75 million of Incremental Tranche A-2 Term Loans on account of fees and other expenses paid by the Consenting Junior Lenders or their affiliates to the Consenting Junior Lenders' Advisor prior to the Execution Date (as defined in the Restructuring Support Agreement).  In exchange, (a) the Junior Lien Financing Litigation Parties shall withdraw, with prejudice, the plaintiffs' motion for leave to appeal to the New York Court of Appeals the decision and order of the Appellate Division, First Judicial Department entered on December 31, 2024 in the Financing Litigation (*Ocean Trails CLO VII* v. *MLN Topco Ltd.*, 225 N.Y.S.3d 192 (App. Div. 2024)), or, in the event such motion has been granted, withdraw the appeal, with prejudice, and (b) the Financing Litigation Parties, including for the avoidance of doubt the Reorganized Debtors, shall jointly seek entry of final judgment dismissing all claims with prejudice in the proceeding in the Commercial Division of the New York Supreme Court

---

[47]  *See In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).

[48]  *See In re Idearc, Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011) (citation omitted); *Roqumore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'" (citations omitted)).

(New York County) captioned *Ocean Trails CLO VII* v. *MLN TopCo Ltd.*, Index No. 651327/2023.[49]

53.     The Plan Settlement is a global resolution to the Financing Litigation. The Debtors, the Ad Hoc Group, the Consenting Sponsor, and the Junior Lien Financing Litigation Parties as parties to the Financing Litigation engaged in extensive, arm's-length negotiations over the terms of the Plan Settlement.[50]   Therefore, the Plan Settlement was a material inducement for the various Consenting Stakeholders to provide support for the Chapter 11 Cases, the prepackaged Restructuring Transactions, and the Debtors' ability to pay all Allowed General Unsecured Claims in full.   Moreover, the Special Committee of the Board[51] comprised of independent directors separately reviewed and approved the terms of the Plan Settlement, as embodied in the Restructuring Support Agreement and the Plan, as being fair, reasonable, and in the best interests of the Debtors' estates.[52]

54.     Without the Plan Settlement, the Debtors likely could not have pursued the comprehensive Restructuring Transactions contemplated by the Plan through a prepackaged process, which will deleverage the Debtors' balance sheet by $1.15 billion.[53]   While the Debtors were determined to prevail in any appeal of the Financing Litigation, given the Debtors'

---

[49]   *See* Plan, Art. IV.U.  The foregoing description is meant as a summary of the operative Plan provisions only. To the extent there is any conflict between this summary and the operative Plan provisions, the Plan shall control.

[50]   *See* First Day Decl. ¶ 13; Yetter Decl. ¶¶ 50–51.

[51]   As discussed further in the First Day Declaration, in early 2024, the boards of directors of Debtors MLN TopCo Ltd. and Mitel Networks (International) Limited (the boards of directors collectively, the "Board") each appointed an independent director, Mr. Julian Nemirovsky, and established a special committee of the Board (collectively, the "Special Committee").  In October 2024, Mr. Andrew C. Kidd was added as an additional independent director to the Board and was also appointed as an additional member of the Special Committee. The Board delegated to the Special Committee the authority to evaluate strategic transactions and any potential conflict transactions.  *See* First Day Decl. ¶ 10.

[52]   Yetter Decl. ¶ 50.

[53]   *Id*. ¶ 56.

constrained prepetition liquidity position and the potential risks of pursuing litigation to the Debtors' Estates in a Chapter 11 Cases, this Plan Settlement provides a value-maximizing opportunity to implement a global resolution among its key stakeholders.  As demonstrated by the overwhelming support for the Plan, the Plan Settlement is fair, equitable, represents the exercise of the Debtors' sound business judgment, is in the best interests of the Debtors' stakeholders, and well within the range of reasonableness required by Bankruptcy Rule 9019.[54] For these reasons, the Plan Settlement should be approved.

## III.   THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED

55.      In order to confirm a plan, a court must find that both the plan and the debtor comply with each of the requirements of section 1129 of the Bankruptcy Code.  The debtor must demonstrate such compliance by a preponderance of the evidence.[55]  The Debtors submit the Plan satisfies the requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and should be confirmed.[56]

---

[54]   *Id.* ¶ 50.

[55]   *See, e.g.*, *Heartland Fed. Sav. & Loan Ass'n* v. *Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The . . . preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *see also In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

[56]   Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code do not apply to the Debtors. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations to which the Debtors are not subject.  *See* 11 U.S.C. § 1129(a)(14).  Similarly, section 1129(a)(15) of the Bankruptcy Code applies only to "individual[s]" as that term is defined in the Bankruptcy Code, and not companies such as the Debtors.  Finally, section 1129(a)(16) of the Bankruptcy Code governs property transfers by entities that, unlike the Debtors, are something other than a "moneyed, business, or commercial corporation or trust."

A.   **Section 1129(a):  The Plan Meets Each of the Applicable Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code**

1.   **Section 1129(a)(1):  The Plan Complies with the Applicable Provisions of the Bankruptcy Code**

56.   Section 1129(a)(1) of the Bankruptcy Code requires a plan to comply with all applicable provisions of the Bankruptcy Code, including the rules governing the classification of claims and interests (section 1122) and the provisions dictating the contents of a plan (section 1123).[57]  The Plan so complies with these provisions of the Bankruptcy Code.

(a)   **Section 1122:   The Plan's Classification Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code**

57.   The Plan's classification of Claims and Interests complies with section 1122(a) of the Bankruptcy Code, which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[58]  Substantial similarity, however, does not require that claims or interests in a particular class be identical, or that all similarly situated claims or interests must receive the same plan treatment.[59]  Courts afford a plan proponent with "significant flexibility" in classifying claims and interests under section 1122(a), provided that there is a reasonable, non-gerrymandering

---

[57]   11 U.S.C. §§ 1122, 1123, 1129(a)(1).   *See In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (Bankr. S.D. Tex. 2015) ("Courts interpret [section 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123."); *see also* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

[58]   11 U.S.C. § 1122(a).

[59]   *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that "[section] 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be *separately* classified"); *see also In re Vitro Asset Corp.*, No. 11-32600, 2013 WL 6044453, at *5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

basis for the classification scheme and all claims or interests within a particular class are substantially similar.[60]

58.     Here, the Plan appropriately classifies Claims and Interests as follows:[61]

| Class | Claims and Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 3 | ABL Loan Claims | Impaired | Entitled to Vote |
| 4 | Priority Lien Claims | Impaired | Entitled to Vote |
| 5 | Non-Priority Lien Term Loan Deficiency Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote *(Presumed to Accept / Deemed to Reject)* |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote *(Presumed to Accept / Deemed to Reject)* |
| 9 | Existing Mitel Interests | Impaired | Not Entitled to Vote *(Deemed to Reject)* |

---

[60]   *See In re Deming Hosp., LLC*, No. 11-12-13377, 2013 WL 1397458, at *2 (Bankr. D.N.M. Apr. 5, 2013) ("The main judicial gloss on § 1122(a) is that the subsection prohibits a debtor from separately classifying similar claims to 'gerrymander' a consenting class . . . ."); *In re Pisces Energy LLC*, No. 09-36591, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *In re Mirant Corp.*, No. 03-46590, 2005 WL 6443614, at *19 (Bankr. N.D. Tex. Dec. 9, 2005); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar."); *see also Aetna Cas. & Sur. Co.* v. *Clerk, U.S. Bankr. Ct. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules: [d]issimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason.").

[61]   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Allowed Professional Fee Claims, Restructuring Expenses, DIP Claims, all fees and charges assessed against the Estates under section 1930 of title 28 of the Judicial Code), and Priority Tax Claims are not classified and are separately treated under the Plan.

59.     The Plan's classification of Claims and Interests is reasonable and complies with the Bankruptcy Code.  All Claims and Interests within each Class have substantially similar rights against the Debtors.  The Plan provides for the separate classification of Claims against and Interests in the Debtors based upon the differences in such Claims' and Interests' legal nature or priority.  ABL Loan Claims, Priority Lien Claims, and Non-Priority Lien Term Loan Deficiency Claims have been classified separately because of the nature of such Claims and their unique proposed treatment under the Plan, as negotiated in connection with the Restructuring Support Agreement.[62]   Moreover, the classification structure generally corresponds to the Debtors' prepetition capital structure and designates Claims and Interests into Classes based on the instruments giving rise to such Claims and Interests.   Further, Intercompany Claims, Intercompany Interests, and Existing Mitel Interests have been classified separately due to their distinct nature and their separate proposed treatment under the Plan.   Accordingly, the Plan complies with section 1122 of the Bankruptcy Code.

**(b)     Section 1123:     The Plan Satisfies the Requirements of Section 1123 of the Bankruptcy Code**

60.     Section 1123 of the Bankruptcy Code sets forth both mandatory and optional provisions for a chapter 11 plan.  For the reasons set forth below, the Plan:  (a) satisfies each of the mandatory requirements of section 1123(a) of the Bankruptcy Code; (b) includes several of the optional provisions permitted under section 1123(b) of the Bankruptcy Code; and (c) includes other provisions not inconsistent with other applicable provisions of the Bankruptcy Code within the meaning of section 1123(b)(6) of the Bankruptcy Code.

---

[62]   Yetter Decl. ¶ 12.

> **(i)** **Section 1123(a):   The Plan Satisfies the Mandatory Provisions of Section 1123(a) of the Bankruptcy Code**

61.     The Plan satisfies the seven mandatory requirements of section 1123(a) of the

Bankruptcy Code:

(a)     <u>Section 1123(a)(1)</u>:   The first requirement of section 1123(a) is that the plan specify the classification of claims and interests.[63]   Article III designates Classes of Claims and Interests as required by section 1123(a)(1) of the Bankruptcy Code.

(b)     <u>Sections 1123(a)(2) and (3)</u>:     The second and third requirements of section 1123(a) are that the plan specify (i) the status (*i.e.*, impaired or unimpaired) of such claims and interests and (ii) the precise nature of their treatment under the plan.[64]   The Plan meets these requirements by identifying each Unimpaired and Impaired Class in Article III of the Plan.

(c)     <u>Section 1123(a)(4)</u>:   The fourth requirement of section 1123(a) is that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment."[65] Article III provides the same treatment for each Claim or Interest of a particular Class, unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of such particular Claim or Interest as required by section 1123(a)(4) of the Bankruptcy Code.   This applies to Holders within each Class.

(d)     <u>Section 1123(a)(5)</u>:   The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation.[66]   Article IV, in conjunction with various other Plan provisions, provides adequate means for implementing the Plan as required by section 1123(a)(5) of the Bankruptcy Code, including, *inter alia*: (i) consummation of the Restructuring Transactions, including the Plan Settlement, and generally allowing for all corporate action necessary to effectuate the Restructuring Transactions; (ii) funding distributions under the Plan with (A) Cash on hand on the Effective Date, (B) proceeds from the Exit Term Loan Facility, (C) proceeds from the DIP Facility, and (D) the New Common Equity; (iii) entry into the Exit Term Loan Facility and the Exit Term Loan Credit Documents; (iv) entry into the Amended and Restated ABL Credit Documents;

---

[63]   *See* 11 U.S.C. § 1123(a)(1).

[64]   *See id.* § 1123(a)(2), (3).

[65]   *See id*. § 1123(a)(4).

[66]   *See id*. § 1123(a)(5).   Section 1123(a)(5) specifies that adequate means for implementation of a plan may include, among other things:  (a) retention by the debtor of all or part of its property; (b) the transfer of property of the estate to one or more entities; (c) cancellation or modification of any indenture; (d) curing or waiving of any default; (e) amendment of the debtor's charter; or (f) issuance of securities for cash, for property, for existing securities, in exchange for claims or interests, or for any other appropriate purpose.

(v) the continued corporate existence of the Debtors, except as otherwise provided in the Plan or the Plan Supplement; (vi) vesting of assets in the Reorganized Debtors; (vii) the rejection, assumption, and/or assumption and assignment of Executory Contracts and Unexpired Leases; (viii) authorization and approval of all corporate actions contemplated under the Plan; (ix) the release of guarantees and liens under the Senior Credit Agreements; (x) adoption of the New Organizational Documents; (xi) the cancellation of existing securities and agreements; (xii) exemption from registration requirements pursuant to section 1145 of the Bankruptcy Code; (xiii) expiration of the terms of the members of the Debtors' boards of directors and appointment of the initial boards of directors or managers of the Reorganized Debtors, including the New Board; (xiv) preservation of certain of the Debtors' Causes of Action; (xv) the dismissal of the Financing Litigation; (xvi) exemption from transfer taxes pursuant to section 1146 of the Bankruptcy Code; and (xvii) the implementation of the Management Incentive Plan after the Effective Date as determined by the New Board.

(e)     Section 1123(a)(6): The sixth requirement of section 1123(a) is that a plan must contemplate a provision in the reorganized debtor's corporate charter, if the debtor is a corporation, that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.[67]  As a United Kingdom limited company, Reorganized Mitel is not a corporation as defined in the Bankruptcy Code, and thus section 1123(a)(6) of the Bankruptcy Code is inapplicable.[68] Nonetheless, to the extent section 1123(a)(6) is applicable, this requirement is satisfied because the Governance Term Sheet and Article IV.K of the Plan provide that the New Organizational Documents shall restrict the issuance of any non-voting equity securities to any third parties, and such non-voting equity securities shall be held exclusively by Reorganized Mitel.[69]    Accordingly, the Debtors respectfully submit that the requirements of section 1123(a)(6) of the Bankruptcy Code are not applicable and, to the extent they are applicable, have been satisfied.

---

[67]   *See id.* § 1123(a)(6).

[68]   *See, e.g.*, *In re Acis Cap. Mgmt., L.P.*, No. 18-30264, 2019 WL 406137, at *9 (Bankr. N.D. Tex. Jan. 31, 2019) (confirming plan of limited partnership debtor stating "[t]he Debtors are not corporations.  Therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable."); *In re McCommas LFG Processing Partners, LP*, No. 07-32222, 2007 WL 4234139, at *13 (Bankr. N.D. Tex. Nov. 29, 2007) (confirming plan of limited partnership debtor, stating "[a]s the Debtors are not corporations, section 1123(a)(6) is inapplicable.").  *But see In re Garza*, 605 B.R. 817, 826 n.57 (Bankr. S.D. Tex. July 2019) (finding section 362(a) of the Bankruptcy Code applies to all entities, including limited liability companies, because "the limited  liability company fall[s] within the [Bankruptcy] Code's definition of 'corporation'" (internal citations omitted)); *Cantwell-Cleary Co.* v. *Cleary Packaging, LLC (In re Cleary Packaging, LLC)*, 36 F.4th 509, 514 (4th Cir. 2022) (noting that limited liability companies are included in the 11 U.S.C. § 101(9) definition of "corporations").

[69]   *See* Plan Supplement, Ex. A.

(f)      Section 1123(a)(7):  Finally, section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[70]  Article IV.L provides that following the Effective Date, the New Board will be appointed in accordance with the Plan, and thereafter, the New Board shall be populated in accordance with the New Organizational Documents.   Further, the Debtors disclosed in the Plan Supplement the appointment rights of any additional members of the New Board, and will, in advance of the Combined Hearing, disclose the known proposed members of the New Board.[71]  The existing board members or managers of the Debtor Subsidiaries of Debtor Mitel Networks (International) Limited, and the officers of each of such Reorganized Debtors, as applicable, shall continue in their existing positions as of the Effective Date, subject to the terms of the New Organizational Documents.  As required by sections 1123(a)(7) and 1129(a)(5) of the Bankruptcy Code, the appointment of the New Board is consistent with the interests of creditors and equity security holders and complies with public policy with respect to the manner of selection the directors for the New Board.[72]

(ii)      **Section 1123(b):  The Plan Satisfies the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code**

62.      Section 1123(b) of the Bankruptcy Code allows a plan to include a variety of different permissive provisions.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[73]   Each of the Plan's permissive provisions comport with these requirements:

(a)      Section 1123(b)(1):  Per section 1123(b)(1) of the Bankruptcy Code, Article III classifies and describes the treatment for Claims and Interests under the Plan, and identifies which Claims and Interests are Impaired or Unimpaired.

---

[70]   *See* 11 U.S.C. § 1123(a)(7).

[71]   *See* Plan Supplement, Ex. B.

[72]   *See generally* 11 U.S.C. § 1123(a)(1)–(7).

[73]   *See id*. § 1123(b)(1)–(3), (6).

(b)     <u>Section 1123(b)(2)</u>:  As set forth in section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the assumption, rejection, or assignment of any executory contract or unexpired lease not previously rejected.[74]  Pursuant to Article V of the Plan, and except as otherwise provided therein, all of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date except for any Executory Contract and Unexpired Lease that (i) was previously assumed or rejected by the Debtors, pursuant to an Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its terms, (iii) is the subject of a motion to reject Filed on or before the Effective Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any. The Plan provides that entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

(c)     <u>Section  1123(b)(3)</u>:   Per  section 1123(b)(3)(A)  of  the  Bankruptcy  Code, Article VIII.C of the Plan provides for a release of certain of the Debtors' Claims and Causes of Action.  Article IV.B of the Plan incorporates the terms of the Plan Settlement, discussed above.   In addition, per section 1123(b)(3)(b) of the Bankruptcy Code, Article IV.H and the Plan Supplement provide that, except as otherwise provided in the Plan, all of the Debtors' Causes of Action will vest in the applicable Reorganized Debtor and the Reorganized Debtors will retain, and may compromise or settle all such Causes of Action.[75]

(d)     <u>Section 1123(b)(5)</u>:  As permitted by section 1123(b)(5) of the Bankruptcy Code, Article III modifies the rights of Holders of Claims as set forth therein.

### (iii)     Section 1123(b)(6):  The Discretionary Contents of the Plan are Permitted by Section 1123(b)(6) of the Bankruptcy Code

63.     Section 1123(b)(6) of the Bankruptcy Code also authorizes the inclusion of "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[76]  The Plan includes several such discretionary provisions, including (a) various terms discharging, releasing, and enjoining the pursuit of Claims, and (b) a consensual Third-Party Release of certain potential Claims.   The release and

---

[74]    *See id*. § 1123(b)(2).

[75]    *See* Plan, Art. IV.H; Plan Supplement, Ex. E.

[76]    11 U.S.C. § 1123(b)(6).

exculpation provisions result from extensive good-faith and arm's-length negotiations by and among the Debtors and certain of the Released Parties.[77]   Such provisions are consistent with applicable Fifth Circuit case law and precedent in this District, comply with the Bankruptcy Code in all respects, were a material inducement for parties to enter into the Restructuring Support Agreement, are overwhelmingly supported by the Debtors' key stakeholders, and are in the best interests of the Debtors' Estates and the Chapter 11 Cases.   In addition, the Third-Party Release contained in the Plan is consensual and consistent with Fifth Circuit precedent.   None of the release, exculpation, or injunction provisions are inconsistent with the Bankruptcy Code and, thus, the requirements of section 1123(b) of the Bankruptcy Code are satisfied.

64.   The Debtor Release.   Article VIII.C of the Plan provides for a release of any and all Claims and Causes of Action, including contingent, unliquidated, unknown, and derivative

---

[77]   Pursuant to Article I.183 of the Plan, the term "Released Parties" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each Prepetition Agent; (e) each DIP Lender; (f) each DIP Backstop Party; (g) the DIP Agent; (h) the Exit Term Loan Facility Agent; (i) the Exit Term Loan Lenders; (j) the Senior Lien Financing Litigation Parties, (k) the Junior Lien Financing Litigation Parties; (l) all Holders of Claims that vote to accept the Plan or that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (m) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (n) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (o) the Information Officer and counsel to the Information Officer (p) with respect to each of the Entities in the foregoing clauses (a) through (o), each such Entity's current and former Affiliates (regardless of whether such interests are held directly or indirectly); (q) with respect to each of the Entities in the foregoing clauses (a) through (o), each such Entity's current and former predecessors, participants, successors, assigns, subsidiaries, direct and indirect equityholders, interest holders, limited partners, co-investors, funds (including affiliated investment funds or investment vehicles), portfolio companies, and management companies; and (r) with respect to each of the Entities in the foregoing clauses (a) through (q), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; *provided*, that, in each case, an Entity shall not be a Releasing Party if it elects to opt out of the releases contained in this Plan, if permitted to opt out.

claims, of the Debtors, the Reorganized Debtors, and their Estates, against the Released Parties

in connection with, among other things and in whole or in part, the Debtors, the Reorganized

Debtors, their Estates, the Plan, the Restructuring Transactions, or the Chapter 11 Cases

(the "Debtor Release").

65.     Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may

include "the settlement or adjustment of any claim or interest belonging to the Debtor or to the

estate."[78]  In considering the appropriateness of such settlements, courts in the Fifth Circuit

generally examine whether the release is fair, equitable, and in the best interests of the estate,[79]

and "[does] not 'fall beneath the lowest point in the range of reasonableness.'"[80]

66.     The Debtor Release satisfies the applicable legal standard.  The Plan (including

the Debtor Release) complies with the Bankruptcy Code's absolute priority rule.  While Class 9

(Existing Mitel Interests) is deemed to reject the Plan, the Debtor Release and the settlements

embodied therein and elsewhere in the Plan, do not result in any junior Classes receiving or

retaining any property on account of junior Claims or Interests.  Thus, the Debtor Release is fair

and equitable in line with Fifth Circuit precedent.

67.     In addition to being fair and equitable, the Debtor Release is in the best interest of

the Estates.  First, the Debtors are not aware of the existence of any Claims or Causes of Action

of any value being released by the Debtors.  As discussed in Article III.J. of the Disclosure

Statement, in November 2024, the Special Committee of the Board retained Ropes & Gray LLP

---

[78]  *See* 11 U.S.C. § 1123(b)(3)(A); *Bigler*, 442 B.R. at 547 (holding that a plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan").

[79]  *See Jackson Brewing*, 624 F.2d at 602 (citing *TMT Trailer Ferry*, 390 U.S. at 424–25); *Bigler*, 442 B.R. at 543 n.6; *In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017).

[80]  *Idearc*, 423 B.R. at 182 (citations omitted); *see also Roqumore*, 393 B.R. at 480 ("[T]he Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'" (citations omitted)).

("Ropes & Gray") as independent counsel to advise the Special Committee with respect to potential claims that the Company might have against insiders of the Company, including its boards of directors, officers, and Searchlight Capital Partners L.P. ("Searchlight"), as the Debtors' sponsor (the "Potential Estate Claims and Causes of Action").[81]   Prior to the Petition Date, the Special Committee, advised by Ropes & Gray, began an extensive assessment of potential claims (the "Independent Investigation").[82]   The Special Committee and Ropes & Gray met on a regular basis over the course of approximately 15 weeks to discuss the Independent Investigation's process, findings, and analysis of Potential Estate Claims and Causes of Action, among other topics.[83]   As set forth in the Disclosure Statement, the Special Committee believes that the releases set forth in Article VIII of the Plan are supported by the Independent Investigation's findings to date, and that such releases are justified under the circumstances.[84]

68.   Moreover, the Plan, including the Debtor Release, was negotiated in good faith and at arm's length by sophisticated entities that were represented by able advisors and that each conditioned their support for and acceptance of the Plan, among other things, on the grant of the Debtor Release.[85]   No party has objected to the Debtor Release and, most importantly, the Debtor Release has provided a material benefit to the Estates by securing the votes in favor of the Plan by voting Holders who executed the Restructuring Support Agreement, in return for

---

[81]   Disclosure Statement, Art. III.J.

[82]   *Id.*

[83]   *Id.*

[84]   *Id.*

[85]   Yetter Decl. ¶ 51.

the Debtor Release and the Third-Party Release discussed below.[86]  The Released Parties have played integral roles in the Chapter 11 Cases, made substantial concessions that underpin the consensual resolution of the Chapter 11 Cases that will allow the Debtors to expeditiously exit bankruptcy with a deleveraged capital structure, and the Released Parties may be unwilling to support the Plan without the Debtor Release.[87]

69.     The resulting compromise reflects a true arm's-length negotiation process.  Accordingly, the Debtor Release is fair, equitable, and in the best interest of the Estates, and should therefore be approved.

70.     <u>Third-Party Release</u>.  Article VIII.D of the Plan provides for a consensual release of any and all Claims and Causes of Action, including derivative claims, by certain non-Debtor Releasing Parties[88] against the Released Parties in connection with, among other things, the Debtors, the Plan, the Restructuring Transactions, or the Chapter 11 Cases (the "<u>Third-Party Release</u>").  The Third-Party Release is fully consensual and should be approved.

---

[86]   *Id.* ¶¶ 51, 56.

[87]   *Id.* ¶ 51.

[88]   Pursuant to Article I.184 of the Plan, the term "<u>Releasing Parties</u>" means, each of, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each Prepetition Agent; (e) each DIP Lender; (f) each DIP Backstop Party; (g) the DIP Agent; (h) the Exit Term Loan Facility Agent; (i) the Exit Term Loan Lenders; (j) all Holders of Claims that receive a ballot and vote to accept the Plan or that are deemed to accept the Plan and receive the notice of non-voting status and, in each case, who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims that receive a ballot and abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; and (*l*) all Holders of Claims or Interests that receive a ballot and vote to reject the Plan or are deemed to reject the Plan and receive a notice of non-voting status and, in each case, who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan.

71.     The Third-Party Release conforms with Fifth Circuit precedent when such releases are consensual.[89]  In its recent decision in *Purdue*, the Supreme Court recognized the validity of third-party releases when they are consensual.[90]  Although the Fifth Circuit has not directly defined what constitutes a consensual third-party release, the District Court for the Southern District of Texas has affirmed this Court's holding that a claimant who received notice of the Debtors' chapter 11 filing and the proposed plan, which included a third-party release, but failed to object to the plan, was deemed to have consented to the third-party release.[91]  The Fifth Circuit has also shed light on the issue through a series of decisions addressing the *res judicata* effect of a confirmed chapter 11 plan that contains a third-party release provision, holding that the Bankruptcy Code does not preclude a third-party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization."[92]

72.     Accordingly, third-party releases that are, as here, (a) consensual, (b) specific in language, (c) integral to the Plan, (d) a condition of the settlement, and (e) given for consideration, do not violate the Bankruptcy Code and should be allowed and included in

---

[89]   *See Bigler*, 442 B.R. at 543–44 ("The recognition that *Pacific Lumber* does not restrict the availability of settlements of claim under § 1123(b)(3)(A) thus provides an avenue for a Chapter 11 plan to provide for releases of liability for non-debtors.  But, such releases . . . . would require . . . consent and consideration . . . ."); *see also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701–02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent.*"); *In re Pilgrim's Pride Corp.*, No. 08-45664, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010) (stating that under *Pacific Lumber* "the court may not, over objection, approve through confirmation of the Plan third-party protections").

[90]   *Purdue*, 603 U.S. at 225–27.

[91]   *See, e.g.*, *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'  Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans.").

[92]   *See Republic Supply Co.* v. *Shoaf*, 815 F.2d 1046, 1050, 1053 (5th Cir. 1987); *see also FOM P.R. S.E.* v. *Dr. Barnes EyeCenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (approving a third-party release that was "an integral part of the Plan and [was] specific enough to satisfy the standard in *Shoaf*").

the Plan.[93]  The critical factor in determining whether a release is consensual is whether—after the Debtors' due process obligations of providing appropriate notice—"the affected creditor *timely objects* to the provision."[94]  Furthermore, paragraph 40 of the Procedures for Complex Cases in the Southern District of Texas (the "<u>Complex Case Procedures</u>") provides that ballots sent to voting and non-voting classes "must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice."[95]

73.     The Third-Party Release satisfies the Fifth Circuit's standard set forth in *Shoaf* and its progeny, and satisfies the Complex Case Procedures.  <u>First</u>, the Third-Party Release is fully consensual.  As set forth above, parties in interest were provided extensive notice of the Chapter 11 Cases, the Plan, the Voting Deadline, and the Objection Deadline for Confirmation of the Plan and final approval of the Disclosure Statement.  The Combined Notice, the Notice of Non-Voting Status, and the Ballots expressly included the terms of the Third-Party Release, as set forth in Article VIII.D of the Plan.  In addition, the Notice of Non-Voting Status and the Ballots set forth the procedures for assenting to or electing to opt out of such Third-Party Release and attached the appropriate Release Opt Out Form in compliance with paragraph 40 of the Complex Case Procedures.  The Combined Notice, the Notice of Non-Voting Status, and the Ballots all advised careful review and consideration of the terms of the Third-Party Release, along with the other release, exculpation, and injunction provisions included in the Plan.

---

[93]     *See FOM P.R.*, 255 F. App'x at 911–12 (discussing Fifth Circuit standard under *Shoaf*); *In re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347, at *15–17 (Bankr. S.D. Tex. Apr. 19, 2016) (citing *Hernandez* v. *Larry Miller Roofing, Inc.*, 628 F. App'x 281, 288–89 (5th Cir. 2016)).

[94]     *See In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007) (emphasis added) (citing *In re Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995)).

[95]     *See* Complex Case Procedures ¶ 40.

The release, exculpation, and injunction provisions, including the Third-Party Release, were also emphasized with bold font in both the Plan and the Disclosure Statement.

74. <u>Second</u>, the Third-Party Release is sufficiently specific to put the Releasing Parties on notice of the claims being released. The Third-Party Release describes the nature and type of claims being released, including with respect to the management and operation of the Debtors, the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases and the Plan, and the negotiation thereof, the Chapter 11 Cases generally, the solicitation of votes with respect to the Plan, or any other act or omission relating to the foregoing taking place on or before the Effective Date.

75. <u>Third</u>, the Third-Party Release is an integral part of the Plan and a condition of the settlement set forth therein and the Restructuring Support Agreement. The Third-Party Release facilitated participation by the Released Parties in both the Plan and the chapter 11 process and was critical in reaching consensus to support the Plan through a prepackaged streamlined process for the benefit of all stakeholders.[96] Indeed, the solicitation version of the Plan was attached as an exhibit to the Restructuring Support Agreement, set forth the global settlement among the parties, and incorporated the Third-Party Release as an integral component of this global settlement. As such, the Third-Party Release was a core negotiation point and appropriately offers certain protections to parties that constructively participated in the restructuring.[97]

76. <u>Fourth</u>, the Third-Party Release is given for substantial consideration. Certain of the Released Parties have played an extensive and integral role in the Debtors' restructuring. The Debtors' creditors benefit from the Restructuring Transactions contemplated by

---

[96]   Yetter Decl. ¶ 55.

[97]   *Id*.

the Restructuring Support Agreement and the Plan—including the distributions under the Plan and the deleveraging of the Debtors' balance sheet by $1.15 billion—which will allow the Debtors to emerge as reorganized entities to the benefit of the Debtors' employees, vendors, and customers.[98]   That accomplishment is a direct result of the significant contributions of and, in some cases, material concessions made by the Released Parties.   Such substantial contributions include, among other things:   (a) compromising Claims and accepting Impaired recoveries, waiving recovery on material claims entirely, or preserving valuable tax attributes for the Debtors; (b) with respect to the DIP Lenders and the Exit Term Loan Lenders, providing new money financing to fund the Restructuring Transactions and enable the Debtors to execute on their go-forward business plan; (c) permitting the use of encumbered assets and cash collateral during the Chapter 11 Cases; and (d) negotiating and supporting the Plan and other documents essential to the success of the Chapter 11 Cases.[99]   Furthermore, those Releasing Parties in the Non-Voting Classes are only enabled to receive payment in full on their respective Claims, a material consideration these parties are receiving in this process, due to the various agreements and concessions made by the Consenting Stakeholders, which required the Third-Party Release as an integral part of the Plan and the Restructuring Transactions.   These Releasing Parties, particularly Holders of General Unsecured Claims, would have been materially impaired if the Consenting Stakeholders did not agree to pursue prepackaged Restructuring Transactions, which required the Third-Party Release.   These contributions will allow for a holistic restructuring that

---

[98]   *See* First Day Decl. ¶ 14; Yetter Decl. ¶ 56.

[99]   Yetter Decl. ¶ 56.

will enable the Debtors to significantly reduce their debt obligations and emerge with sufficient operational liquidity following the Effective Date.[100]

77.    Based on the foregoing, the Third-Party Release complies with the controlling Fifth Circuit standards, is appropriate and justified under the circumstances, and should therefore be approved.

78.    <u>Exculpation</u>.   Article VIII.E of the Plan contains a customary exculpation benefitting the Exculpated Parties, which are limited to the Debtors, for claims arising out of or relating to the Chapter 11 Cases and the agreements made in connection therewith (the "<u>Exculpation</u>").  The Exculpation carves out acts or omissions that are determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.[101]

79.    Unlike the Third-Party Release, the Exculpation does not affect the liability of third parties *per se*, but rather sets a standard of care of gross negligence, fraud, or willful misconduct in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[102]  An exculpation provision represents a legal determination that flows from several different findings a bankruptcy court must reach in confirming a plan, as well

---

[100]  In addition to the above, the Debtors' directors and officers:  (a) made substantial and valuable contributions to the Debtors' restructuring and the Estates, including extensive negotiations with various stakeholders, and ensured the uninterrupted operation of the Debtors' business during the Chapter 11 Cases; (b) invested significant time and effort to make the Debtors' restructuring a success and preserve the value of the Estates in a challenging operating environment; (c) attended hearing on "first day" motions; (d) attended numerous board meetings related to the restructuring and directed the restructuring negotiations that led to the Restructuring Support Agreement and the Plan; (e) are entitled to indemnification from the Debtors under applicable law, organizational documents, and agreements; (f) invested significant time and effort in the preparation of the Plan, the Disclosure Statement, all supporting analyses, and the numerous other pleadings filed in the Chapter 11 Cases, thereby ensuring the smooth administration of the Chapter 11 Cases; and (g) are entitled to all other benefits under any current employment contracts with the Debtors.

[101]  The above description is only a summary of the Exculpation, which is qualified entirely by the language of the Exculpation and the applicable definitions in the Plan, which shall control.

[102]  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

as the statutory exculpation in section 1125(e) of the Bankruptcy Code.[103]  Thus, once the court

makes a finding of good faith, it is appropriate to set the standard of care of the parties involved

in the formulation of that chapter 11 plan.[104]  Exculpation provisions, therefore, properly prevent

future collateral attacks against estate fiduciaries.

80.     Here, the Exculpation is appropriate as it represents an integral component of the

Plan, is the product of good-faith, arm's-length negotiations among various parties (including the

key constituents of the Chapter 11 Cases), is properly and narrowly tailored in time and scope

under applicable law, and is authorized pursuant to the Court's authority under sections 105,

1123(b), 1125, and 1129(a)(1) of the Bankruptcy Code.  The Exculpated Parties are similarly

narrowly tailored to comprise only the Debtors, consistent with the Fifth Circuit's most recent

decision in *In re Highland Capital Management, L.P.*, 132 F.4th 353, 360–62 (5th Cir. 2025)

("*Highland II*").

81.     Injunction.    Article VIII.F of the Plan contains an injunction provision that

permanently enjoins all Entities who have held, hold, or may hold Claims, Interests, or Causes of

Action that have been released, discharged, or are subject to the Exculpation, from, among other

things, commencing or continuing any action against, as applicable, the Debtors,

the Reorganized Debtors, the Exculpated Parties, and/or the Released Parties on account of such

Claims or Interests (the "Injunction").    The Injunction is necessary to implement, preserve,

and enforce the Plan's release, discharge, exculpation, and gatekeeping provisions, which are

integral to the Plan.  Furthermore, the Injunction is properly tailored to achieve its objective and

only encompasses Claims or Causes of Action that have been consensually released.  The Court

---

[103]  *See* 11 U.S.C. § 1125(e); *see also* 28 U.S.C. § 157(b)(2)(L) (confirmations of plans are core proceedings).

[104]  *See PWS*, 228 F.3d at 246–47 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties").

should, therefore, approve the Injunction in connection with approving the discharge, release, and exculpation provisions included in the Plan.

82.    In addition, in the Injunction in Article VIII.F, the Plan includes a "gatekeeping" provision to implement the Plan's exculpation and release provisions (the "Gatekeeping Provision").    Substantially contemporaneously with the filing of this Confirmation Brief, the Debtors filed a modified version of the Plan that revised the Gatekeeping Provision in Article VIII.F to accord with the Fifth Circuit's holding in *Highland II*.  In *Highland II*, the Fifth Circuit found that beneficiaries of a provision like the Gatekeeping Provision must be coextensive with the parties subject to the exculpation provisions because, while "bankruptcy courts have some power to perform gatekeeping functions, they nonetheless do not have unrestricted power to protect non-debtors from liability via a pre-filing injunction."[105]

83.    Specifically, Article VIII.F of the Plan now provides that in order for any Person or Entity to commence or pursue a Claim or Cause of Action of any kind against the Debtors or an Exculpated Party that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of Claims or Causes of Action subject to the Debtor Release, the Third-Party Release, or Exculpation, the Court must (a) first determine, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (b) specifically authorize such Person or Entity to bring such Claim or Cause of Action against any of the Debtors as Exculpated Parties.  As only the Debtors are Exculpated Parties under the Plan, the beneficiaries of the Gatekeeping Provision are coextensive with the Exculpated Parties,

---

[105]    *Highland II*, 132 F.4th at 359.

satisfying the standard articulated in *Highland II*.[106]   Moreover, the Gatekeeping Provision is consistent with other recent confirmation orders in this District.[107]

**(iv)    Section 1123(d): The Plan's Cure Process is Appropriate under Section 1123(d)**

84.    Section 1123(d) of the Bankruptcy Code provides that amounts necessary to cure defaults under a plan shall be "determined in accordance with the underlying agreement and applicable nonbankruptcy law."[108]   Article V.C of the Plan provides for the satisfaction of the Cure Claims associated with each Executory Contract or Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.   Specifically, the Debtors or the Reorganized Debtors, as applicable, shall pay the undisputed Cure Claims, if any, on (a) the Effective Date or as soon as reasonably practicable thereafter, for Executory Contracts and Unexpired Leases assumed as of the Effective Date, (b) in the ordinary course of the Debtors' business in accordance with the terms of such Executory Contract or Unexpired Lease, or (c) the assumption effective date, if different than the Effective Date.[109]   Any disputed Cure Claim will be determined in accordance with the procedures set forth in Article V.C of the Plan and

---

[106]   *See id.* at *6.

[107]   *See, e.g.*, Order (I) Approving Debtors' Disclosure Statement and (II) Confirming First Amended Prepackaged Joint Plan of Reorganization of The Container Store Group, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code ¶¶ AA–BB, *In re The Container Store Grp., Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) [Docket No. 181] (the "*Container Store* Conf. Order"); Order Approving Debtors' Disclosure Statement and Confirming Debtor's Prepackaged Plan of Reorganization ¶¶ AA–BB, *In re Vroom, Inc.*, No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025) [Docket No. 122]; Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement Supplement on a Final Basis and (II) Confirming the Debtors' First Amended Joint Chapter 11 Plan of Reorganization ¶¶ 41, 101, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) [Docket No. 2671]; Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Third Amended Joint Chapter 11 Plan of Reorganization of Hornblower Holdings LLC and Its Debtor Affiliates ¶¶ 45, 124, *In re Hornblower Holdings LLC*, No. 24-90061 (MI) (Bankr. S.D. Tex. June 6, 2024) [Docket No. 1388].

[108]   11 U.S.C. § 1123(d).

[109]   *See* Plan, Art. V.C.

applicable law.   As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts or Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code, and therefore complies with section 1123(d) of the Bankruptcy Code.

85.     Based upon the foregoing, the Plan complies fully with sections 1122 and 1123, and therefore satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### 2.     Section 1129(a)(2):     The Debtors Have Complied with the Bankruptcy Code

86.     As confirmed by its legislative history, section 1129(a)(2) of the Bankruptcy Code requires compliance with the disclosure, solicitation, and voting requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[110]

### (a)     Section 1125:     Postpetition Disclosure Statement and Solicitation

87.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[111]  As set forth above in Part I of this Confirmation Brief, and as evidenced by the Voting Report and the Solicitation Certificate, the Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order governing notice,

---

[110]   *See* 11 U.S.C. § 1129(a)(2); H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see Cypresswood Land Partners*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[111]   11 U.S.C. § 1125(b).

disclosure, and solicitation in connection with the Plan and the Disclosure Statement.[112] Following the execution of the Restructuring Support Agreement and immediately prior to commencing these Chapter 11 Cases, the Solicitation Agent solicited votes on the Plan consistent with the Court-approved Solicitation Procedures.[113]  In addition, the Debtors and their professionals acted in good faith in all respects in connection with the solicitation of votes on the Plan and the tabulation of such votes.[114]  Accordingly, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.[115]

### (b)      Section 1126:  Acceptance of the Plan

88.      Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a plan and determining acceptance thereof.  Pursuant to section 1126, only holders of allowed claims or equity interests in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan.[116]  As set forth above in Part I of this Confirmation Brief, the Debtors solicited acceptances of the Plan only from the Holders of Claims in the Voting Classes, which are the

---

[112]  *See generally supra* Part I; Voting Report; Solicitation Certificate.

[113]  *See generally* Solicitation Certificate.

[114]  *See* 11 U.S.C. § 1126(b) ("[A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title."); *see also id.* § 1125(g) ("[A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.").

[115]  *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (holding section 1129(a)(2) satisfied where the debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to plan).

[116]  *See* 11 U.S.C. § 1126(a), (f), & (g).

only Classes that are Impaired and entitled to vote on the Plan.[117]  The Debtors did not solicit

votes to accept or reject the Plan from the Holders of Claims and Interests in the Non-Voting

Classes, all of which are either (a) Unimpaired and, therefore, deemed to have accepted the Plan

pursuant to section 1126(f) of the Bankruptcy Code, or (b) presumed to have rejected the Plan

pursuant to section 1126(g) of the Bankruptcy Code.

89.      Sections 1126(c) and (d) of the Bankruptcy Code specify that holders of an

impaired class of claims or interests must vote in favor of a plan by at least two-thirds in amount

and more than one-half in number of the allowed claims, or interests, of such class to accept the

plan.[118]  Of those who timely voted, based on voting results, Holders of Claims in Classes 3, 4,

and 5 voted to accept the Plan in excess of this statutory threshold.[119]  Based on the foregoing,

the requirements of sections 1125 and 1126 of the Bankruptcy Code have been satisfied, and

thus, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

### 3.      Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Is Not by Any Means Forbidden by Law

90.      Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law."[120]  For the reasons set forth in Part II above,

the Debtors have proposed the Plan in good faith.  Furthermore, the Plan is "not by any means

forbidden by law," and indeed, is in full compliance with the Bankruptcy Code and applicable

nonbankruptcy law.

---

[117]  *See* Solicitation Certificate; Voting Report ¶ 8.

[118]  *See* 11 U.S.C. § 1126(c)–(d).

[119]  Voting Report, Ex. E.

[120]  11 U.S.C. § 1129(a)(3).

### 4.   Section 1129(a)(4):  The Plan Provides that Professional Fees and Expenses Are Subject to Court Approval

91.     Section 1129(a)(4) of the Bankruptcy Code requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, . . . be[] approved by, or [be] subject to the approval of, the court as reasonable."[121]  Section 1129(a)(4) has been construed to require that all payments of estate professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the court.[122]  As to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[123]

92.     Article II.D of the Plan provides that all Professional Fee Claims must be reviewed and approved by the Court as reasonable pursuant to final fee applications. Article XI(b) of the Plan provides that the Bankruptcy Court retains jurisdiction to "decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan."[124]  Accordingly, the applicable provisions in the Plan comply with section 1129(a)(4) of the Bankruptcy Code.

---

[121]   *Id.* § 1129(a)(4).

[122]   *See Cajun II*, 150 F.3d at 517–18 ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate."); *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan can be confirmed, "there must be a provision for review by the Court of any professional compensation").

[123]   *Cajun II*, 150 F.3d at 517.

[124]   *See* Plan, Art. II.D, XI(b).

### 5. Section 1129(a)(5): The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

93. Section 1129(a)(5) of the Bankruptcy Code requires (a) that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor, (b) that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and (c) to the extent there are any insiders that will be retained or employed by the Debtors, that there be disclosure of the identity and nature of any compensation of any such insiders.[125] These provisions are meant to ensure that the post-confirmation governance of a reorganized debtor is in "good hands."[126]

94. As part of the Plan Supplement, the Debtors have disclosed (a) the process for selecting candidates to serve as the initial members of the New Board in the Governance Term Sheet and (b) the identities and affiliations of individuals that are proposed to serve on the New Board following the Effective Date to the extent known prior to the Combined Hearing. Accordingly, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

### 6. Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes

95. Section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan."[127] Section 1129(a)(6) is inapplicable to the Chapter 11 Cases, as the Plan does not provide for any rate changes.

---

[125] 11 U.S.C. § 1129(a)(5).

[126] *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("[T]o lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice its creditors."); *In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however. If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i)."); *In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors.") (citing *Am. Solar King Corp.*, 90 B.R. at 815)).

[127] 11 U.S.C. § 1129(a)(6).

### 7.      Section 1129(a)(7):  The Plan Satisfies the "Best Interests" Test

96.      Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code at that time.[128]  This "best interests test" is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the Debtors' plan of reorganization that rejects the plan.[129]  Because the best interests test by its terms does not apply to Classes of Unimpaired Claims under the Plan, it is not relevant for Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 6 (General Unsecured Claims).  Therefore, the best interests test is deemed satisfied for all members of the Classes of Unimpaired Claims.

97.      Here, the best interests test is satisfied with respect to the Holders to which it applies:  the Holders of Claims in Class 3 (ABL Loan Claims), Class 4 (Priority Lien Claims), and Class 5 (Non-Priority Lien Term Loan Deficiency Claims) that abstained from voting on or voted to reject the Plan, Holders of Claims in Class 9 (Existing Mitel Interests) who are deemed to have rejected the Plan, and Holders of Interests in Class 7 (Intercompany Claims) and Class 8

---

[128]  *Id.* § 1129(a)(7).

[129]  *See Bank of Am. Nat'l Tr. & Sav. Ass'n* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see also Tex. Extrusion Corp.*, 844 F.2d at 1159 n.23 (stating that, under section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

(Intercompany Interests) who are also deemed to have rejected or presumed to have accepted the Plan.[130]   As set forth in the Stroup Declaration, FTI, in collaboration with the Debtors' management, performed the Liquidation Analysis that was attached as Exhibit E to the Disclosure Statement.[131]   Subject to the assumptions and qualifications contained therein, the Liquidation Analysis establishes that all Holders of Claims and Interests in Impaired Classes will receive or retain property under the Plan valued, as of the Effective Date, in an amount greater than or equal to the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.[132]

98.     The Debtors' Liquidation Analysis is sound, reasonable, and incorporates justified assumptions and estimates regarding the liquidation of the Debtors' assets and claims, including assumptions that the Debtors initiate proceedings under chapter 7 of the Bankruptcy Code on April 30, 2025, cease all material operations as of that date, and spend the next six-month period facilitating piecemeal sales of the Debtors' available property, which is the primary source of value to creditors in this scenario.[133]   The assumptions and estimates in the Liquidation Analysis are appropriate in the context of the Chapter 11 Cases and are based upon the collective knowledge and expertise of the Debtors' management and advisors, all of whom have intimate knowledge of the Debtors' business and relevant industry or restructuring experience.[134]   Based

---

[130]   *See* Stroup Decl. ¶¶ 9, 15.

[131]   *See generally id.*

[132]   *See* Liquidation Analysis; Stroup Decl. ¶ 14.

[133]   *See* Stroup Decl. ¶¶ 11–12.

[134]   *See id.* ¶¶ 10, 15.

on the foregoing, the Plan satisfies the requirements of the best interests test under section 1129(a)(7) of the Bankruptcy Code.[135]

### 8. Section 1129(a)(8): The Plan Has Been Accepted by Each Impaired Voting Class

99. Section 1129(a)(8) of the Bankruptcy Code requires the following: "[w]ith respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan."[136]  As reflected in the Voting Report, the voting results indicate that each of the Voting Classes (Class 3 (ABL Loan Claims), Class 4 (Priority Lien Claims), and Class 5 (Non-Priority Lien Term Loan Deficiency Claims)) has voted to accept the Plan.[137]  More particularly, the Debtors received votes in favor of the Plan from (a) 100.00% in amount of the Class 3 ABL Loan Claims, (b) 99.31% in amount of the Class 4 Priority Lien Claims that voted, and (c) 100.00% in amount of the Class 5 Non-Priority Lien Term Loan Deficiency Claims that voted.[138]  Class 9 (Existing Mitel Interests) is deemed to reject the Plan, and Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) are presumed to accept or deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.  As discussed below, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code, and thus will be able to "cram-down" Classes 7, 8, and 9 under section 1129(b) of the Bankruptcy Code notwithstanding the ostensible requirements of section 1129(a)(8).

---

[135]   *See id.* ¶ 15.

[136]   11 U.S.C. § 1129(a)(8).

[137]   Voting Report, Ex. E.

[138]   *Id.*

9.       **Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims**

100.    Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to a different treatment with respect to such claims.[139]  The Plan provides that, except as otherwise agreed with the relevant Holder of such Claims, Allowed Administrative Claims and Allowed Other Priority Claims (which exclude Priority Tax Claims) will be paid in full in Cash on the Effective Date, and Allowed Priority Tax Claims shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code and, to the extent that an Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable nonbankruptcy law, or in the ordinary course of business by the Reorganized Debtors.   The Plan accordingly complies with section 1129(a)(9)(A)–(C) of the Bankruptcy Code.[140]

10.      **Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted the Plan**

101.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of Impaired Claims, "determined without including any acceptance of the plan by any insider."[141]  Class 3 (ABL Loan Claims), Class 4 (Priority Lien Claims), and Class 5 (Non-Priority Lien Term Loan Deficiency Claims) are Impaired and accepted the Plan based on voting results, without including the acceptance of the Plan by any

---

[139]   11 U.S.C. § 1129(a)(9).

[140]   *See* Plan, Art. II.

[141]   11 U.S.C. § 1129(a)(10).

insiders in such Class.[142]     Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### 11. Section 1129(a)(11): The Plan Is Feasible

102.    Section 1129(a)(11) of the Bankruptcy Code requires the court to determine that a plan is feasible, and that "[c]onfirmation of the plan is not likely to be followed by [a] liquidation, or the need for further financial reorganization."[143]    The feasibility inquiry is fact-intensive and requires a case-by-case analysis, but has a relatively low threshold of proof necessary to satisfy the feasibility requirement.[144]    A debtor does not have to guarantee the success of a plan to demonstrate its feasibility under section 1129(a)(11) of the Bankruptcy Code.[145]    Instead, courts will find that a plan is feasible if a debtor demonstrates a reasonable assurance that consummation of the plan will not likely be followed by a further need for financial reorganization.    "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."[146]    Therefore, the applicable

---

[142]  Voting Report, Ex. E.

[143]  11 U.S.C. § 1129(a)(11).

[144]  *See Mercury Cap. Corp.* v. *Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) ("[A] 'relatively low threshold of proof' will satisfy the feasibility requirement." (quoting *Comp. Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003))).

[145]  *See Save Our Springs (S.O.S.) All., Inc.* v. *WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) All., Inc.)*, 632 F.3d 168, 172 (5th Cir. 2011) ("[T]o obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible, which means that it is 'not likely to be followed by . . . liquidation, or the need for further financial reorganization.'" (quoting 11 U.S.C. § 1129(a)(11))); *Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required." (citation omitted)); *Landing Assocs.*, 157 B.R. at 820 (stating that section 1129(a)(11) only requires a finding that a plan offers "a reasonable probability of success"); *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (finding that feasibility "contemplates whether the debtor can realistically carry out its plan and whether the plan offers a reasonable prospect of success and is workable" (citations omitted)); *In re Cajun Elec. Power Co-op, Inc. (Cajun III)*, 230 B.R. 715, 745 (Bankr. M.D. La. 1999) ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds . . . .").

[146]  *See Pizza of Haw., Inc.* v. *Shakey's, Inc.* (*In re Pizza of Haw., Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985) (citation omitted).

standard of proving plan feasibility is by a preponderance of the evidence,[147] which means presenting proof that a given fact is "more likely than not."[148]

103.    In assessing feasibility, courts consider the following factors, among others: (a) the adequacy of the capital structure; (b) the earning power of the business; (c) the economic conditions; (d) the ability of management; (e) the probability of the continuation of the same management; and (f) any other matter that determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[149]

104.    Here, the Financial Projections attached to the Disclosure Statement demonstrate that the Plan is feasible and that the Debtors are expected to have sufficient earnings to meet their obligations under the Plan.  The Financial Projections were integral to the development of the Reorganized Debtors' Valuation Analysis and are based on assumptions, including as to: (a) timely Confirmation and Consummation pursuant to the terms of the Plan; (b) the anticipated future performance of the Reorganized Debtors; (c) industry performance; (d) general business and economic conditions; and (e) other matters or circumstances, many of which are beyond the control of the Debtors, and some or all of which may not materialize.[150]  As demonstrated in the Financial Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and will be able to satisfy obligations related to their

---

[147]    *Fin. Sec. Assurance Inc.* v. *T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 801 (5th Cir. 1997); *Briscoe*, 994 F.2d at 1164.

[148]    *Briscoe*, 994 F.2d at 1164.

[149]    *See, e.g.*, *In re M&S Assocs. Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *58 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Prudential Energy Co.*, 58 B.R. 857, 862–63 (Bankr. S.D.N.Y. 1986).

[150]    *See* Financial Projections at 1–2.

post-emergence business operations in the ordinary course of business.[151]   The Financial Projections show that the Debtors will emerge with a refinanced balance sheet, with debt service payments reduced to a manageable level.[152]   Therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.[153]

105.   The Plan also contemplates that the Debtors will enter into the Exit Term Loan Facility provided by the Exit Term Loan Lenders.   Entry into the Exit Term Loan Facility will provide operational liquidity upon emergence from the Chapter 11 Cases, and thus serves the interests of the Reorganized Debtors and represents a reasonable exercise of their business judgment, including with respect to the fees and premiums incurred under the facility.[154]

106.   Furthermore, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders.   The Debtors' stakeholders extensively reviewed the Financial Projections and the business plan, which ultimately resulted in the terms incorporated into the Plan.[155]   Together with the settlements negotiated with the Debtors' key counterparties and stakeholders, the Plan contemplates a comprehensive restructuring that fully and finally resolves the Debtors' largest outstanding disputes and provides approximately $71 million of new money exit financing (inclusive of fees and premiums payable-in-kind) to execute on the Reorganized Debtors' go-forward business plan.[156]   Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

---

[151]   *See* Financial Projection at 1; Yetter Decl. ¶ 39.

[152]   *See* Financial Projections, Ex. B; Yetter Decl. ¶ 39.

[153]   *See* Financial Projections at 1; Yetter Decl. ¶ 39.

[154]   *See* Financial Projections at 1; Schlappig Decl. ¶¶ 20–21.

[155]   *See* Yetter Decl. ¶ 39.

[156]   *See* Schlappig Decl. ¶ 9.

### 12. Section 1129(a)(12):  All Statutory Fees Have or Will Be Paid Under the Plan

107.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under section 1930 of title 28 of the United States Code, which are afforded priority as administrative expenses.[157]   In accordance with these requirements, the Plan provides that all such fees due and payable before the Effective Date shall be paid by the Debtors or the Reorganized Debtors, as applicable, for each quarter, until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.[158]    The Plan therefore complies with section 1129(a)(12) of the Bankruptcy Code.

### 13. Section 1129(a)(13):  The Plan Does Not Modify Retiree Benefits

108.    Section 1129(a)(13) of the Bankruptcy Code requires that the Plan provide for the continuation, after the Effective Date, of all retiree benefits.[159]   The Plan does not modify any retiree benefits provided by the Debtors within the meaning of section 1114 of the Bankruptcy Code, and pursuant to Article IV.R of the Plan, any such retiree benefits shall continue to be paid in accordance with applicable law.[160]   Accordingly, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

### B. Section 1129(b):  The Plan Satisfies the "Cram-Down" Requirements

109.    Under section 1129(b)(1) of the Bankruptcy Code, the court may "cram-down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  By its express terms, section 1129(b) of the Bankruptcy Code is only applicable

---

[157]   11 U.S.C. §§ 507(a)(2), 1129(a)(12).

[158]   *See* Plan, Art. XII.D.

[159]   11 U.S.C. §§ 1114, 1129(a)(13).

[160]   *See* Plan, Art. IV.R.

to a class of creditors or equityholders that rejects a plan.[161]  Accordingly, a dissenting holder in an accepting class lacks standing to object to the plan on the basis of unfair discrimination or absolute priority.[162]

110.    As discussed above, Holders of Claims in all Voting Classes (Class 3 (ABL Loan Claims), Class 4 (Priority Lien Claims), and Class 5 (Non-Priority Lien Term Loan Deficiency Claims)) voted to accept the Plan.[163]  Accordingly, cram-down is only relevant to Class 9 (Existing Mitel Interests), which is deemed to reject the Plan, and Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests), which are presumed to accept or deemed to reject the Plan. Furthermore, the Consenting Sponsor holds more than 99% of the Existing Mitel Interests and consented to, and agreed to support, the Plan's treatment of the Exiting Mitel Interests under the Restructuring Support Agreement.[164]  The Plan may be confirmed as to each of these Classes pursuant to the cram-down provisions of section 1129(b) of the Bankruptcy Code.

### 1.    The Plan Does Not Discriminate Unfairly

111.    The Bankruptcy Code does not provide a standard for determining "unfair discrimination."[165]  Courts instead examine the facts and circumstances of the particular case to

---

[161]    *See* 11 U.S.C. § 1129(b)(1) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [section 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan." (emphasis added)).

[162]    *See Off. Comm. of Equity Sec. Holders* v. *Off. Comm. of Unsecured Creditors (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420, 426 (2d Cir. 2008) ("[A] plan need not satisfy the Absolute Priority Rule so long as any class adversely affected by the variation accepts the plan . . . ."); *Kane* v. *Johns-Manville Corp.*, 843 F.2d 636, 650 (2d Cir. 1988) (refusing to consider objection of dissenting creditor in accepting class because section 1129(b) did not need to be satisfied as to an accepting class); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1062 (3d Cir. 1987) (overruling cram-down objection because objecting party was a member of an accepting class and therefore section 1129(b)(1) afforded no protection to such party).

[163]    *See* Voting Report, Ex. E.

[164]    *See* Yetter Decl. ¶ 43.

[165]    *See Idearc*, 423 B.R. at 171.

determine whether there is unfair discrimination.[166]   The unfair discrimination requirement ensures that similarly situated creditors and interest holders do not receive materially different treatment under a proposed plan without a compelling justification.[167]

112.    The Plan does not discriminate unfairly with respect to any potential rejecting Class.   There is no unfair discrimination among Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), and Class 9 (Existing Mitel Interests).

113.    Claims in Class 7 (Intercompany Claims) and Interests in Class 8 (Intercompany Interests) are entirely unique from Claims or Interests in any other Class, and, therefore, are appropriately placed in their own Classes.   The Debtors separately classified Intercompany Claims from other Claims, and Intercompany Interests from other Interests, in order to preserve the option to, as applicable, reinstate, set off, settle, distribute, contribute, merge, cancel, or release such Claims and Interests.   Such treatment allows for greater flexibility for the Debtors to determine whether it is more efficient to maintain their organizational structure when they are implementing the Restructuring Transactions.   Importantly, this optionality does not affect any stakeholders' recovery under the Plan, including General Unsecured Claims, which are Unimpaired under the Plan, and is intended only for administrative convenience in the restructuring process.

---

[166]   *See In re Kolton*, No. 89-53425-C, 1990 WL 87007, at *5 (Bankr. W.D. Tex. Apr. 4, 1990) (citing *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985); *Bowles*, 48 B.R. at 507 ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis . . . ."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[167]   *See Idearc*, 423 B.R. at 171 ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *Liberty Nat'l Enters.* v. *Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane* v. *Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

114.     Interests in Class 9 (Existing Mitel Interests) are also legally distinct in nature from all other Classes, as they represent the ultimate equity Interests in the Debtors MLN TopCo Ltd. ("<u>TopCo</u>") and Mitel Networks (International) Limited ("<u>MNIL</u>") held by third parties, including the Consenting Sponsor.[168]  All other Debtors are wholly owned subsidiaries of MNIL, which is in turn, a wholly owned subsidiary of TopCo.[169]  All Interests in TopCo and MNIL are classified together and afforded the same treatment under the Plan.  Class 9 therefore represents legally distinct Interests from Class 8.

115.     Thus, the Plan does not "discriminate unfairly" with respect to any Impaired Classes of Claims or Interests.

## 2.     The Plan Is Fair and Equitable

116.     Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[170]  In other words, a plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan if it follows the "absolute priority" rule.[171]  The absolute priority rule mandates that a junior class of claims or interests cannot receive a distribution under the plan on account of such claims or interests unless senior classes are rendered unimpaired or give their consent.[172]  Additionally, in order for a plan

---

[168]  TopCo is owned 99.89% by funds managed by Searchlight, and the remaining 0.11% is owned by an individual former employee of the Company.  *See* First Day Decl. ¶ 22 & n.4.

[169]  *See id.* ¶ 22.

[170]  *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

[171]  *See* 11 U.S.C. § 1129(b); *203 N. LaSalle*, 526 U.S. at 441–42.

[172]  *See* 11 U.S.C. § 1129(b).

to be "fair and equitable," no creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its claims).[173]

117.     There is no class junior to Class 9 (Existing Mitel Interests), and thus no possible violation of the "fair and equitable" rule with respect to such Class.  The "fair and equitable" rule is likewise satisfied as to the other Classes that may be deemed to reject the Plan (*i.e.*, Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests)).  To the extent Classes 7 and 8 receive a recovery, such treatment is not "on account of" such Intercompany Claims or Intercompany Interests within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code. Rather, it is simply to maintain the Debtors' prepetition organizational structure for the administrative benefit of the Reorganized Debtors and has no economic substance.  Courts have recognized that such technical preservations for the purpose of corporate formalities do not violate the absolute priority rule, and the unimpairment of such Claims and Interests, if any, affects neither the economic substance of the Plan, nor any recoveries to the Debtors' creditors.[174]   Furthermore, no Claims and Interests junior to each such Class, as applicable, will receive or retain any property under the Plan on account of such junior Claims or Interests. Further, as set forth in Article III of the Plan, no Class of Claims or Interests is being paid more than it is owed.[175]

---

[173]  *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

[174]  *See In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 47–48 (Bankr. D. Del. 2000) (holding that "the retention of the corporate structure among the Debtors will not adversely affect any creditors" and does not violate the absolute priority rule); *ION Media Networks, Inc.* v. *Cyrus Select Opportunities Master Fund Ltd. (In re ION Media Networks, Inc.)*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[175]  *See* Plan, Art. III.

118.     Accordingly, because the Plan does not discriminate unfairly and is fair and equitable, the Plan satisfies the "cram-down" requirements of section 1129(b) of the Bankruptcy Code and may be confirmed.

### C.     Section 1129(c):  The Plan Is the Only Plan Currently on File

119.     The Plan is the only plan filed in the Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

### D.     Section 1129(d):    The Purpose of the Plan Is Not Tax or Securities Law Avoidance

120.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no governmental unit has objected to Confirmation of the Plan on such grounds.   The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### E.     Section 1129(e):  Does Not Apply to the Plan

121.     The provisions of section 1129(e) of the Bankruptcy Code apply only to a "small business case."  The Chapter 11 Cases are not a "small business case."

## IV.     THE U.S. TRUSTEE OBJECTION TO THE PLAN SHOULD BE OVERRULED

### A.     The U.S. Trustee Improperly Relies on *Purdue* and Non-Binding State Law

122.     The U.S. Trustee Objection should be overruled.   The U.S. Trustee has asserted the substantially identical objection in multiple other recent cases.   In each instance, this Court has rejected similar objections.   *See, e.g.*, *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) ("[T]he consensual third-party releases in the Plan are appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out. There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan. . . . And, again, *Purdue* did not change the law in this Circuit."); *Container*

*Store* Conf. Order ¶ 46 (approving the third-party releases contained in the Plan over the objection of the U.S. Trustee); Conf. Hr'g at 31:00–30, *In re Vroom, Inc.*, No. 24-90571 (CML) (Bankr. S.D. Tex. Jan. 8, 2025) [Docket No. 128] (the "<u>*Vroom* Conf. Hr'g</u>") ("I'm comfortable that [the third-party release] runs afoul of no law and that these should be approved and that they . . . don't run afoul of *Purdue*."); Corrected Findings of Fact, Conclusions of Law, and Order (I) Confirming Further Modified Second Amended Joint Chapter 11 Plan of Wesco Aircraft Holdings, Inc. *et al.* and (II) Granting Related Relief at II, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025) [Docket No. 2550] ("Consistent with [*Purdue*], the releases by non-Debtors contained in the Plan (the '*Third Party Release*') are consensual, and all Releasing Parties have received due and adequate notice of the Third-Party Release and sufficient opportunity and instruction to elect to opt out of the Third Party Release."); Conf. H'rg Tr. at 34–36, *In re Intrum AB*, No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) [Docket No. 275] (approving third-party releases for which consent was confirmed through opt-outs); Conf. H'rg Tr. at 66, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 18, 2024) [Docket No. 2680] ("When I look at everything, I'm going to approve the Plan under the law.  I think it complies with every provision under the law.  I think the opt-outs worked.").

123.     The U.S. Trustee objects to the Third-Party Release relying on a misreading of the Supreme Court's opinion in *Purdue*, which held that the Bankruptcy Code does not permit non-consensual, third-party releases in chapter 11 plans of reorganization, except under section 524(g) of the Bankruptcy Code.[176]  In doing so, the Supreme Court expressly limited its holding to the issue before it:

---

[176]   *See* U.S. Trustee Obj. ¶¶ 20–22.

> As important as the question we decide today are ones we do not.  Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here.  Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.[177]

Even before *Purdue*, the Fifth Circuit had prohibited such non-consensual, third-party releases in chapter 11 plans, and accordingly, "*Purdue* did not change the law in this Circuit."[178]

124.    However, despite the clear instruction from the Supreme Court to limit the scope of its decision to *non-consensual* releases, the U.S. Trustee argues extensively that non-binding state law and case law from outside of this District require that this Court revisit what constitutes "consent" for the purpose of a third-party consensual release.[179]  Specifically, the U.S. Trustee posits that a failure to opt out of the Third-Party Release is insufficient to manifest consent. Under this view, a Releasing Party should be required to manifest its affirmative consent (*i.e.*, "opting-in") in order to demonstrate sufficient consent to grant a Third-Party Release.[180]  Despite the U.S. Trustee's insistence, there is no finding or holding in *Purdue*—nor in any other case law in this District—to support the U.S. Trustee's attempt to utilize the Supreme Court's limited decision to subvert longstanding Fifth Circuit and Southern District of Texas precedent, which support the Ballots' and Notice of Non-Voting Status's opt-out mechanism.

---

[177]  *Purdue*, 603 U.S. at 226.

[178]  *Robertshaw*, 662 B.R. 300 at 323; Conf. Hr'g Tr. at 89, *Robertshaw*, No. 24-90052 [Docket No. 942]*; see also In re Pipeline Health Sys., LLC*, No. 22-90291, 2025 WL 686080, at *4 (Bankr. S.D. Tex. Mar. 3, 2025) (noting that *Purdue* aligns with existing Fifth Circuit law while leaving open the issue of what qualifies as consent for releases, but that "[o]pt-out procedures are a proper means to obtain consent to third-party releases in a chapter 11 plan"); Conf. Hr'g at 8:55–9:00, *In re Indep. Cont. Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 122] ("Case law in the Fifth Circuit allows the use of injunctions in consensual third party releases."); *CJ Holding Co.*, 597 B.R. at 608–09 (noting that, while the Fifth Circuit has found that a plan may not provide for non-consensual third-party releases, an opt-out release is permissible).

[179]  *See* U.S. Trustee Obj. ¶¶ 22–53.

[180]  *See id*. at ¶¶ 28; 33–53.

125.     Instead, the U.S. Trustee points to non-binding New York[181] and Texas state law "as a point of reference" and invokes contract law principles for the unremarkable proposition that parties must indicate consent prior to being bound to an agreement.[182]  However, courts have found that "[t]here is no requirement that the bankruptcy court must look to state law to resolve the question of the validity of consensual third-party releases."[183]  Further, by failing to identify which state's laws apply, the U.S. Trustee Objection illustrates the unworkable nature of such an analytical framework, as courts would need to undertake a choice-of-law analysis as to which state's law applies to each released claim.  The U.S. Trustee's preferred state law analysis would thus undermine one of the fundamental purposes of the federal bankruptcy system, which is to ensure the uniform enforceability of confirmed plans and bankruptcy court orders throughout the nation.  Moreover, as recognized by the court in *Mallinckrodt*, opt-out mechanisms are pervasive within the judicial system and are sufficient to manifest consent within the bankruptcy system: "The notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system. . . . There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization."[184]  The U.S. Trustee's assertions that voting to accept the Plan by itself does not provide affirmative consent is equally unavailing given the prepackaged nature of the

---

[181]   While the U.S. Trustee states that the Plan is governed by New York state law and references New York common law, the U.S. Trustee only cites to Delaware and Texas case law in this section.  *See id.* at ¶ 31 & n. 8.

[182]   *See id.* at ¶¶ 28–32.

[183]   Order Denying the United States Trustee's Motion for a Stay of Confirmation Order Pending Appeal at 13, *In re the Container Store Grp.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Apr. 7, 2025) [Docket No. 280] (the "<u>Container Store Stay Denial Order</u>").

[184]   *In re Mallinckrodt PLC*, 639 B.R. 837, 879 (Bankr. D. Del. 2022); *see also Robertshaw*, 662 B.R. at 323 n.120 ("The U.S. Supreme Court and the Fifth Circuit have also approved opt-outs in nonbankruptcy cases like class actions as providing consent.").

Chapter 11 Cases.[185]   As illustrated by the voting results in support of the Plan, the overwhelming majority of the Holders in the Voting Classes are parties to the Restructuring Support Agreement, and therefore have already agreed to, among other things, (a) support and vote in favor of the Plan and (b) be bound by the Third-Party Release.

### B.     The Third-Party Release Is Consistent with this Court's Precedents and Provides Adequate Notice

126.    As discussed above in Part III of this Confirmation Brief, consensual third-party releases are permitted under Fifth Circuit and Southern District of Texas precedent. The Third-Party Release in the Plan is consensual because all Releasing Parties have received adequate notice and sufficient opportunity to object, but have not done so.[186]   This Court has overruled objections by the U.S. Trustee to third-party releases that were effectuated consensually through notice and opt-out procedures substantially similar to the Solicitation Procedures here, such as in *Vroom*, *The Container Store*, and *Robertshaw*.   This Court found in these precedent cases that the third-party releases "satisfy applicable law and the Procedures for Complex Cases in the Southern District of Texas."[187]   Indeed, as noted by Judge Perez in *The Container Store*, "[p]arties that receive adequate notice may, consistent with due process, be bound by the third-party releases."[188]   The Court should similarly reject the U.S. Trustee's meritless objection here.

---

[185]   *See* U.S. Trustee Obj. ¶¶ 41–46.

[186]   *See supra* ¶¶ 70–77.

[187]   *See Robertshaw*, 662 B.R. at 323; *see Container Store* Conf. Order ¶ 46 (approving the third-party releases contained in the Plan over the objection of the U.S. Trustee); *Vroom* Conf. Hr'g at 31:00–30 ("I'm comfortable that [the third-party release] runs afoul of no law and that these should be approved and that they . . . don't run afoul of *Purdue*.").

[188]   *Container Store* Stay Denial Order at 10.

127.    The U.S. Trustee does not identify any meaningful distinction between the notice and opt-out mechanisms in this present case and the mechanisms that were previously approved over similar objections from the U.S. Trustee in *Vroom*, *The Container Store*, and *Robertshaw*— because there is none.  For example, here, as in *Vroom*, *The Container Store*, and *Robertshaw*, parties were provided with notice about the Plan filing, the Objection Deadline, and the Voting Deadline, and provided the opportunity to opt out of the Third-Party Release.[189]  In addition, as here, the disclosure statements in *Vroom*, *The Container Store*, and *Robertshaw* included detailed descriptions about the third-party release, all ballots provided claimants with the opportunity to opt out, and the claimants in the non-voting classes received a notice that provided claimants with the same opportunity to opt out of the third-party release.[190]  As in the present case, the ballots and the notice of non-voting status in *Robertshaw* "allowed parties to carefully review and consider the terms of the third-party release and the consequences of electing not to opt out."[191]  Consequently, in accordance with the Complex Case Procedures and Fifth Circuit precedent, the Debtors sent all Releasing Parties either a Ballot or a notice that (a) informed them of the Third-Party Release (including the full text of the Third-Party Release), (b) included a box to check to indicate whether they would opt out of the Third-Party Release, and (c) informed them of the method for returning the Ballot or notice (including electronically).[192]  Further, here, as in *The Container Store*, Allowed General Unsecured Claims are unimpaired, which "support[s] finding the opt-out third-party releases consensual."[193]

---

[189]  *See Robertshaw*, 662 B.R. at 323; *Container Store* Conf. Order ¶ VII.G; *Vroom* Conf. Hr'g at 27:22–28:59.

[190]  *See id*.

[191]  *See Robertshaw*, 662 B.R. at 323.

[192]  Yetter Decl. ¶ 57; Solicitation Certificate.

[193]  *Container Store* Stay Denial Order at 10 ("Here, unsecured creditors likely did not opt out of the third-party releases because they were being paid in full.  While not determinative, it is an important fact that unsecured

128.   Moreover, courts in this District and others have found that third-party releases were consensual in part because "the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots."[194]  Here, the opportunity to opt out of the Third-Party Release appears in clear and conspicuous language throughout the Ballots and the Notice of Non-Voting Status with the full text of the Third-Party Release included in the solicitation version of the Plan.  In addition, the Combined Notice was published in the national edition of the *New York Times* on March 27, 2025, included the following text in all-caps, bold type, and provided a link where any reader could obtain a copy of the Plan and Disclosure Statement free of charge:

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**[195]

Finally, as reflected in the Voting Report, the Solicitation Agent received 11 opt-out elections on Ballots and Notices of Non-Voting Status with respect to the Third-Party Release and received outreach from parties requesting that the Confirmation Order make clear that such parties are

---

creditors in this case were paid in full.  Based on the Liquidation Analysis, the company would have been 'hopelessly insolvent' and secured creditors would have received pennies on the dollar.  As a result of the TSA, unsecured creditors are getting a hundred cents on the dollar and the old ABL was paid off.  In these cases, facts matter, and the facts here support finding the opt-out third-party releases consensual.").

[194]   *See* Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization at ¶ 43, *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) [Docket No. 1324]; *see also Robertshaw*, 662 B.R. at 323; *see Container Store* Conf. Order ¶ 46 (approving the third-party releases contained in the debtors' plan over the objection of the U.S. Trustee); *Vroom* Conf. Hr'g at 31:00–30 ("I'm comfortable that [the third-party release] runs afoul of no law and that these should be approved and that they . . . don't run afoul of *Purdue*."); *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *12 (Bankr. S.D.N.Y. Mar. 7, 2025) (authorizing similar opt-out mechanism where debtors provided clear and prominent notice to interested parties of third-party release in plan, disclosure statement, and solicitation materials and noting that *Purdue* did not preclude consensual third-party releases where opt-out mechanism was consistent with contract law principles of obtaining consent).

[195]   *See* Publication Certificate.

opting out of the Third-Party Release (which the Debtors accommodated), further indicating that parties entitled to opt out understood the opt-out option and had adequate notice and opportunity to exercise it.[196]

### C.   The Injunction and the Gatekeeping Provision Are Consistent with Fifth Circuit Law and Plans Confirmed in this District

129.   Lastly, notwithstanding longstanding Fifth Circuit precedent permitting injunctions for consensual third-party releases, the U.S. Trustee objects to the Injunction because (a) the Gatekeeping Provision must only apply to the parties that are "properly exculpated" under the Plan, (b) the Court cannot enforce the Third-Party Release by barring claims against non-Debtors under *Purdue* and *Highland II*, and (c) the Debtors are unable to meet the traditional factors that support injunctive relief.[197]   For the reasons set forth below, the Gatekeeping Provision and Injunction are both consistent with applicable law and practice in the Fifth Circuit and this District.

130.   First, as noted in Part III of this Confirmation Brief, the modified Plan filed substantially contemporaneously herewith narrowed the Gatekeeping Provision to apply only to the Exculpated Parties, *i.e.*, the Debtors.   Accordingly, the Gatekeeping Provision is fully consistent with *Highland II* and the U.S. Trustee Objection is rendered moot in this respect.

131.   Second, the U.S. Trustee asserts that the Injunction must be limited to parties entitled to the Exculpation (*i.e.* the Debtors), which neuters the purpose of the Injunction as an enforcement mechanism to facilitate a "fresh start" for the Debtors.[198]   The Injunction is a necessary means of enforcing the releases under the Plan.   The U.S. Trustee's assertion that the

---

[196]   Voting Report, Ex. H.

[197]   U.S. Trustee Obj. ¶¶ 54–67.

[198]   *Id.* ¶ 56.

Court does not have authority to impose an injunction to enforce even a consensual Third-Party Release is nonsensical.[199]  For this reason, this Court has confirmed plans with substantially similar injunctions when enforcing consensual third-party releases.[200]  Moreover, nothing in *Highland II* indicates that the Fifth Circuit intended to limit injunctions for consensual third-party releases.  Rather, courts following *Highland II* have found that "the [*Highland II*] holding that the injunction be narrowed to include the same parties as the exculpation clause, should not have an impact . . . where the parties entered a consensual release."[201]  Given that the Third-Party Release meets the criteria as a consensual release and the Injunction is otherwise consistent with applicable law, the Court should similarly overrule the U.S. Trustee Objection regarding the Injunction.

132.    The U.S. Trustee has not cited a single decision in this Court or the Fifth Circuit in which its argument has prevailed.  Nor could it when the U.S. Trustee Objection's asserts arguments contrary to precedential law.  The U.S. Trustee does not advance any argument as to why the result in this present case should be different than the other cases where identical arguments have failed.  Accordingly, the U.S. Trustee Objection should be overruled and should not pose any impediment to Confirmation of the Plan.

### D.    The Modified Plan Addresses the Remaining Points in the U.S. Trustee Objection

133.    The remaining points in the U.S. Trustee Objection have been addressed in the modified Plan filed substantially contemporaneously herewith.  As noted in the Response Chart,

---

[199]  *Id*. ¶ 60.

[200]  Conf. Hr'g Tr. at 32:3-4, *In re Indep. Cont. Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127]; *see also CJ Holding Co.*, 597 B.R. at 608 (collecting cases); *Camp Arrowhead*, 451 B.R. at 701–02 ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent*.").

[201]  *See Container Store* Stay Denial Order at 16.

the Debtors incorporated the language referenced in the U.S. Trustee Objection into the Confirmation Order clarifying that U.S. governmental agencies and sub-agencies or any state or local authority do not constitute Releasing Parties under the Plan, and their police and regulatory powers are not impaired or affected by the Plan Documents.[202]  Further, the Debtors revised the Plan to remove the request to waive the 14-day stay under Bankruptcy Rule 3020(e) and revised the Confirmation Order to clarify that the order shall not constitute a waiver of the stay under Bankruptcy Rule 3020(e).[203]

## **CONCLUSION**

134.    For all of the reasons set forth herein and in the Supporting Declarations, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court finally approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Confirmation Order and granting such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

---

[202]   U.S. Trustee Obj. ¶ 69.

[203]   *Id.* ¶¶ 70–72.

Dated: April 15, 2025                    Respectfully submitted,

                                          */s/ John F. Higgins*
                                          **PORTER HEDGES LLP**
                                          John F. Higgins (TX Bar No. 09597500)
                                          Eric M. English (TX Bar No. 24062714)
                                          M. Shane Johnson (TX Bar No. 24083263)
                                          James A. Keefe (TX Bar No. 24122842)
                                          Jack M. Eiband (TX Bar No. 24135185)
                                          1000 Main St., 36th Floor
                                          Houston, Texas 77002
                                          Telephone:    (713) 226-6000
                                          Facsimile:    (713) 226-6248
                                          Email:        jhiggins@porterhedges.com
                                                        eenglish@porterhedges.com
                                                        sjohnson@porterhedges.com
                                                        jkeefe@porterhedges.com
                                                        jeiband@porterhedges.com

                                          - and -

                                          **PAUL, WEISS, RIFKIND, WHARTON &
                                          GARRISON LLP**
                                          Paul M. Basta (admitted *pro hac vice*)
                                          John T. Weber (admitted *pro hac vice*)
                                          Shafaq Hasan (admitted *pro hac vice*)
                                          Martin J. Salvucci (admitted *pro hac vice*)
                                          1285 Avenue of the Americas
                                          New York, New York 10019
                                          Telephone:    (212) 373-3000
                                          Facsimile:    (212) 757-3990
                                          Email:        pbasta@paulweiss.com
                                                        jweber@paulweiss.com
                                                        shasan@paulweiss.com
                                                        msalvucci@paulweiss.com

                                          *Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on April 15, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*  

John F. Higgins

**<u>Exhibit A</u>**

**Response Chart**

## Summary Chart of Informal Comments and Objections

| Objector | Resolved / Unresolved | Summary of Comment or Objection | Debtors' Response |
|---|---|---|---|
| **I.** | | INFORMAL COMMENTS WITH RESPECT TO THE PLAN AND CONFIRMATION | |
| **Rackspace US, Inc.** ("<u>Rackspace</u>") | Resolved | Rackspace proposed language to clarify that the rights, claims, and interests under certain agreements by and among Rackspace, the Debtors, and RingCentral, Inc. (collectively, the "<u>Rackspace Agreement</u>") shall not be affected, limited, or prejudiced by the Plan, the Restructuring Transactions contemplated thereunder, or the Confirmation Order, including any dispute arising from the purported prepetition assignment of the Rackspace Agreement to RingCentral, Inc., and that Rackspace would not be considered a Releasing Party or Released Party under the Plan. | The Debtors resolved this comment by including certain language in the Confirmation Order. *See* Confirmation Order ¶ 130. |
| **U.K. Pension Trustee** | Resolved | Counsel for the U.K. Pension Trustee proposed comments to clarify that (a) the Debtors and the Reorganized Debtors shall not take any action to cancel, release, extinguish, or otherwise impair the Mitel Networks Limited Family Security Plan, and (b) Article III of the Plan does not otherwise affect the rights under the Mitel Networks Limited Family Security Plan. | The Debtors resolved this comment by including certain language in the Confirmation Order. *See* Confirmation Order ¶ 96. |
| **Pension Benefit Guaranty Corporation** (the "<u>PBGC</u>") | Resolved | The PBGC proposed language to clarify that the Plan, the Confirmation Order, and section 1141 of the Bankruptcy Code shall not be construed to discharge, release, or relieve any party from liability or responsibility with respect to the Unify Inc. pension plan. | The Debtors resolved this comment by including certain language in the Confirmation Order. *See* Confirmation Order ¶ 97. |
| **The Texas Taxing Authorities**[204] | Resolved | The Texas Taxing Authorities proposed language to clarify that (a) the Texas Taxing Authorities shall be entitled to retain any applicable liens in accordance with the Texas Property Tax Code | The Debtors resolved this comment by including certain language in the Confirmation Order. *See* Confirmation Order ¶ 128. |

---

[204]   As used herein, the term "<u>Texas Taxing Authorities</u>" shall mean Bexar County, City of Carrollton, Dallas County, City of El Paso, Fort Bend County, Harris

| Objector | Resolved / Unresolved | Summary of Comment or Objection | Debtors' Response |
|---|---|---|---|
| | | with respect to any Claims of the Texas Taxing Authorities until such Claims are paid in full (the "<u>Tax Claims</u>"), and (b) the Tax Claims shall include all accrued interest properly charged under applicable nonbankruptcy law and the Bankruptcy Code; *provided*, that the Debtors' defenses and rights with respect to such Tax Claims shall be fully preserved. | |
| **BOF FL Fountain Square LLC** ("<u>Fountain Square</u>") | Resolved | Fountain Square proposed language (a) clarifying that the Debtors shall remain liable for their obligations under the lease with Fountain Square and (b) preserving all parties' rights and interests under the lease and applicable nonbankruptcy law, including with respect to Cure Claims. | The Debtors resolved this comment by including certain language in the Confirmation Order. *See* Confirmation Order ¶ 131. |
| **The U.S. Trustee** | Resolved | The U.S. Trustee requested that the Debtors conform the Plan's "Gatekeeping Provision" in Article VIII.F to the Fifth Circuit's recent decision in *Highland II* such that the parties subject to the Gatekeeping Provision are limited to the Exculpated Parties. | The Debtors resolved this comment in the modified Plan by revising the "Gatekeeping Provision" in Article VIII.F to limit the provision to the Debtors and Exculpated Parties only. *See* Plan Art. VIII.F. |
| | Resolved | The U.S. Trustee requested clarification that the definition of "Released Parties" is narrowly tailored to only include parties that were provided opportunity and notice to opt out of the releases in Article VIII of the Plan. | The Debtors resolved this comment in the modified Plan by revising the definition of "Released Parties." *See* Plan Art. I. A.184. |
| | Resolved | The U.S. Trustee requested that the Debtors carve out Claims arising out of willful misconduct, gross negligence, and actual fraud from the Debtor Release and the Third-Party Release. | The Debtors resolved this comment by revising Articles VIII.C and D of the modified Plan. *See* Plan Art. VIII. C and D. |

County Emergency Service District #48, Hood CAD, City of Houston (for those accounts collected by Linebarger), Houston Community College System, Houston Independent School District, Katy Independent School District, Lewisville Independent School District, Lone Star College System, Montgomery County, City of Richardson, Tarrant County, Bowie CAD, Brazos County, Comal County, Denton County, Guadalupe County, Williamson County, Plano Independent School District, Fort Bend Independent School District, Fort Bend County Levee Improvement District #2, West Memorial Municipal Utility District, City of Houston (for those accounts collected by Perdue), La Porte Independent School District, and Brazoria County, et al.

| Objector | Resolved / Unresolved | Summary of Comment or Objection | Debtors' Response |
|---|---|---|---|
| **II.** | **FILED OBJECTIONS TO THE PLAN AND CONFIRMATION** | | |
| **The U.S. Trustee** | Unresolved | The U.S. Trustee objects in Docket No. 229 to the inclusion of an opt-out mechanism to the Third-Party Release in the Plan because the U.S. Trustee argues that it provides a non-consensual release that is inconsistent with *Purdue* and that nonbankruptcy law requires that there be affirmative indication of consent given by the parties to be affected by the release. Further, the U.S. Trustee argues that the permanent injunction in Article VIII.F must be limited to only the Exculpated Parties because the Court cannot enforce the Third-Party Release by barring claims against non-debtors under *Purdue* and *Highland II*. | The Debtors address the U.S. Trustee Objection in this Confirmation Brief at ¶¶ 122-133, *supra*. <br><br> The opt-out mechanism for the Third-Party Release in the Plan is consistent with Fifth Circuit precedent for consensual third-party releases.  Holders were provided sufficient notice and opportunity to opt out of the releases in the Plan through the Disclosure Statement, instructions on the Ballots, the Combined Notice, the Notice of Non-Voting Status, and the Publication Notice.  The release provisions were also included in these materials in clear, conspicuous, and bold-face type.  Further, as reflected in the Voting Report, the Solicitation Agent received 11 opt-out elections with respect to the Third-Party Release, further indicating that parties entitled to opt out understood the opt-out option and had adequate notice and opportunity to exercise it. <br><br> The permanent injunction in Article VIII.F of the Plan is a necessary provision for implementing the Restructuring Transactions under the Plan.  Nothing in *Highland II* or *Purdue* limits the application of an injunction for a consensual third-party release to non-debtors.  Rather, courts following *Highland II* have found that *Highland II*'s holding that the injunction be narrowed to the exculpation parties is not applicable where the parties enter into a consensual third-party release, as in the present case. |

| Objector | Resolved / Unresolved | Summary of Comment or Objection | Debtors' Response |
|---|---|---|---|
| **III.**    OTHER FILED OBJECTIONS | | | |
| **Ingate Systems A.B. and Ingate Inc.** ("Ingate") | Resolved | Ingate proposed language that (a) the Plan Documents shall not impair, reduce, amend, or waive the rights, obligations, claims, and defenses of Ingate under that certain OEM Agreement, entered into as of May 20, 2008 (as amended, restated, amended and restated, or otherwise modified from time to time, the "OEM Agreement"), (b) any Cure Amounts shall be resolved in accordance with the Plan, and (c) preserves all rights with respect to the determination of the executory nature of the OEM Agreement. | The Debtors resolved this objection by including certain language in the Confirmation Order. *See* Confirmation Order ¶ 132. |